COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                                    SUPERIOR COURT

|  |  |
|---|---|
| OMNI DEVELOPMENT<br>    CORPORATION, | : |
| Plaintiff, | : |
| v. | : |
| CONNOLLY AND PARTNERS, LLC,<br>FHRC MANAGEMENT CORPORATION,<br>FIRST HARTFORD CORPORATION, and<br>NEIL H. ELLIS, | : |
| Defendants, | : |
| and | : |
| ROCKVILLE BANK, | : |
| Reach and Apply<br>Defendant, | : |
| ROCKLAND TRUST,<br>BANK OF AMERICA, N.A.,<br>RBS CITIZENS BANK,<br>SOVEREIGN BANK,<br>FIDELITY MANAGEMENT AND<br>    RESEARCH COMPANY,<br>WAINWRIGHT BANK & TRUST<br>    COMPANY,<br>EASTERN BANK, and<br>MECHANICS COOPERATIVE BANK, | : |
| Trustee Defendants. | : |

CIVIL ACTION NO.  10-4487D

**MEMORANDUM IN SUPPORT OF MOTION OF OMNI DEVELOPMENT
CORPORATION FOR TRUSTEE PROCESS ATTACHMENTS, GENERAL
WRIT OF ATTACHMENT, AND TEMPORARY RESTRAINING ORDER**

## I.     Introduction

Plaintiff Omni Development Corporation ("Omni") submits this memorandum in support of its Emergency Motion for Trustee Process Attachments, General Writ of Attachment and a Temporary Restraining Order to prevent Defendants Connolly and Partners, LLC ("Connolly"), FHRC Management Corporation ("FHRC"), First Hartford Corporation ("First Hartford")  and Neil H. Ellis ("Mr. Ellis") (collectively referred to as the "Defendants") from dissipating and concealing their assets to destroy the ability of Omni to satisfy the judgment it is likely to obtain in this action.

## II.     Statement of Facts

Omni is a not-for-profit community planning and development corporation whose mission is to revitalize neighborhoods through the development of residential and commercial real estate to provide the highest quality of affordable housing.  Verified Complaint ("Complt."), ¶ 17.  For more than twenty (20) years, Omni has successfully helped local cities, towns, community action groups, and housing agencies to develop and rehabilitate sorely needed affordable housing for economically disadvantaged individuals, families of low to moderate incomes, the elderly and the disabled.  *Id.*

In order to rehabilitate and develop affordable housing in Rockland, Massachusetts, Omni, Connolly and other entities formed Rockland Place Apartments Limited Partnership (the "Partnership").  Complt., ¶ 18, Exhibit ("Ex.") A.  The Partnership was formed to acquire, rehabilitate, develop, improve, maintain, own, operate, lease, dispose of and otherwise deal with an apartment project located in Rockland, Massachusetts, known as the Spring Gate Apartments (the "Project").  Complt., ¶ 19.

Omni and Connolly entered into an agreement to become Rockland Place Developers LLC to develop and perform certain services with respect to the Project. Complt., ¶ 21. Omni and Connolly entered into the Rockland Place Developers LLC Operating Agreement on or about July 17, 2006. Complt., ¶ 22, Ex. B. Approximately one month later, Rockland Place Developers LLC, comprised of Omni and Connolly, and the Partnership entered into an Amended and Restated Development Agreement (the "Development Agreement"). Complt., ¶ 23, Ex. C. Section 6 of the Development Agreement provides that the developer, Rockland Place Developers LLC, comprised of Omni and Connolly, shall receive a fee of $1,663,945.00, as a development fee. Complt., ¶24. Section 6.2 of the Operating Agreement provides that Rockland Place Developers LLC shall distribute operating cash flow to the members, Omni and Connolly, in proportion to their respective Percentage Interests which are fifty percent (50%) each. Complt., ¶ 25.

In order to provide funding for the Project, Rockland Place Apartments, LLC, Defendant First Hartford, Omni, and Omni Rockland Development Corporation entered into a Funding Agreement. Complt., ¶ 26, Ex. D. The Funding Agreement specifies exactly how the Project is to be funded and if and when funding sources are to be repaid out of which sources of income. Complt., ¶ 27. For example: "In no event will overhead costs of Rockland [Place Apartments, LLC], First Hartford, Connolly and Partners, Omni Development [Omni], Omni Rockland [Development Corporation], or their nominees be reimbursed to them from partnership funds or funds otherwise available for the payment of development fees." Complt., ¶ 27, Ex. D, p. 3.

Pursuant to the Funding Agreement, Defendants First Hartford and Connolly, the

Manager of Rockland Place Apartments, LLC promised that the:

> [Rockland Place Apartments Limited] Partnership and
> Rockland Place Developers LLC agree to not engage any
> non-routine consultants post closing for which a
> contribution is required of Omni Development [Omni] or
> Omni Rockland [Development Corporation] or for which
> payment will affect the funds otherwise due and payable to
> Rockland Place Developers LLC without the prior written
> approval of Omni Rockland [Development Corporation] or
> Omni Development [Omni]. Rockland [Place Apartments,
> LLC] further agrees to provide Omni Development [Omni]
> and/or Omni Rockland [Development Corporation] with a
> copy of the annual [Rockland Place Apartment Limited]
> Partnership audited financial statements and tax returns,
> and will provide for the signature of Omni Development
> [Omni] on all Rockland Place Developers LLC checks, and
> will, on a timely basis, provide copies of any legal notices
> received by the [Rockland Place Apartment Limited]
> Partnership from time to time. Any funds received by
> Rockland Place Developers LLC will be disbursed on a
> timely basis to the members without holdback.

Complt., ¶ 28, Ex. D, pp. 4-5. The avowed intent of the Funding Agreement was to

assure that neither Omni nor Omni Development Corporation would be required to

advance any monies to develop the Project and to secure the return of the one-half

development fee to Omni agreed upon in the Operating Agreement. Complt., ¶29, Ex. D,

¶ 8.

In order to secure the necessary approvals and funding for the Project, Defendant

First Hartford, by Defendant Mr. Ellis, signed a Guaranty Agreement unconditionally and

irrevocably guaranteeing payment and advancement of all funds and every obligation of

Rockland Place Apartments, LLC and Omni Rockland Development Corporation, as well

as Rockland Place Developers LLC. Complt., ¶ 30, Ex. E.

In contravention of their promises in the Funding Agreement, Defendants failed to provide Omni with a copy of the annual Rockland Place Apartments Limited Partnership tax returns or audited financial statements on a timely basis; such documents were only provided after Omni requested them numerous times. Complt., ¶ 31. Despite Omni's repeated requests, the Defendants have failed and refused to provide an accurate accounting of the post-closing costs they have incurred without Omni's approval. *Id.* The Defendants have refused to provide all Rockland Place Developers LLC checks for Omni's signature. *Id.* In flagrant disregard of both the spirit and the letter of the Agreements, the Defendants have used the entirety of the development fee as their own – spending it as they wished without prior approval by or accountability to Omni. Complt., ¶ 32.

Omni has repeatedly requested both an accounting and the payment of the portion of the one-half of the development fee to Omni that it is due minus the small number of expenses that Omni has approved, but the Defendants have steadfastly failed and refused to pay the development fee to Omni breaching the Agreements and their duties to Omni and causing Omni great damage and harm. Complt., ¶ 33.

This misconduct by Defendants has precluded Omni from using the funds to develop other projects which are in need. Complt., ¶ 37. The Defendants have no contractual or other right to retain the entire development fee. Complt., ¶ 36. The Defendants should be enjoined and restrained from dissipating the funds owed to Omni.

Defendants could not obtain the funding necessary for the Project without the participation of a partner like Omni. Complt., ¶ 51. Mr. Ellis, with the knowledge and active participation of the other Defendants, devised a plan and scheme, unbeknownst to

Omni, whereby they would agree to develop the Project with Omni at the outset to obtain all of the necessary government and funding approvals, then Mr. Ellis and Defendants would manage the Project and all funds diverting them for themselves and not paying Omni the development fee owed. Complt., ¶ 52. Mr. Ellis and the other Defendants fraudulently induced Omni to enter into the Agreements in order to further this scheme. Complt., ¶ 53.

Defendants have a history with partners in other development ventures of obtaining development fees and failing to pay their development partners their share, then dissipating the fees and claiming that they have no funds left to pay what the partners are owed. Complt., ¶ 57. If Defendants follow their prior pattern of conduct, Omni will have no way to satisfy the judgment it is likely to obtain against the Defendants in this action. Complt., ¶ 58. Through the pleadings, motion and documents, Omni has shown that it has a clear likelihood of success upon the merits of its claims. Based upon Defendants' defaults and their failing and refusing to pay the debt owed to Omni, it is clear that Omni must seek prejudgment relief to secure the ability to collect upon the judgment it will obtain in this action.

Omni is seeking the requested trustee process and attachments to secure at least part of the judgment Omni is likely to obtain. Similarly, Omni is seeking a temporary restraining order immediately restraining the transfer of assets and funds that otherwise would be available to satisfy at least part of a judgment in this action. To date, Omni has suffered damages that it is entitled to recover under the Agreements of $716,000, together with interest and costs. Complt., ¶ 35. The attachments sought and restraining order requested are limited to this amount.

6

### III.   Argument

#### A.   Immediate Prejudgment Relief Is Necessary to Protect the Judgment Omni Will Obtain in This Action.

In order to obtain injunctive relief, Omni must show:

(1)   a likelihood of success on the merits;

(2)   the danger of immediate and irreparable harm absent such relief; and

(3)   a balancing of the equities favors the issuance of prejudgment relief.

M.C. Gilleran, "Prejudgment Security Devices:  Attachment, Trustee Process and Reach and Apply," 69 Mass. L. Rev. 156, 170 (Winter, 1984); *Packaging Industries Group, Inc. v. Cheney*, 308 Mass. 609, 616-618, 405 N.E. 2d 106, 111-112 (1980).  Omni has shown that it is likely to prevail on the merits, since Defendants have defaulted upon their debt obligations under the Agreements.

Without attachments and injunctive relief, Omni will suffer immediate and irreparable harm, since Defendants will be unable to satisfy the judgment obtained in this action.  Finally, balancing the equities favors granting the attachments and injunctive relief sought by Omni, since such an Order would preserve the *status quo* until the Court has adjudicated the parties' rights and obligations.

In a similar case, a bank loaned the defendants approximately $3,300,000.00. *Fleet National Bank v. Rapid Processing Company, Inc.*, 643 F. Supp. 1065 (D. Mass. 1986).  After the defendants defaulted upon their debt obligations under the loan agreement and a standstill agreement, the bank commenced litigation and obtained an

injunction restraining defendants from disposing of or otherwise alienating their property.

In granting the injunction, the trial court found that:

> [w]here an action for damages would be inadequate because the defendant is insolvent or its assets are in danger of depletion and dissipation, however, a preliminary injunction may be appropriate. *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986). The court in *Teradyne* noted that the United States Supreme Court in *Deckert v. Independent Shares Corporation*, 311 U.S. 282, 61 S. Ct. 229, 885 L. Ed. 189 (1940) held that a preliminary injunction, designed to freeze the status quo and protect the damages remedy, is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment. *Teradyne*, 797 F.2d at 52. Thus, a preliminary injunction may be granted when it is necessary to protect the damages remedy. *Teradyne*, at 53.

*Fleet National Bank, supra* at 1066.

Similarly, in *Boston Athletic Association v. International Marathons, Inc.*, 392 Mass. 359, 467 N.E.2d 58 (1984), the plaintiff challenged the validity of a contract with a defendant making the defendant the sole promoter of the Boston Marathon. The plaintiff obtained an injunction preventing the defendant from disbursing the funds generated by the contract until the merits of the claim could be decided. The court found that if it did not issue an injunction, the defendant would disburse or dispose of the funds prior to judgment to the detriment and prejudice of the plaintiff. On the other hand, if the injunction was granted, defendant's only harm was loss of use of the funds. Therefore, the court found that the risk to the plaintiff was far greater than the risk to the defendant, since if the defendant ultimately prevailed on the merits, it could be compensated for its loss of use of the money by an interest payment.

In the present case, it is clear that attachments and an injunction are necessary to protect the damages remedy and to preserve Omni's right to its portion of the

development fee. Following the court's reasoning in *Fleet National Bank* and *Boston Athletic Association*, this Court should issue attachments and an emergency temporary restraining order and, after a hearing, a preliminary injunction, restraining Defendants and anyone acting in concert with each or any of them from transferring any funds for any purpose up to the amount of $716,000; and restraining Reach and Apply Defendant Rockville Bank from transferring any goods, effects or credits of Defendants up to the amount of $716,000; until further order of the Court.

Mass. R. Civ. P. 4.1 and 4.2 permit the Court to issue trustee process attachments and a general writ of attachment to secure the recovery of a judgment in an action where a debt or damages are recoverable. A court will issue an order for an attachment if a reasonable likelihood exists that the plaintiff will recover a judgment in an amount equal to or greater than the amount of the attachment, exclusive of any liability insurance of the defendant. *See, e.g. Anderson Foreign Motors Corp. v. New England Toyota Distrib., Inc.*, 475. F. Supp. 973, 978 (D. Mass. 1979) ("the central question on the motion for approval of attachment is whether the plaintiffs are likely to prevail on the merits and obtain damages in the necessary amount"). The same standard governs the issuance of a trustee summons – a court must find the existence of a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater in value than the property subject to trustee process, exclusive of any liability insurance of the defendant. Mass. R. Civ. P. 4.2(c).

As is evident from the actions of Defendants in repeatedly failing and refusing to pay the portion of the development fee owed to Omni and Defendants' past conduct in failing to pay partners in developments their shares of development fees then

claiming they had no money to pay them, it is clear that Omni needs to obtain security for repayment of Defendants' debt obligations under the Agreements. Therefore, Omni needs a restraining order and attachments immediately against Defendants in order to preserve its ability to satisfy the judgment which it is likely to obtain in this action.

A defendant's insolvency is a standard ground for concluding that plaintiff will suffer irreparable harm if injunctive relief is not granted, which cannot be cured by an award of damages at the end of the trial. *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 596 (7th Cir. 1986). In that case, the court analyzed whether the granting of a preliminary injunction, and therefore an equitable lien, giving the plaintiff a preference over other creditors, was fair when weighed against the policies of the Bankruptcy Code. The court held:

> To use the defendant's insolvency as a reason for granting the plaintiff an injunction now rather than making him wait for damages till the end of the trial may seem to give the plaintiff a preference in the distribution of the defendant's assets and thus impose harm on third parties, the defendant's other creditors. The responsibility for assessing those harms, however, has been placed in the bankruptcy court . . . rather than the court asked to grant a preliminary injunction. Ordinarily, the bankruptcy court can, just by not granting a motion to lift the automatic stay of litigation against the bankrupt, prevent a creditor from seeking the "preference" represented by the grant of a preliminary injunction in the creditor's favor.

*Id.*

It is clear that: Omni is likely to succeed on the merits of its claims against Defendants; Omni will suffer immediate and irreparable harm if the requested relief is not granted; and balancing the equities favors the granting of injunctive relief, since it merely preserves the *status quo* and permits Omni to satisfy the judgment which it is likely to obtain against Defendants who otherwise will claim to be insolvent.

## IV.   <u>Conclusion</u>

Omni has shown that it is likely to succeed upon the merits of its claims against Defendants because Defendants have breached their obligations under the Agreements. Having failed to pay the money owed to Omni, when Defendants received the $1,663,945.00 development fee and having a history of failing to pay its development partners their share of development fees then claiming that they do not have the money to do so, Defendants are unlikely to be able to pay the judgment Omni is likely to obtain in this action.

Omni will suffer immediate and irreparable harm if Defendants are permitted to transfer and dissipate their assets so that Omni can not secure and execute upon the judgment it is likely to obtain.  Omni respectfully requests this Court to issue an immediate Order: (1) approving an attachment by trustee process of goods, effects or credits of each and any of the Defendants in the possession of each of the Trustee Process Defendants in the amount of $716,000; (2) issuing a general writ to attach all assets, including but not limited to equipment, tangible and real property, belonging to and/or in the possession of each or any of the Defendants up to the amount of $716,000; (3) issuing

a temporary restraining order enjoining Reach and Apply Defendant Rockville Bank, to

the extent it is holding goods, effects or credits of any of the Defendants from transferring

any such monies, funds or assets for any purpose up to the amount of $716,000, until

further order of the Court; and (4) issuing a temporary restraining order enjoining

Defendants and any one acting in concert with each or any of them from transferring any

funds for any purpose up to the amount of $716,000 until further order of the Court.


Respectfully submitted,


Pamela E. Berman (BBO #551806)
ADLER POLLOCK & SHEEHAN P.C.
175 Federal Street, 10th Floor
Boston, MA 02110
Tel:  (617) 603-0552
Fax: (617) 482-0604
E-Mail: pberman@apslaw.com

Dated: November 17, 2010                *Attorneys for Plaintiff*
                                        *Omni Development Corporation*

*491648_1.doc*

A TRUE COPY ATTEST
PROCESS SERVER
MICHAEL WALTON

12

# EXHIBIT A

ROCKLAND PLACE APARTMENTS LIMITED PARTNERSHIP

FIRST AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP

Dated as of November 1, 2006

f:3915778_v6

ROCKLAND PLACE APARTMENTS LIMITED PARTNERSHIP

FIRST AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP

Preliminary Statement

Rockland Place Apartments Limited Partnership (the "Partnership") was formed as a Massachusetts limited partnership pursuant to an Agreement of Limited Partnership dated May 15, 2006 (the "Original Agreement") by and between Rockland Place Apartments, LLC, a Massachusetts limited liability company ("RPALLC"), as the Managing General Partner, and Omni Rockland Development Corporation, a Massachusetts corporation ("ORDC"), as an additional general partner (collectively, the "General Partner") and RPALLC, as the original limited partner (the "Original Limited Partner"), and a Certificate of Limited Partnership (the "Certificate") filed in the Filing Office on May 16, 2006.

The parties desire to amend and restate the Original Agreement to (i) provide for the withdrawal from the Partnership of the Original Limited Partner in its capacity as a limited partner of the Partnership, (ii) provide for the admission of BOSTON CAPITAL CORPORATE TAX CREDIT FUND XXV, A LIMITED PARTNERSHIP, a Massachusetts limited partnership ("Fund 25") and BOSTON CAPITAL CORPORATE TAX CREDIT FUND XXVI, A Limited Partnership, a Massachusetts limited partnership ("Fund 26") (collectively, "BCCTCF"), each as a Investment Limited Partner, (iii) provide for the admission of BCCC, INC., a Massachusetts corporation ("BCCC"), as the Special Limited Partner, and (iv) more fully set forth the rights and obligations of the Partners.

In consideration of the mutual agreements set forth herein, it is agreed and certified, and the Original Agreement is hereby amended and restated in its entirety as follows:

## ARTICLE I
### Defined Terms

The defined terms used in the Agreement shall have the meanings specified below:

"Act" means the Revised Uniform Limited Partnership Act as in effect in the State.

"Actual Credit" means, with respect to a particular Fiscal Year, the total amount of Tax Credit properly allocable by the Partnership to the Investment Limited Partner for such Fiscal Year. The Actual Credit shall be retroactively revised if the amount of Tax Credit properly allocable to the Investment Limited Partner is revised as the result of an audit or is recaptured.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provisions of this Agreement or is deemed to

#3915778_v6

be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), respectively; and

    (ii)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

    "Admission Date" means the first date on which all parties hereto shall have executed this Agreement.

    "Adverse Consequences" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

    "Affiliate" means as to a specified Person, (i) such Person; (ii) each member of the Immediate Family of such Person; (iii) each legal representative, successor or assignee of any Person referred to in the preceding clauses (i) or (ii); (iv) each trustee of a trust for the benefit of any Person referred to in the preceding clauses (i) or (ii); or (v) any other Person (a) who directly or indirectly controls, is controlled by, or is under common control with such Person, (b) who is an officer of, director of, partner in or trustee of, or serves in a similar capacity with respect to, such Person or of which such Person is an officer, director, partner or trustee, or with respect to which such Person serves in a similar capacity, (c) who, directly or indirectly, is the beneficial owner of ten percent (10%) or more of any class of equity securities of such Person or of which such Person is directly or indirectly the owner of ten percent (10%) or more of any class of equity securities, (d) who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the voting securities or beneficial interests of any Person referred to in the foregoing clauses (v) (b) or (v) (c), or (e) who, whatever such Person's title, performs functions for such Person or any Affiliate of such Person similar to a Chairman or member of the Board of Directors, or executive officer such as the President, Executive Vice President or Senior Vice President, Corporate Secretary, or Treasurer, or any Person holding a five percent (5%) or more equity interest in such Person, or any Person having the power to direct or cause the direction of such Person whether through the ownership of voting securities, by contract or otherwise. An Affiliate of any Investment Limited Partner or of any Investment General Partner does not include an employee of a Person or a Person who is a partner in a Partnership or joint venture with any Investment Limited Partner or any other Affiliate of any Investment Limited Partner if such Person is not otherwise an Affiliate of any Investment Limited Partner or any Investment General Partner. For purposes of this definition, the term Affiliate shall not be deemed to include any law firm (or member or associate or employee thereof) providing legal services to any Investment Limited Partner, any Investment General Partner, the General Partner or any Affiliate of any of them.

"AFR" means the "applicable federal rate" as defined and determined in the manner set forth in Section 1274 of the Code.

"Agency" means the Credit Agency or any other Governmental Authority with jurisdiction over the Apartment Complex, or the business and operations of the Partnership.

"Agreement" means this First Amended and Restated Agreement of Limited Partnership, including Schedule A, as amended from time to time.

"Allocation Regulations" means the Treasury Regulations issued under Sections 704(b) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

"Apartment Complex" means the real property located in Rockland, Plymouth County, Massachusetts, as more fully described in Exhibit A attached hereto, together with (i) all buildings and other improvements constructed or to be constructed thereon and (ii) all furnishings, equipment and personal property located thereon or otherwise covered by the Mortgages.

"Applicable Percentage" has the meaning set forth in Section 42(b) of the Code.

"Applied Amounts" shall have the meaning set forth in Section 6.10.

"Asset Management Fee" means the fee payable to BCCTCF or an Affiliate thereof pursuant to the provisions of Section 6.12(b).

"Assignee" shall have the meaning set forth in Section 4.1(c).

"Auditors" means the Reznick Group, or such other firm of independent certified public accountants, which accountants must be registered with the Public Company Accounting Oversight Board, as may be engaged by the General Partner with the Consent of the Special Limited Partner for the purposes of preparing the Partnership's income tax returns, auditing the books and records of the Partnership and certifying financial reports of the Partnership.

"BCCC" means BCCC, Inc., a Massachusetts corporation, and its successors and assigns.

"BCCTCF" means collectively, Fund 25 and Fund 26, and their successors and assigns.

"Best Knowledge" shall mean and include, in the case of a specified Person, (i) actual knowledge and (ii) that knowledge which a prudent businessperson (including, in the case of an Entity, the general or managing partners, officers, directors and key employees of such Entity) should have obtained in the management of his or her business affairs after making due inquiry and exercising due diligence with respect thereto. In connection therewith, the knowledge (both actual and constructive) of any general or managing partner, director, officer or key employee of an Entity shall be deemed to be the knowledge of the Entity.

"Bridge Loans" means the Primary Bridge Loan and the Development Fee Bridge Loan.

"Capital Account" has the meaning set forth in Section 4.1(b).

"Capital Contribution" means the total value of cash or property contributed and agreed to be contributed to the Partnership by each Partner, as set forth in Schedule A. Any reference in this Agreement to the Capital Contribution of a then Partner shall include a Capital Contribution previously made by any prior Partner for the Interest of such then Partner.

"Capital Proceeds" means the proceeds of a Capital Transaction.

"Capital Transaction" means a refinancing of any Partnership indebtedness or a sale, exchange, eminent domain taking, damage or destruction (whether insured or uninsured), insured title defect or other disposition of all or any portion of the Apartment Complex (other than an event generating proceeds of any business or rental interruption insurance), but excluding the payment of Capital Contributions.

"Carryover Allocation" means a valid and enforceable carryover allocation for 2006 Tax Credits issued by the Credit Agency to the Partnership in the amount of not less than $991,000 of Tax Credits.

"Carryover Certification" means the issuance, in a form and in substance satisfactory to the Special Limited Partner, of the certification of the Auditors and all supporting documentation that, with respect to the carryover allocation of 2006 Tax Credits, as of a date no later than the last to occur of December 31, 2006 or six months after the date of such carryover allocation, the Partnership had incurred capitalizable costs with respect to the Apartment Complex of at least ten per cent (10%) of the Partnership's reasonably expected basis in the Apartment Complex as of December 31, 2008, so that each building in the Apartment Complex constitutes a "qualified building" for the purposes of Section 42(h)(1)(E)(ii) of the Code.

"Cash Available for Debt Service Requirements" for any period, means the excess of (i) all cash actually received by the Partnership on a cash basis from normal operations during such period, but specifically excluding the proceeds of insurance (other than business or rental interruption insurance), loans, Capital Transactions or Capital Contributions over (ii) all cash requirements of the Partnership properly allocable to such period of time on an accrual basis (not including distributions to Partners out of Cash Flow of the Partnership or fees payable from Cash Flow) and, on an annualized basis, all projected expenditures, including those of a seasonal nature, which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation as determined by the Auditors but specifically excluding Debt Service Requirements. For purposes of this definition, (i) cash requirements of the Partnership shall include to the extent not otherwise covered above, full funding of reserves (including, without limitation, funding of the Replacement Reserve), normal repairs, real estate taxes at fully assessed levels assuming a fully improved property and necessary capital improvements and (ii) if free rent or other rental concessions shall have been granted to tenants, the calculation of rental revenues under clause (i) of the preceding sentence shall be adjusted so that the effect of such concessions is amortized equally over the term of all leases (excluding renewal periods) to which it applies.

"Cash Expenditures" means all disbursements of cash during a specified Fiscal Year (other than distributions to Partners), including, without limitation, payment of operating expenses, payment of principal and interest on any Partnership indebtedness (other than payments of principal and interest on any Subordinated Loans, Voluntary Loans, Bridge Loans or any Mortgage Loans made to the Partnership the debt service on which is payable solely from Cash Flow), the cost of repairs to the Apartment Complex, amounts allocated to reserves by the General Partner and the payment of any fees other than the Asset Management Fee, the Partnership Management Fee, the Incentive Management Fee and the Development Fee. In addition, except for a net increase resulting from interest earnings, the net increase during such Fiscal Year in any escrow account or reserve maintained by or for the Partnership shall be considered a Cash Expenditure during such Fiscal Year. The term Cash Expenditures shall not include Development Costs. Cash Expenditures payable to Partners or Affiliates of Partners shall be paid after Cash Expenditures payable to third parties.

"Cash Flow" means the excess of Cash Receipts over Cash Expenditures. Cash Flow shall be determined separately for each Fiscal Year or portion thereof.

"Cash Receipts" means all cash receipts of the Partnership from whatever source derived other than from a Capital Transaction, including, without limitation, rental revenues and government subsidy payments. In addition, the net reduction in any Fiscal Year in the amounts of any escrow account or reserve maintained by or for the Partnership (including, without limitation, the Operating Reserve and the Replacement Reserve) shall be considered a cash receipt of the Partnership for such Fiscal Year. Notwithstanding the foregoing, at the election of the General Partner, Cash Receipts received near the end of a Fiscal Year and intended for use in meeting the Partnership's obligations (including the cost of acquiring assets or paying debts or expenses) in the subsequent Fiscal Year shall not be deemed to be received until such following Fiscal Year.

"Certificate" shall have the meaning set forth in the Preliminary Statement.

"City" means the City of Rockland, Massachusetts.

"Class Contribution" means the aggregate Capital Contributions of all members of a particular class of Partners (i.e., the General Partner, the Investment Limited Partner, the Special Limited Partner or any Substituted Limited Partner).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations (permanent and temporary) issued thereunder. References herein to any Code section shall include any successor provisions.

"Commencement Date" means the first day of the month in which the Admission Date occurs.

"Competitive Real Estate Commission" means that real estate or brokerage commission paid for the purchase or sale of the Apartment Complex or other Partnership property which is reasonable, customary and competitive in light of the size, type and location of the Apartment Complex or other property.

E 3915778_v6

"Completion Date" means the later of: (i) the date the Investment Limited Partner shall have received copies of all requisite certificates or permits permitting occupancy of 100% of the apartments units in the Apartment Complex as issued by each Agency having jurisdiction; provided, however, that if such certificates or permits are of a temporary nature, the Completion Date shall not be deemed to have occurred unless the General Partner certifies to the Investment Limited Partner that any work remaining to be completed is for so-called "punch list items" and the General Partner knows of no reason why permanent certificates of occupancy will not be issued upon completion of such "punch list items"; or (ii) the date as of which the Inspecting Consultant certifies that the work to be performed by the Contractor under the Construction Contract is substantially complete.   Any representation by the General Partner under this Agreement that the Completion Date has occurred shall be subject to confirmation by the Special Limited Partner pursuant to a physical inspection of the Apartment Complex; provided, however, that in the event that the Special Limited Partner does not make such physical inspection of the Apartment Complex within ten (10) business days after having received a written representation of the General Partner that the Completion Date has occurred, then the Special Limited Partner will be deemed to have waived the physical inspection requirement.

"Compliance Period" means the fifteen (15)-year period commencing with the first year of the Credit Period.

"Consent of the Investment Limited Partner" means the prior written consent or approval of each Investment Limited Partner which, unless otherwise specifically provided herein, may be given or withheld in its sole discretion.  The Consent of the Investment Limited Partner shall be exercised by and through the respective Investment General Partner, acting in the name and on behalf of such Investment Limited Partner.

"Consent of the Special Limited Partner" means the prior written consent or approval of the Special Limited Partner which, unless otherwise specifically provided herein, may be given or withheld in its sole discretion.

"Construction Contract" means the construction contract dated as of July 18, 2006, by and between the Contractor and the Partnership, as amended.

"Construction Lender" means Mass Housing or any other Lender providing construction financing for the Apartment Complex.

"Construction Loan" means the construction phase of the loan, in the maximum aggregate amount of $5,700,000 to be provided by the Construction Lender to the Partnership pursuant to the terms of the Construction Loan Documents.

"Construction Loan Agreement" means the Repairs Agreement to be entered into by and between the Construction Lender and the Partnership, as amended.

"Construction Loan Documents" means the Construction Note, the Construction Mortgage, the Construction Loan Agreement and all other documents executed and/or delivered in connection with the Construction Loan.

"Construction Mortgage" means the Mortgage securing the Partnership's obligations under the Construction Note.

"Construction Note" means the promissory note executed by the Partnership to evidence its obligations with respect to the Construction Loan, which note is or shall be secured by the Construction Mortgage.

"Construction Permitting Date" means the first date upon which the Partnership shall have received the Requisite Approvals for the commencement of the rehabilitation and operation of the Apartment Complex in accordance with the Plans and Specifications therefor.

"Contractor" means EH&N Construction Company, a Delaware corporation, and its successors.

"Contractor Pay-Off Letter" means a letter in form and substance reasonably satisfactory to the Special Limited Partner delivered by the Contractor to the Partnership which certifies that (i) all amounts due to the Contractor from the Partnership have been paid, (ii) the Partnership is not in default under the Construction Contract and (iii) the Contractor has paid in full each materialman and subcontractor who performed work on the Apartment Complex.

"Controlling Person" has the meaning set forth in Section 15 of the Securities Act of 1933, as amended.

"Consumer Price Index" means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Cost Certification" means the date upon which each Limited Partner shall have received the written certification of the Auditors, in a form and in substance satisfactory to the Special Limited Partner, as to the itemized amounts of the construction and development costs of the Apartment Complex and the Actual Credit pertaining to each building in the Apartment Complex.

"Credit Agency" means the Massachusetts Department of Housing and Community Development, and its successors.

"Credit Period" has the meaning set forth in Section 42(f)(1) of the Code.

"Credit Recovery Loan" means a constructive interest-bearing advance of the Investment Limited Partner, as more fully described in Section 5.1(g). Credit Recovery Loans and interest thereon shall not be treated as loans or interest, respectively, for accounting, tax or liability purposes or for the purposes of Section 6.2(a)(i). For the purposes of Article X, the term Credit Recovery Loan shall not include any portion of such a deemed advance which shall have theretofore been paid to the Investment Limited Partner.

"Credit Shortfall" shall have the meaning set forth in Section 5.1(g).

f:391577R_v6

"Debt Service Coverage Ratio" means, for any period with each month considered individually, a fraction, the numerator of which is the Cash Available for Debt Service Requirements with respect to such period and the denominator of which is the Debt Service Requirements for such period. The achievement by the Partnership of a specified Debt Service Coverage Ratio shall be confirmed by the Auditors and shall be subject to the approval of the Special Limited Partner, which shall not be unreasonably withheld, provided, however, that no objection by the Special Limited Partner to the determination of the Auditors shall be valid unless the General Partner is notified of such objection, and the specific reasons therefor, within seven (7) business days following the receipt by the Special Limited Partner of the Auditor's determination letter and in the event that the Special Limited Partner does not so notify the General Partner within such seven (7) business day period, the Special Limited Partner will be deemed to have waived its right to object to such determination.

"Debt Service Requirements" means for any period, all debt service, reserve, mortgage insurance premium, tax and insurance escrows and/or other cash requirements imposed with respect to the Mortgage or any other indebtedness (except for the Subordinated Loans, Bridge Loans, any Mortgage Loans made to the Partnership the debt service on which is payable solely from Cash Flow and Voluntary Loans) properly allocable to such period of time on an annualized accrual basis as determined by the Auditors. To the extent the relevant period includes any period prior to Permanent Mortgage Commencement, Debt Service Requirements for such period shall be computed by adding to the foregoing amounts the amount (if any) by which the debt service on such Permanent Loan for such period beginning after principal amortization has commenced exceeds the actual debt service on such Permanent Loan (and any previous Mortgage Loan which may have then been in place) for the relevant period.

"Deficit Restoration Obligation" means, for each Partner, the sum of (i) any amounts which such Partner is obligated to restore to the Partnership in accordance with the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h) or any other applicable provisions of the Allocation Regulations, (ii) such Partner's Share of Partnership Minimum Gain if any, and (iii) such Partner's Share of Partner Nonrecourse Debt Minimum Gain, if any.

"Defined Mortgagee" shall have the meaning set forth in Section 3.6.

"Designated Net Worth Requirements" means as of the date of determination, such standards or criteria (relating to net worth or other characteristics) as may be approved by the Special Limited Partner, provided, however, that the conditions of this definition shall be deemed to be fully satisfied if the General Partner and the Guarantors maintains at all times an aggregate net worth of not less than $1,500,000.

"Developer" means Rockland Place Developers LLC, a Massachusetts limited liability company, and its successors.

"Development Agreement" means the Amended and Restated Development Agreement, dated as of November 1, 2006, by and between the Developer and the Partnership.

"Development Costs" means any and all costs and expenses necessary to (i) cause the construction of the Apartment Complex to be completed, in a good and workmanlike manner,

free and clear of all mechanics', materialmen's or similar liens, in accordance with the Plans and Specifications, (ii) equip the Apartment Complex with all necessary and appropriate fixtures, equipment and articles of personal property (including, without limitation, refrigerators and ranges), (iii) obtain all required certificates of occupancy for the apartment units and other space in the Apartment Complex, (iv) pay the Development Fee, (v) finance the construction of the Apartment Complex and achieve Rental Achievement in accordance with the provisions of the Project Documents, (vi) discharge all Partnership liabilities and obligations arising out of any casualty generating insurance proceeds for the Partnership prior to Rental Achievement, (vii) fund any Partnership reserves required hereunder or under any of the Project Documents, (viii) repay and discharge the Construction Loan (or convert and/or pay such loan down to the permitted amount of the Permanent Loan), and (ix) pay any other costs or expenses necessary to achieve the Completion Date and Rental Achievement.

"Development Fee" means the fees and overhead payable by the Partnership to the Developer pursuant to the terms of the Development Agreement for its services in connection with the development and rehabilitation of the Apartment Complex.

"Development Fee Bridge Loan" shall have the meaning set forth in Section 3.8(a).

"Disposition" (including the forms Dispose and Disposing) means, as to a specified Partner, the assignment, sale, transfer, exchange or other disposition of all or any part of its Interest.

"Due Diligence Recommendations" means those developmental recommendations set forth on Exhibit C hereto.

"Economic Risk of Loss" has the meaning set forth in Treasury Regulation Section 1.752-2.

"Eligible Basis" has the meaning set forth in Section 42(d) of the Code.

"Entity" means any Person, general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association.

"Estoppel Letter" means an estoppel letter in form and substance reasonably satisfactory to the Special Limited Partner delivered to the Partnership from each Lender which certifies as to each Mortgage Loan (i) that there is no default ongoing pursuant to the Mortgage Loan Documents, (ii) the amounts of interest and principal paid on such Mortgage Loan to date and (iii) the outstanding principal balance of such Mortgage Loan.

"Event of Bankruptcy" means with respect to any Person.

(i)     the entry of a decree or order for relief by a court having jurisdiction in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or

Partnership.  At any and all times where there is more than one General Partner, the term General Partner shall mean such General Partners.

"Governmental Authority" means Mass Housing, HUD, the City, the Credit Agency or any other federal, state or local governmental authority having jurisdiction over the particular matter to which reference is being made.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(vi)   The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

(vii)   The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations; provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(viii)   The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(ix)   The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Allocation Regulations and Section 4.1 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent that the General Partner determines that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"GSE" means Fannie Mae and/or Federal Home Loan Mortgage Corporation, and their successors.

"Guarantors" means First Hartford Corporation, a Maine corporation and Omni Development Corporation, a Rhode Island corporation, and each of their successors.

"Guaranty" means the Guaranty, dated as of November 1, 2006, of the Guarantors of all of the obligations of the General Partner hereunder and of the Developer as set forth in the Development Agreement, as amended.

"Hazardous Material" has the collective meanings given to the terms "hazardous material", "hazardous substances", "hazardous wastes", "toxic substances" and analogous terms, in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and to the term "radioactive materials" in the context of the Atomic Energy Act, 28 U.S.C. Sec. 2344, and also includes any meanings given to such terms in any similar state or local statutes, ordinances, regulations or by-laws. The term Hazardous Material also includes oil and any other substance known to be hazardous.

"HSF Loan" means the loan of HSF funds in the aggregate amount of $500,000 to be provided by the Credit Agency to the Partnership pursuant to the terms of the HSF Loan Documents.

"HSF Loan Agreement" means the loan agreement to be entered into between the Credit Agency and the Partnership, as may be amended.

"HSF Loan Documents" means the HSF Loan Agreement, the HSF Loan Note, the HSF Loan Mortgage and all other documents to be executed by the Partnership in connection with the HSF Loan upon the Consent of the Special Limited Partner.

"HSF Loan Mortgage" means the Mortgage securing the Partnership's obligations under the HSF Loan Note.

"HSF Loan Note" means the promissory note to be executed by the Partnership to evidence its obligations with respect to the HSF Loan, which loan is secured by the HSF Loan Mortgage.

"HUD" means the U.S. Department of Housing and Urban Development, and its successors.

"Immediate Family" means with respect to any Person, such Person's spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children, children-in-law, grandchildren and grandchildren-in-law.

"Incentive Management Agreement" means the agreement by and between the Partnership and the General Partners which provides for the payment of the Incentive Management Fee.

"Incentive Management Fee" means the fee payable under the Incentive Management Agreement to the General Partners for supplemental services provided with respect to the Apartment Complex.

"Initial Adjustment Date" shall have the meaning set forth in Section 5.1(e).

"Initial Compliance Audit" shall have the meaning set forth in Section 12.7(n).

"Initial 100% Occupancy Date" means the first date on which (i) not less than 193 of the apartment units in the Apartment Complex shall have been leased to and shall have been initially physically occupied by tenants on such date meeting the terms of the Minimum Set-Aside Test under executed leases at rentals meeting the requirements of the Rent Restriction Test and (ii) not less than 90% of the 204 apartment units in the Apartment Complex are then physically occupied under executed leases with terms of not less than 12 months.

"Initial Operating Period" means the period commencing upon Cost Certification and ending on the fifth (5th) anniversary of the Completion Date.

"Inspecting Consultant" means the consultant retained by any Lender (including, without limitation, the Construction Lender) or the Partnership with the Consent of the Special Limited Partner to monitor the progress of the rehabilitation of the Apartment Complex and to certify as to the completion of such construction.

"Installment" means an installment of the Investment Limited Partner's Capital Contribution paid or payable to the Partnership pursuant to Section 5.1.

"Insurance Requirements" means the insurance which the General Partner is required to cause the Partnership to maintain during the term of the Partnership as set forth on Exhibit D hereto.

"Interest" means the entire interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which a Partner may be entitled hereunder and the obligation of such Partner to comply with the terms of this Agreement.

"Invested Amount" means (i) as to the Investment Limited Partner, an amount equal to the Capital Contribution and any loans to the Company of the Investment Limited Partner divided by 0.8553 and (ii) as to any other Partner, an amount equal to its paid-in Capital Contribution.

"Investment General Partner" means the current general partner of each Investment Limited Partner, and any other Person who may become a successor or additional general partner of such Investment Limited Partner.

"Investment Limited Partner" means collectively, Fund 25 and Fund 26, and any Person or Persons who replace it as Substituted Limited Partner. At any time when there is more than one Investment Limited Partner, the term Investment Limited Partner shall mean each of the Investment Limited Partners and each such Investment Limited Partner shall be responsible only for the obligations of and entitled only to the benefits (including, without limitation, any fees provided for herein) of the Investment Limited Partner described herein only in accordance with their Sharing Ratios.

"Investment Partnership Agreement" means the respective Agreement of Limited Partnership of each the Investment Limited Partner, as amended from time to time.

"Lender" means any Person (other than the General Partner or its Affiliates) who makes a loan to the Partnership, whether or not such loan is secured by a Mortgage, or the successors and assigns of such Person in such capacity.

"Limited Partners" means the Investment Limited Partner, the Special Limited Partner and any Substituted Limited Partner.

"Liquidating Event" shall have the meaning set forth in Section 2.4.

"Managing General Partner" means any Person designated as such pursuant to the provisions of Section 6.4.

"Management Agent" means FHRC Management Corporation, a Delaware corporation in its capacity as the initial management and rental agent for the Apartment Complex, and any successor management and rental agent designated or appointed at any time.

"Management Agreement" means the agreement between the Partnership and the Management Agent providing for the management of the Apartment Complex.

"Management Fee" means the Management Fee to which reference is made in Section 11.1.

"Mass Housing" means Massachusetts Housing Finance Agency, and its successors and assigns.

"Material Agreement" means any agreement to which the Partnership is a party or to which the Apartment Complex is subject, the termination of which would have a material adverse impact on the Apartment Complex or the business and operations of the Partnership.

"Material Event" means the occurrence of any of the following events:

(x)    a material breach by a General Partner or Guarantor (or any of their Affiliates) in the performance of any of its obligations under this Agreement, or any of the Material Agreements;

(xi)   a Terminating Event as to any General Partner or an Event of Bankruptcy as to the Partnership or any Guarantor;

(xii)  a material violation by any General Partner of its fiduciary duties as a General Partner of the Partnership;

(xiii) a violation by any General Partner of any law, regulation or order applicable to the General Partner or the Partnership which has or may have a material adverse effect on the Partnership or the Apartment Complex;

B3915778_v6

(xiv)   a material breach by the Partnership or any General Partner (or any of their respective Affiliates) under any Project Document or other material agreement or document affecting the Partnership or the Apartment Complex;

(xv)   the failure to achieve the Completion Date by December 31, 2008;

(xvi)   the failure to begin the Credit Period for all buildings in the Apartment Complex not later than calendar year 2008;

(xvii)   the commencement of foreclosure proceedings with respect to any Mortgage, which have not been withdrawn or dismissed within thirty (30) days after the date of such commencement;

(xviii)   the failure of the General Partner to make any payment required to be made to the Investment Limited Partner pursuant to the provisions of Section 5.1(e) or (f);

(xix)   the fraud, bad faith, gross negligence, or willful misconduct by a General Partner; or

(xx)   a final determination by the Tax Accountants that the Investment Limited Partner shall be allocated less than 70% of the Projected Credit during the Credit Period.

"MHFA Subordinate Loan" means that certain loan from Mass Housing assumed by the Partnership on or about the date hereof in the current amount of approximately $178,677, which loan is evidenced by a promissory note, as amended from time to time, and is secured by a subordinate Mortgage.

"Minimum Set-Aside Test" means the set aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes equal to 60% or less of area median income, as adjusted for family size.

"Mortgage" means any mortgage indebtedness of the Partnership evidenced by any Note and secured by any mortgage on the Apartment Complex from the Partnership to any Lender; and, where the context admits, the term "Mortgage" shall mean and include any of the mortgages securing said indebtedness and any other documents pertaining to said indebtedness which were required by the Lender as a condition to making such Mortgage Loan. In case any Mortgage is replaced by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages. The term "mortgage" means any mortgage, mortgage deed, deed of trust, deed to secure debt or any similar security instrument, and "foreclose" and words of like import include the exercise of a power of sale under a mortgage or comparable remedies.

"Mortgage Loan" means a loan to the Partnership made by any Lender and secured by a Mortgage.

"Mortgage Loan Documents" means the Construction Loan Documents and/or the Permanent Loan Documents, as the context may require.

"New Allocation" shall have the meaning set forth in Section 10.5(b).

"Nonrecourse Debt" or "Nonrecourse Liability" means any indebtedness for which none of the Partners has any Economic Risk of Loss other than through his or its interest in the Partnership property securing such indebtedness, as defined in Section 1.752-1(a)(2) of the Allocation Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Allocation Regulations.

"Note" means and includes any Note from the Partnership to a Lender evidencing a Mortgage Loan, and shall also mean and include any Note supplemental to said original Note issued to a Lender or any Note issued to a Lender in substitution for any such original Note.

"Operating Deficit" means, for any specified period of time, the amount by which the Cash Receipts of the Partnership are less than the amount necessary to pay all Cash Expenditures of the Partnership.

"Operating Profits or Losses" means, with respect to any Fiscal Year, the Profits or Losses of the Partnership for such Fiscal Year other than Profits or Losses from a Capital Transaction.

"Operating Reserve" shall have the meaning set forth in Section 6.5(e)(ii).

"Original Agreement" has the meaning set forth in the Preliminary Statement.

"Original Limited Partner" has the meaning set forth in the Preliminary Statement.

"Partner" means any General Partner or Limited Partner.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Allocation Regulations.

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Sections 1.704-2(i)(2) and (3) of the Allocation Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(1) of the Allocation Regulations.

"Partnership" means the limited partnership continued pursuant to this Agreement.

"Partnership Items" shall have the meaning set forth in Section 10.4(b)(xvi).

"Partnership Management Fee" shall have the meaning set forth in Section 6.12(c).

"Partnership Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Allocation Regulations.

"Payment Certificate" shall have the meaning set forth in Section 5.1(b)

"Percentage Interests" means the interests of the Partners in Profits and Losses, tax-exempt income, non-deductible, non-capitalizable expenditures and Tax Credits, as set forth in Schedule A.

"Permanent Lender" means Mass Housing, the Credit Agency, HUD, or any other Lender providing permanent financing for the Apartment Complex who has been approved by the Special Limited Partner and the General Partner, except as otherwise provided in Section 3.2.

"Permanent Loan" means any permanent loan, including without limitation, the Construction Loan after conversion to its permanent phase, the Section 236 Loan, the MHFA Subordinate Loan, the Residual Receipts Loan and the HSF Loan, provided by a Permanent Lender to the Partnership pursuant to the terms of the Permanent Loan Documents and approved by the Special Limited Partner.

"Permanent Loan Commitment Date" means the date on which the Partnership has received a commitment for permanent financing from the Permanent Lender in form and substance satisfactory to the Special Limited Partner.

"Permanent Loan Documents" means the Permanent Note, the Permanent Mortgage and all other documents executed and/or delivered in connection with the Permanent Loan.

"Permanent Mortgage" means the Mortgage securing the Partnership's obligations under the Permanent Note.

"Permanent Mortgage Commencement" means the payment and discharge of the Construction Loan (or the conversion of such loan to its permanent phase), the commencement of the amortization of each Permanent Loan and the execution and delivery of the Permanent Loan Documents.

"Permanent Note" means the Note to be executed by the Partnership to evidence its obligations with respect to the Permanent Loan, which Note shall be secured by the Permanent Mortgage.

"Person" means any individual or Entity.

"Plans and Specifications" means the plans and specifications for the rehabilitation of the Apartment Complex, including, without limitation, specifications for materials, and all properly approved amendments and modifications thereof.

"Primary Bridge Loan" shall have the meaning set forth in Section 3.8(b).

"Prime Rate" means the rate of interest announced from time to time by *The Wall Street Journal* as its base rate.

"Profits or Losses" shall have the meaning set forth in Section 10.4(b)(v).

"Project Documents" means and includes the Mortgage Loan Documents, this Agreement, the Development Agreement, the Extended Use Agreement, the Guaranty, the Incentive Management Agreement, the Management Agreement, the Purchase Option, all other instruments delivered to (or required by) any Lender and all other documents relating to the Apartment Complex and by which the Partnership is bound, as amended or supplemented from time to time.

"Projected Credit" means as to the Tax Credits, $844,775 for 2007, $990,901 per annum for each of the Fiscal Years 2008 through 2015 (inclusive), and $146,126 for 2017, provided, however, that the Projected Credit for 2017 shall be reduced by the amount, if any, by which the Actual Credit for 2007 exceeds $844,775, and provided further that upon the occurrence of any of the events described in Section 5.1(e), the Projected Credit shall thereafter be the Revised Projected Credit.

"Projected Rents" means the rents described in Exhibit B attached hereto and made a part hereof.

"Purchase Option" means that certain Purchase Option and Right of First Refusal Agreement dated as of November 1, 2006, by and among Rockland Housing Authority, the Partnership, the General Partner and the Limited Partners, as amended

"Qualified Basis" has the meaning set forth in Section 42(c) of the Code.

"Qualified Contract" has the meaning set forth in Section 3.5(a).

"Qualified Income Offset Item" means (1) an allocation of loss or deduction that, as of the end of each year, reasonably is expected to be made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Partnership, (b) pursuant to Section 706(d) of the Code as the result of a change in any Partner's Interest, or (c) pursuant to Treasury Regulation Section 1.751-1(b)(2)(ii) as the result of a distribution by the Partnership of unrealized receivables or inventory items and (2) a distribution that, as of the end of such year, reasonably is expected to be made to a Partner to the extent it exceeds offsetting increases to such Partner's Capital Account which reasonably are expected to occur during or prior to the Partnership taxable year in which such distribution reasonably is expected to occur.

"Recapture Amount" shall have the meaning set forth in Section 10.6.

"Recapture Event" shall have the meaning set forth in Section 10.6(a).

"RECD" means the Rural Economic Community and Development office of the United States Department of Agriculture.

"Reconstitution Period" shall have the meaning set forth in Section 7.2(b).

"Recourse Obligations" shall have the meaning set forth in Section 10.4(b)(i).

"Reduction Amount" shall have the meaning set forth in Section 5.1(f).

"Reduction Year" shall have the meaning set forth in Section 5.1(f).

"Regulations" means the rules and regulations applicable to the Apartment Complex or the Partnership of the Credit Agency, and any Governmental Authority having jurisdiction over the Partnership and/or the Apartment Complex.

"Related Person" means a Person related to a Partner within the meaning of Treasury Regulation Section 1.752-4(b).

"Remaining Interest" shall have the meaning set forth in Section 7.4(d).

"Rent Restriction Test" means the test pursuant to Section 42 of the Code whereby the gross rent charged to tenants of the low-income units in the Apartment Complex may not exceed thirty percent (30%) of the qualifying income levels.

"Rental Achievement" means the first time following three (3) consecutive full calendar months of operations, at least one of which months occurs after Permanent Mortgage Commencement (with each month considered individually), that the Apartment Complex generates a 1.15 to 1.00 Debt Service Coverage Ratio.

"Replacement Reserve" shall have the meaning set forth in Section 6.5(e).

"Repurchase Amount" shall have the meaning set forth in Section 5.2(a).

"Repurchase Event" shall have the meaning set forth in Section 5.2(a).

"Required Sale Notice" has the meaning set forth in Section 3.5(b).

"Requisite Approvals" means any required approvals of each Lender and Agency to an action proposed to be taken by the Partnership.

"Residual Receipts Loan" means that certain loan from HUD modified and assumed by the Partnership on or about the date hereof, in the amount of approximately $4,268,812, which loan is evidenced by a promissory note (as amended on or about the date hereof), and is secured by a mortgage. The Residual Receipts Loan was assumed in connection with the acquisition of the Apartment Complex and bears interest at 0% going forward. The parties acknowledge that the principal amount of the Residual Receipts Loan (as calculated under Section 1274 of the Code) will be excluded from the Eligible Basis of the Partnership, but will remain in the Partnership's depreciable basis of the Apartment Complex as allowed by the provisions of the Code.

"Revised Projected Credit" has the meaning set forth in Section 5.1(e).

"Schedule A" means Schedule A to this Agreement, as amended from time to time.

"Section 236 Loan" means that certain loan from Mass Housing assumed by the Partnership on or about the date hereof, in the amount of approximately $2,409,018, which loan is evidenced by a promissory note, as amended from time to time, and is secured by the Mortgage which also secures the Construction Loan.

"Service" means the Internal Revenue Service.

"Share of Partner Nonrecourse Debt Minimum Gain" means, for each Partner an amount equal to his or its "share of partner nonrecourse debt minimum gain" as determined in accordance with Section 1.704-2(i)(5) of the Allocation Regulations.

"Share of Partnership Minimum Gain" means for each Partner, an amount equal to his or its "share of partnership minimum gain" as determined in accordance with Section 1.704-2(g) of the Allocation Regulations.

"Sharing Ratio" means the percentages set forth on Schedule A which represent the division of obligations and benefits set forth herein among the Investment Limited Partners to the extent there is more than one Investment Limited Partner.

"Site" has the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to it in any similar state or local statutes, ordinances, regulations or by-laws.

"Special Limited Partner" means BCCC, and any Person who becomes a Special Limited Partner as provided herein, in its capacity as a special limited partner of the Partnership.

"Specified Proceeds" means (i) the proceeds of all Mortgage Loans, (ii) the net rental income, if any, generated by the Apartment Complex prior to Rental Achievement which is permitted by the Lenders to be applied to the payment of Development Costs, (iii) the Capital Contributions of the Limited Partners, (iv) the Capital Contributions of the General Partner in the amounts set forth in Schedule A as of the date hereof, and (v) any insurance proceeds arising out of casualties occurring prior to Rental Achievement.

"State" means the Commonwealth of Massachusetts.

"State Designation" means the date on which the Partnership receives an allocation in proper form pursuant to Section 42 of the Code from the Credit Agency of Tax Credits, as evidenced by the execution by or on behalf of the Credit Agency of one or more Form(s) 8609. For the purposes of determining State Designation, each building in the Apartment Complex shall be treated as having received an allocation of Tax Credit in an amount equal to the lesser of (i) the amount of Tax Credit set forth in the Carryover Allocation as to such building or (ii) the amount of Tax Credits set forth on the Form 8609 as to such building.

"Subordinated Loan" means any loan made by the General Partner to the Partnership pursuant to Section 6.5(e)(i), Section 6.10 or any other provision of this Agreement which specifies advances to be made as a Subordinated Loan.

"Subordinated Loan Period" shall have the meaning set forth in Section 6.10.

"Substituted Limited Partner" means any Person who is admitted to the Partnership as Limited Partner under Section 8.2 or acquires the Interest of a Limited Partner pursuant to Section 5.2.

"Syndication Expenses" means all expenditures classified as syndication expenses pursuant to Treasury Regulation Section 1.709-2(b). Syndication Expenses shall be taken into account under this Agreement at the time they would be taken into account under the Partnership's method of accounting if they were deductible expenses.

"Tax Accountants" means The Reznick Group of Bethesda, Maryland or such other firms of independent certified public accountants as may be engaged by the Special Limited Partner to review the Partnership income tax returns

"Tax Credit" means the low-income housing tax credit described in Section 42 of the Code.

"Tax Credit Set-Aside" means the date on which the Partnership receives the Carryover Allocation.

"Terminating Event" means the death or permanent disability of, or a Final Determination of insanity or incompetence as to, an individual General Partner (unless the Consent of the Special Limited Partner to a substitute General Partner is received, and such substitute General Partner is admitted to the Partnership by the first to occur of (i) the sixtieth day following such event or (ii) such earlier date as is necessary to prevent a dissolution of the Partnership under the Act), the Bankruptcy or dissolution of a General Partner, the transfer of all of its Partnership Interest by a General Partner, or the voluntary or involuntary withdrawal of the General Partner from the Partnership. For purposes of the foregoing, an individual General Partner shall be deemed to be permanently disabled if he or she becomes disabled during the term of this Agreement through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his or her duties and responsibilities hereunder for one hundred twenty (120) days during any period of three hundred sixty-five (365) consecutive calendar days. Involuntary withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law or pursuant to any terms of this Agreement. In the case of a General Partner which is an Entity, a transfer of a majority of the voting stock (or other beneficial interest) of the General Partner to a Person who is not an Affiliate of the General Partner or any Entity constituting the General Partner shall be deemed to be a transfer by the General Partner of its Partnership Interest.

"Termination Notice" has the meaning set forth in Section 3.5(a).

"Title Policy" means the owner's title insurance policy, or at the option of the Special Limited Partner an endorsement thereto, with an effective date on or after the date hereof, in the amount of not less than $22,420,521, issued by First American Title Insurance Company to the Partnership, evidencing the Partnership's ownership of the Apartment Complex subject only to such exclusions, exceptions, conditions and stipulations as may be approved by the Special Limited Partner in its sole discretion and endorsed at a minimum with a Fairway endorsement, a

non-imputation endorsement, an access endorsement, a comprehensive endorsement and a same-as-survey endorsement.

"Vessel" has the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to it in any similar state or local statutes, ordinances, regulations or by-laws.

"Voluntary Loans" shall have the meaning set forth in Article IX.

"Withdrawal" (including the forms Withdraw, Withdrawing and Withdrawn) means, as to a General Partner, the occurrence of death, adjudication of insanity or incompetence, Event of Bankruptcy, dissolution, liquidation, or voluntary or involuntary withdrawal or retirement from the Partnership for any reason, including whenever a General Partner may no longer continue as a General Partner by law or pursuant to any terms of this Agreement.  Withdrawal also shall mean the sale, assignment, transfer or encumbrance by a General Partner of its interest as a General Partner other than a pledge or assignment by a General Partner of its Interest required pursuant to the terms of the Construction Loan Documents and as approved in writing by the Special Limited Partner.  A General Partner which is a corporation, limited liability company or partnership shall be deemed to have sold, assigned, transferred or encumbered its interest as a General Partner in the event (as a result of one or more transactions) of any sale, assignment or other transfer (but specifically excluding any transfer occurring pursuant to the laws of descent and distribution) or encumbrance of a controlling interest in a corporate or limited liability company General Partner or of a general partner interest in a General Partner which is a partnership to a Person who is not an Affiliate of the General Partner.  For purposes of this definition of Withdrawal, the term "controlling interest" shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

## ARTICLE II
### Name and Business

2.1.   Name; Continuation

The name of the Partnership is "Rockland Place Apartments Limited Partnership". The Partners agree to continue the Partnership which was formed pursuant to the provisions of the Act.

2.2.   Office and Registered Agent

(a)   The principal office of the Partnership is c/o Connolly and Partners, LLC, 8 Faneuil Hall Marketplace, Boston, MA 02109, at which office there shall be maintained those records required by the Act to be kept by the Partnership. The Partnership may have such other or additional offices as the General Partner shall deem desirable. The General Partner may at any time change the location of the principal office and shall give due notice thereof to the Limited Partners, provided that doing so shall not adversely affect the Investment Limited Partner for tax purposes.

(b)   The registered agent for the Partnership in the State for service of process is as follows:

> William M. Connolly
> c/o Connolly & Partners, LLC
> 8 Faneuil Hall Marketplace
> Boston, MA 02109

2.3.   Purpose

The sole purpose of the Partnership is to acquire, hold, invest in, secure financing for, construct, rehabilitate, develop, improve, maintain, operate, lease and otherwise deal with the Apartment Complex and the Permanent Loan Documents. The Partnership shall operate the Apartment Complex in accordance with any applicable Regulations. The Partnership shall not engage in any other business or activity.

2.4.   Term and Dissolution

(a)   The Partnership shall continue in full force and effect until December 31, 2050, except that the Partnership shall be dissolved and its assets liquidated prior to such date upon the first to occur of the following events ("Liquidating Events"):

(i)   The sale or other disposition of all or substantially all of the assets of the Partnership;

(ii)   The Withdrawal of a General Partner, unless the Partnership is continued as provided in Section 7.2;

(iii)   The election to dissolve the Partnership made in writing by the General Partner with the Consent of the Investment Limited Partner and any Requisite Approvals;

(iv)   The entry of a final decree of dissolution of the Partnership by a court of competent jurisdiction; or

(v)   Any other event which causes the dissolution of the Partnership under the Act if the Partnership is not reconstituted pursuant to the provisions of Section 7.2 or Section 7.3.

(b)   Upon the dissolution of the Partnership, the General Partner (or for purposes of this paragraph, its trustees, receivers or successors) shall cause the cancellation of the Certificate and shall liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with the provisions of Section 10.3, unless the Investment Limited Partner elects to reconstitute the Partnership and continue its business as provided in Section 7.2 or 7.3, in which case the Partnership assets shall be transferred to the new Partnership as provided in such Section.   Notwithstanding the foregoing, if, during liquidation, the General Partner shall determine that an immediate sale of part or all of the Partnership's assets would be impermissible, impractical or cause undue loss to the Partners, the General Partner may defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Partnership except those necessary to satisfy Partnership debts and obligations (other than Subordinated Loans).

2.5.   Nature of Partnership Interests

No Partnership Interest hereunder shall be represented by any certificate or be considered a "security" or "investment property" for purposes of Article 8 and Article 9 of the Uniform Commercial Code of any jurisdiction.

### ARTICLE III
#### Mortgage, Refinancing and Disposition of Property

3.1.    Personal Liability

The Partnership shall be authorized to obtain the Construction Loan to finance the acquisition, development and construction of the Apartment Complex and shall secure the Construction Loan by the Construction Mortgage. The General Partner and its Affiliates, jointly and severally, are hereby authorized to incur personal liability for the repayment of funds advanced by the Construction Lender (and interest thereon) pursuant to the Construction Loan Documents. However, from and after the date of Permanent Mortgage Commencement, neither the General Partner nor any Related Person shall at any time bear, nor shall the General Partner permit any other Partner or any Related Person to bear, the Economic Risk of Loss for the payment of any portion of any Mortgage Loan unless, prior to the effectiveness of the transaction in which such Economic Risk of Loss is created or assumed, the General Partner shall have obtained, at the expense of the Partnership, an opinion from reputable tax counsel, in form and substance reasonably satisfactory to the Special Limited Partner, to the effect that such Economic Risk of Loss will not result in the reallocation of Tax Credits or Losses from any Limited Partner to the General Partner. The General Partner shall cause the Partnership to elect promptly, to the extent permitted and in the manner prescribed by any Agency or Lender having jurisdiction, that all debt service payments made by the Partnership to the holder of the Permanent Mortgage shall be applied first to interest determined at the stated rate set forth in the Permanent Note, and then to principal due with respect to the Permanent Note.

3.2.    Refinancings; Permanent Loan Documents

The Partnership may decrease, increase or refinance any Mortgage Loan and may make any required transfer or conveyance of Partnership assets for security or mortgage purposes, provided, however, prior to the end of the Compliance Period for the last building in the Apartment Complex, any such decrease, increase or refinancing of any Mortgage Loan (except for the discharge of the Construction Loan in accordance with the Construction Loan Documents and the borrowing of the original principal amount of the Permanent Loan or the conversion thereto) may be made by the General Partner only with the Consent of the Special Limited Partner which Consent shall not be unreasonably withheld or delayed. To the extent not executed as of the date hereof, the form and content of the Permanent Loan Documents shall be subject to the reasonable Consent of the Special Limited Partner.

3.3.    Sale of Assets

Except pursuant to Section 3.5 or the Purchase Option, the Partnership may sell, lease, exchange or otherwise transfer or convey all or substantially all the assets of the Partnership only with the Consent of the Special Limited Partner. Notwithstanding the foregoing and except as set forth in Section 6.2(a)(vi), no Consent of the Special Limited Partner shall be required for the execution and delivery of the Construction Loan Documents, the leasing of apartments to tenants in the normal course of operations or the leasing of all or substantially all the apartments to a public housing authority at rents satisfactory to any Agency or Lender as expressed in writing,

provided (subject to the Rent Restriction Test) that such rents are not less than the Projected Rents.

### 3.4.   Real Estate Commissions

The total compensation to all Persons for the sale of the Apartment Complex shall be limited to a Competitive Real Estate Commission, which in no event shall exceed three percent (3%) of the contract price for the sale of the Apartment Complex.

### 3.5.   Sale of the Apartment Complex

(a)     Notwithstanding any provision of this Agreement to the contrary, but subject to the Purchase Option and the laws of the State, the Special Limited Partner and/or the Investment Limited Partner shall have the right at any time after the end of the fourteenth year of the Compliance Period to require, by notice to the General Partner that the General Partner submit a written request (the "Termination Notice") to the Credit Agency to find a person to acquire the Partnership's interest in the low-income portion of the Apartment Complex pursuant to the provisions of the Extended Use Agreement and in accordance with the provisions of Section 42(h)(6) of the Code, unless the Partnership has waived its right to do so. If the General Partner shall fail to submit the Termination Notice within ten (10) days of the Special Limited Partner's request therefor, then the Special Limited Partner shall have the right at any time thereafter to submit the Termination Notice to such Credit Agency. If within one year of the Credit Agency's receipt of the Termination Notice, the Credit Agency presents a "qualified contract," as said term is defined in Section 42(h)(6)(F) of the Code (hereinafter "Qualified Contract"), for the acquisition of the Apartment Complex, then the General Partner shall cause the Partnership promptly to sell the Apartment Complex in accordance with the terms of said Qualified Contract, but in no event shall any such sale occur prior to the end of the Compliance Period without the prior written consent of the Investment Limited Partner.

(b)     Notwithstanding any provision of this Agreement to the contrary, at any time after the later of: (i) the end of the Compliance Period, or (ii) the expiration of one year after the date upon which the Termination Notice was submitted to the Credit Agency (if such notice was delivered prior to the end of the Compliance Period), or (iii) the termination of the term of the Purchase Option, the Special Limited Partner shall have the right to require, by notice to the General Partner (the "Required Sale Notice"), that the General Partner promptly use commercially reasonable efforts to obtain a buyer for the Apartment Complex on the most favorable terms then available. The General Partner shall submit the terms of any proposed sale to the Special Limited Partner and the Investment Limited Partner for their approval as provided in Section 3.5(a). If the General Partner shall fail to so obtain a buyer for the Apartment Complex within twelve (12) months of the Required Sale Notice or if the Special Limited Partner and/or the Investment Limited Partner in its/their sole discretion shall withhold its/their consent to any proposed sale to such buyer, then the Special Limited Partner shall have the right at any time thereafter to obtain a buyer for the Apartment Complex on terms most favorable then available and otherwise acceptable to the Special Limited Partner. In the event that the Special Limited Partner so obtains a buyer, it shall notify the General Partner and the Investment Limited Partner in writing with respect to the terms and conditions of the proposed sale and, provided the Investment Limited Partner approves, in its sole discretion, the terms of such sale, the General

Partner shall cause the Partnership promptly to sell the Apartment Complex to such buyer. In the event that the Investment Limited Partner fails to approve any sale proposed by the General Partner for a purchase price of equal to or greater than the fair market value of the Apartment Complex, the General Partner shall have the right to purchase the Interests of the Special Limited Partner and the Investment Limited Partner for a price equal to the amount which they would have received (giving effect to reasonable estimates of closing costs which would have been incurred) in liquidation of the Partnership had such sale been consummated. In the event that the General Partner fails to exercise such right or, having exercised the same, to consummate the purchase of such Interests within sixty (60) days after the disapproval by the Investment Limited Partner of the proposed sale, the Investment Limited Partner shall have the right to purchase the Interest of each General Partner for a price equal to the amount it would have received (giving effect to reasonable estimates of closing costs which would have been incurred) in liquidation of the Partnership had the sale which was not approved been consummated.

(c)     The General Partner is hereby required, within five (5) days after its receipt of any offer to purchase the Apartment Complex or all of the Interests in the Partnership, to send a copy of such offer (or a written description of any such oral offer) to each of the Limited Partners. In connection with any proposed sale of the Apartment Complex, the Special Limited partner (or its designee) shall have the right to (i) receive and review copies of all documents relating to the proposed sale, (ii) participate in the negotiations of the terms and conditions of the proposed sale, (iii) meet with the proposed purchaser, (iv) solicit proposals for alternative offers for the Apartment Complex, and (v) provide such other services in connection with the proposed sale as it deems to be appropriate.

3.6.   Investor Provisions

Subject to provisions of this Agreement with respect to related party loans, any GSE that is a limited partner or member in any entity that is a Limited Partner (a "Defined Mortgagee") at any time may make, guarantee, own, acquire, or otherwise credit enhance, in whole or in part, a Mortgage Loan. Under no circumstances will such a Defined Mortgagee be considered to be acting on behalf or as an agent or the alter ego of the Limited Partner of which it is a limited partner or member. A Defined Mortgagee may take any actions that such Defined Mortgagee, in its discretion, determines to be advisable in connection with the applicable Mortgage Loan (including in connection with the enforcement of such Mortgage Loan). By acquiring an interest in the Partnership, each Partner acknowledges that no Defined Mortgagee owes the Partnership or any Partner any fiduciary duty or other duty or obligation whatsoever by virtue of such Defined Mortgagee being a limited partner or member in a Limited Partner. Neither the Partnership nor any Partner will make any claim against a Defined Mortgagee, or against the Limited Partner in which the Defined Mortgagee is a limited partner or member, relating to a Mortgage Loan and alleging any breach of any fiduciary duty, duty of care, or other duty whatsoever to the Partnership or to any Partner based in any way upon the Defined Mortgagee's status as a limited partner or member of a Limited Partner.

3.7.   Option to Purchase Promissory Notes

The Partners hereby acknowledge the Partnership's right to purchase for fair market value that certain promissory note held by Mass Housing in the amount of $18,315,482

(collectively, the "Assumed Notes"), all under the terms and conditions of such Assumed Notes and the assignment, assumption and other loan documents executed in connection with such Assumed Notes. The General Partner agrees that upon the request of the Special Limited Partner it shall cause the Partnership to timely exercise such purchase option and that the General Partner shall not at any time cause the Partnership to exercise such purchase option without the Consent of the Special Limited Partner.

3.8.    Bridge Loan

(a)    At the time of the payment of the First Installment, the General Partner may cause the Partnership to borrow from the Investment Limited Partner, in order to pay a portion of the Development Fee, an amount not to exceed $230,000 of the Fifth Installment (the "Development Fee Bridge Loan"). The Investment Limited Partner shall lend such amounts to the Partnership on the terms set forth in this Section 3.8(a), provided that the Partnership may not borrow the Development Fee Bridge Loan without the prior consent of the Lenders and the Agency.

The Development Fee Bridge Loan shall be evidenced by a promissory note, shall be due upon the satisfaction of the conditions to the payment of the Fifth Installment and shall not bear interest. The Development Fee Bridge Loan shall be guaranteed by each General Partner and the Guarantors, jointly and severally, and shall be repaid out of the proceeds of and no later than the payment of the Fifth Installment. In addition to a promissory note, the Investment Limited Partner may require that the Partnership execute and deliver a guaranty and any other such loan documents deemed reasonably necessary by the Investment Limited Partner. The Investment Limited Partner will have a right of offset of its Fifth Installment (or in the event of a Material Event hereunder, against any Installment) against any outstanding Development Fee Bridge Loan. Any default in respect of the Development Fee Bridge Loan shall be deemed to be a Material Event hereunder. At any time, at the election of the Investment Limited Partner, the amount of the Development Fee Bridge Loan may be converted to equity and credited against an Installment of the Investment Limited Partnership's Capital Contributions due hereunder.

(b)    After the payment of the Second Installment and upon the delivery of a balanced development budget and upon the later of April 1, 2007 or the completion, in the reasonable discretion of the Investment Limited Partner, of 75% of the construction of the Apartment Complex, the General Partner may cause the Partnership to borrow from the Investment Limited Partner, only to the extent needed to pay Development Costs (other than the Development Fee) in order to achieve the Completion Date, an amount not to exceed one hundred percent (100%) of the amount of the Third Installment (the "Primary Bridge Loan"). The Investment Limited Partner shall lend such amounts to the Partnership on the terms set forth in this Section 3.8(b) provided the Partnership may not borrow the Primary Bridge Loan on more than one occasion.

The Primary Bridge Loan shall be evidenced by a promissory note, shall bear no interest provided that all of the conditions to the payment of the Third Installment are met within six (6) months of the time the Primary Bridge Loan is advanced to the Partnership. If the conditions to the payment of the Third Installment are not fully satisfied within six (6) months of the time the Primary Bridge Loan is first advanced to the Partnership, the Primary Bridge Loan shall bear simple interest from the date that is six (6) months after the date the Primary Bridge Loan was advanced at the annual rate of 6%, which interest shall be paid to the Investment Limited Partner

#3915778_v6

upon maturity. The Primary Bridge Loan shall be guaranteed by each General Partner and the Guarantors, jointly and severally, and shall be repaid out of the proceeds of and no later than the satisfaction of the conditions to the payment of the Third Installment. In addition to a promissory note, the Investment Limited Partner may require that the Partnership execute and deliver a guaranty and any other such loan documents deemed reasonably necessary by the Investment Limited Partner. The Investment Limited Partner will have a right of offset of its Third Installment (or in the event of a Material Event hereunder, against any Installment) against any outstanding Primary Bridge Loan. Any default in respect of the Primary Bridge Loan shall be deemed to be a Material Event hereunder. At any time, at the election of the Investment Limited Partner, the amount of the Primary Bridge Loan and any accrued interest thereon may be converted to equity and credited against an Installment of the Investment Limited Partnership's Capital Contributions due hereunder.

3.9.   <u>Mass Housing Provisions</u>

Notwithstanding anything to the contrary set forth herein:

(a)   If any General Partner of the Partnership is a corporation, partnership, or limited liability company, such General Partner shall not engage in any business or activity or have a controlling interest in any property, business, or asset other than Mass Housing-financed developments unless otherwise approved in writing by Mass Housing.

(b)   The General Partners shall be solely responsible for the management of the Partnership's business with all the rights and powers generally conferred by law and the Partnership Agreement. Any party dealing with the Partnership may rely on a certificate signed by any General Partner that the General Partners have all necessary power and authority to bind the Partnership by their acts.

(c)   The Limited Partners are entering into the Partnership Agreement in reliance upon the unique expertise, skills and management ability of the General Partner. The General Partner shall not assign, delegate or permit the assignment of its management rights, whether voluntarily or involuntarily, without the prior written consent of Mass Housing. In the event of the involuntary assignment of the General Partner's interest in the Partnership as a result of the General Partner's death, dissolution, bankruptcy, or declaration of legal incompetence or incapacity, the General Partner's assignees or successors in interest shall be entitled only to the rights of an assignee of the General Partner's economic interest in the Partnership, if any, and shall not succeed to any of the General Partner's management rights or authority without the prior written consent of Mass Housing.

(d)   The term of any loans or advances to the Partnership by its Partners shall be subject to the prior written approval of Mass Housing.

(e)   Distributions to the Partners shall be subject to the limitations set forth in the Permanent Loan Documents.

(f)   Operating Reserves and Replacement Reserves for the Apartment Complex shall be maintained as set forth in the Permanent Loan Documents to the extent such requirements are more onerous than those set forth in this Partnership Agreement.

(g)     The Partnership shall not authorize the commencement of any voluntary bankruptcy, receivership, or insolvency proceeding without the written consent of all of the Partners.

(h)     The hiring of a management agent for the Apartment Complex, the management contract and the management fees payable thereunder shall be subject to Mass Housing written approval. No distribution or loan to the Partnership may be guaranteed by any assignment of any management fees to be received by any Partner.

(i)     The admission, change or substitution of any General Partner, or the conveyance, assignment, transfer, surrender or relinquishment of 25% or more of such Partner's Interests in the Partnership or any right to manage or receive the rents and profits of the Apartment Complex, shall be subject to the requirements set forth in the Permanent Loan Documents. Any new or Substitute Partner must agree to acknowledge the Partnership's obligations to Mass Housing in connection with the Loan and the operation of the Apartment Complex. Except as otherwise provided in the Permanent Loan Documents, any new or Substitute Partner may be admitted to the Partnership only after the prior written approval of Mass Housing.

(j)     Any General Partner may assign or pledge its interest in the Partnership to Mass Housing as security for the Permanent Loan.  Upon exercise by Mass Housing of its rights pursuant to such pledge or assignment, Mass Housing shall succeed to all of the assignor's right, title, and interest in the Partnership, and, at Mass Housing's sole election, shall be admitted to the Partnership as a Substitute Partner having all of the rights of a Partner attributable to such interest.

(k)     The Partnership may not voluntarily be dissolved without the prior written approval of Mass Housing.

(l)     Upon the withdrawal, termination, retirement, dissolution, bankruptcy, death or declaration of legal incompetence of any General Partner, either voluntarily or by operation of law, the remaining General Partners, if any (or if none, the remaining Partners), shall notify Mass Housing of such a withdrawal, shall continue the business of the Partnership, and, if no General Partner remains, the Partners shall appoint a successor General Partner acceptable to Mass Housing.  The retirement, death, dissolution, bankruptcy or declaration of legal incompetence, or any other event of dissolution or disassociation under the Act of a General Partner or a Partner shall not dissolve the Partnership, and the business of the Partnership shall be continued by the remaining General Partners or by the Partners.

(m)     Upon any dissolution of the Partnership, no title or right to possession and control of the Apartment Complex, and no right to collect the rents from the Apartment Complex, shall pass to any person who is not bound by the Project Documents.

(n)     The Partnership designates the General Partner as its representative for all matters concerning the Apartment Complex which require Mass Housing consent or approval and the signature of an authorized representative of the General Partner shall bind the Partnership in all such matters provided that the General Partner has obtained consent, as required expressly under Section 6.2(a) of the Partnership Agreement.  Notwithstanding the foregoing, nothing in the

Partnership Agreement shall serve to impede or restrict Mass Housing's rights under the Project Documents, including, but not limited to, the right to require termination of the management contract and designation of a management agent acceptable to Mass Housing.

(o)     Except to effect substitutions of Partners which do not require Mass Housing consent under the Permanent Loan Documents, no amendment to the Partnership Agreement shall be made which would affect the rights of Mass Housing under the Project Documents without securing the prior written consent of Mass Housing.

(p)     Notwithstanding any other provisions of the Partnership Agreement, in the event that any provision of the Partnership Agreement conflicts with the Permanent Loan Documents, the provisions of the Permanent Loan Documents shall control.

(q)     The provisions of this Section 3.8 are intended for the benefit of Mass Housing so long as the Permanent Loan shall remain outstanding. Mass Housing shall have the right to enforce the provisions of this Section 3.8 as a third-party beneficiary. Violation of the provisions of this Section 3.8 shall constitute an event of default under the Permanent Loan Documents.

ARTICLE IV
Partners; Capital

4.1.   Capital and Capital Accounts

(a)   The capital of the Partnership shall be the aggregate amount of the cash and the Gross Asset Value of property contributed by the General Partner and by the Limited Partners as set forth in Schedule A. No interest shall be paid by the Partnership on any Capital Contribution to the Partnership. Schedule A shall be amended from time to time to reflect the withdrawal or admission of Partners, any changes in the Partnership Interests held by a Partner arising from the transfer of an Interest to or by such Partner and any change in the amounts to be contributed or agreed to be contributed by any Partner. No Partner shall have the right to withdraw or receive a return of any of its Capital Contributions except as set forth in this Agreement.

(b)   An individual Capital Account shall be established and maintained for each Partner, including any additional or substituted Partner who shall hereafter receive an interest in the Partnership. The Capital Account of each Partner shall be maintained in accordance with the following provisions:

(i)   To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain that are specially allocated pursuant to Section 10.4 hereof, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership Property distributed to such Partner;

(ii)   To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Section 10.4 hereof, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

In the event that the Gross Asset Values of Partnership assets are adjusted pursuant to this Agreement, the Capital Accounts of all Partners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized gain or loss equal to the amount of such aggregate net adjustment.

(c)   The original Capital Account established for any Assignee (as hereinafter defined) shall be in the same amount as, and shall replace, the adjusted Capital Account of the Partner which such Assignee succeeds, and, for the purpose of the Agreement, such Assignee shall be deemed to have made the Capital Contribution, to the extent actually paid in, of the Partner which such Assignee succeeds. The term "Assignee," as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the Profits, Losses, Tax Credits and distributions of the Partnership by reason of such Person succeeding to the Interest of a Partner by assignment of all or any part of an Interest. To the extent an Assignee receives less than 100% of the Interest of a Partner, such Assignee's Capital Account and Capital Contribution

shall be in proportion to the Partnership Interest such Assignee receives, and the Capital Account and Capital Contribution of the Partner who retains a partial interest in the Partnership shall continue, and not be replaced, in proportion to the Partnership Interest such Partner retains.

(d)     The foregoing provisions and other provisions of this Agreement relating to the maintenance of the Capital Accounts are intended to comply with the Allocation Regulations, and shall be interpreted and applied in a manner consistent with such Allocation Regulations.

### 4.2.   General Partner

(a)     The name, address and Capital Contribution of the General Partner are as set forth on Schedule A.

(b)     Each General Partner has contributed or will contribute contemporaneously with the execution hereof $100 to the capital of the Partnership.

(c)     Notwithstanding anything contained herein to the contrary, in the event that the Developer is an Affiliate of any General Partner, at the election of the Special Limited Partner in its sole and absolute discretion, upon the removal of such General Partner in accordance with the terms hereof, to the extent all or any portion of the Development Fee remains unpaid as of the effective date of such removal of such General Partner, such General Partner shall immediately prior to such removal make a capital contribution to the Partnership in an amount sufficient to pay any unpaid balance of the Development Fee, and the Partnership shall thereafter promptly pay to the Developer such remaining balance of the Development Fee.

### 4.3.   Limited Partners

(a)     The Original Limited Partner hereby withdraws as a limited partner of the Partnership and acknowledges that it no longer has any Interest in, or rights or claims against, the Partnership as a Partner as of the Admission Date.

(b)     Each of the Special Limited Partner and each Investment Limited Partner is hereby admitted to the Partnership as a Limited Partner in substitution for the Original Limited Partner as of the Admission Date and agrees to be bound by the terms and provisions of the Project Documents and this Agreement.   The name and address of the Investment Limited Partner and the Special Limited Partner are as set forth on Schedule A.

(c)     Except as otherwise specifically set forth in Sections 4.5 or 7.4, the General Partner shall have no authority to admit additional Limited Partners without the Consent of the Investment Limited Partner.

### 4.4.   Liability of the Limited Partners

No Limited Partner or any Person who becomes a Substituted Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership; such Persons shall be liable only to pay their respective Capital Contributions as and when the same are due hereunder and under the Act. After its Capital Contribution shall be fully paid, no Limited Partner shall,

except as otherwise required by the Act, be required to make any further capital contributions or payments or lend any funds to the Partnership.

4.5.   Special Rights of the Special Limited Partner

(a)   Notwithstanding any other provisions herein (other than Section 13.8), to the extent the law of the State is not inconsistent, the Special Limited Partner shall have the right, subject to any Requisite Approvals, to:

(i)   [Reserved];

(ii)   [Reserved];

(iii)   remove any General Partner and elect a new General Partner (A) on the basis of the performance and discharge of such General Partner's obligations constituting fraud, bad faith, gross negligence, willful misconduct or breach of fiduciary duty, or (B) upon the occurrence of a Material Event.

(iv)   continue the business of the Partnership with a substitute General Partner, provided that the General Partner has been removed pursuant to Section 4.5(a)(iii) above; and

(v)   approve or disapprove the sale of all or substantially all of the assets of the Partnership.

(b)   Upon the removal of a General Partner for cause pursuant to Section 4.5(a)(iii),

(i)   without any further action by any Partner, the Special Limited Partner shall cause an Affiliate automatically to become a General Partner (the "Substitute General Partner") and acquire in consideration of a cash payment of $100 such portion of the Interest of the removed General Partner as counsel to the Special Limited Partner shall determine is the minimum appropriate interest in order to assure the continued status of the Partnership as a partnership under the Code and under the Act;

(ii)   the remaining portion of the economic Interest of the removed General Partner shall automatically be transferred to the Partnership, not as a penalty but as liquidated damages to compensate the Partnership for the action or omission of such General Partner leading to its removal, or for the fact of its violation of the terms of this Agreement and to allow the Partnership to adequately compensate any replacement General Partner; and

(iii)   the Substitute General Partner shall automatically be irrevocably delegated all of the powers and duties of the General Partners pursuant to Section 6.13. A General Partner so removed will not be liable as a general partner for any obligations of the Partnership incurred after the effective date of its removal. Each General Partner hereby grants to the Special Limited Partner an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to execute and deliver any and all documents and instruments on behalf of such General Partner and the Partnership as the

#_3915778_v6

Special Limited Partner may deem to be necessary or appropriate in order to effect the provisions of this Section 4.5 and to enable the new General Partner to manage the business of the Partnership.

4.6.   Meetings

The General Partner or Limited Partners holding more than ten percent (10%) of the then outstanding Limited Partner Interests may call meetings of the Partnership for any matters for which the Limited Partners may vote as set forth in this Agreement. A list of the names and addresses of all Limited Partners shall be maintained as part of the books and records of the Partnership and shall be made available upon request to any Limited Partner or his representative at his cost. Upon receipt of a written request either in person or by certified mail stating the purpose(s) of the meeting, the General Partner shall provide all Limited Partners within ten (10) days after receipt of said request, written notice of a meeting and the purpose of such meeting to be held on a date not less than fifteen (15) nor more than sixty (60) days after receipt of said request, at a time and place convenient to the Limited Partners.

ARTICLE V
Capital Contributions of the Investment Limited Partner
and the Special Limited Partner

5.1.   Payments

(a)   The Special Limited Partner's Capital Contribution of $10 shall be paid in full in cash on the Admission Date.  The Investment Limited Partner's Capital Contribution in the aggregate amount of $9,364,014 shall be paid in cash installments (the "Installments"), as follows (with each Investment Limited Partner responsible for its portion of such total Capital Contribution in accordance with the Sharing Ratios):

(i)   $4,682,007 (the "First Installment") on the latest of (A) the Admission Date, (B) the closing of the Construction Loan, (C) the Permanent Loan Commitment Date, or (D) the Construction Permitting Date;

(ii)   $1,872,803 (the "Second Installment") on the latest of (A) the 50% Completion Date, (B) January 31, 2007, and (C) receipt of an updated Title Policy in form and substance reasonably satisfactory to the Special Limited Partner or (D) receipt by the Special Limited Partner of the Carryover Allocation and the Carryover Certification;

(iii)   $1,498,242 (the "Third Installment"), on the latest of (A) the Completion Date, (B) receipt of an updated Title Policy in form and substance satisfactory to the Special Limited Partner, which policy in no event shall contain a survey exception, (C) receipt by the Investment Limited Partner of the Contractor Pay-Off Letter, an Estoppel Letter from each Lender, and evidence of satisfaction of the Insurance Requirements and the Due Diligence Recommendations, or (D) delivery of an "As Built" survey by a professional engineer licensed in the State reflecting all improvements to the property, provided however that the proceeds of the Third Installment shall first be used to repay any outstanding principal and interest in respect of the Primary Bridge Loan;

(iv)   $374,561 (the "Fourth Installment") on the latest of (A) the Initial 100% Occupancy Date, (B) Permanent Mortgage Commencement, (C) receipt by the Investment Limited Partner of the Initial Compliance Audit which shows no material noncompliance (as set forth in Section 12.7(n)), or (D) Cost Certification; and

(v)   $936,401 (the "Fifth Installment") upon the latest of (A) State Designation, (B) Rental Achievement or (C) the receipt by the Investment Limited Partner of a copy of the properly filed Partnership federal income tax return and an audited Partnership financial statement for the year in which Rental Achievement occurs, provided however that the proceeds of the Fifth Installment shall first be used to repay any outstanding principal and interest in respect of the Development Fee Bridge Loan;

provided, however, that (x) the General Partner shall give the Investment Limited Partner not less than twenty-one (21) days' written notice prior to the due date of each Installment subsequent to the First Installment, (y) no Installment shall be due unless and until all conditions to the payment of all prior Installments have been satisfied, and (z) the full amount of the First

and Second Installments of the Investment Limited Partner's Capital Contribution (less all amounts approved as reimbursement for Development Costs on the Admission Date) shall be deposited into an escrow account in the name of the Partnership with the Construction Lender (the "Installment Escrow"). Funds may be withdrawn from such Installment Escrow to pay Development Costs in monthly draws only (1) after the delivery to the Special Limited Partner by the General Partner of a monthly draw request and all supporting back-up invoices and documentation therefor, including without limitation, the applicable construction inspection report of the Inspecting Consultant, (2) the countersignature of the Special Limited Partner of such draw request and (3) the subsequent submission to and approval by the Construction Lender of such draw request, if such approval is required by the Construction Loan Documents.

(b)     The obligation of the Investment Limited Partner to pay each Installment is conditioned upon delivery by the General Partner to the Investment Limited Partner of a written certificate (the "Payment Certificate") stating that as of the date of such certificate (i) all the conditions to the payment of such Installment and each prior Installment have been satisfied, (ii) all representations and warranties of the General Partner contained in this Agreement are true and correct and (iii) no event has occurred which suspends or terminates the obligations of the Investment Limited Partner to pay Installments under this Agreement which has not been cured as herein provided, (iv) no event has occurred which, with the giving of notice, would oblige the General Partner to repurchase the Interests of the Investment Limited Partner pursuant to Section 5.2(a). Except as provided in the final sentence of this Section 5.1(b), acceptance by the Partnership of any Installment shall constitute a confirmation that, as of the date of payment, all such conditions are satisfied and all such representations and warranties are true and correct. The obligation of the Investment Limited Partner to pay the First Installment is also conditioned upon delivery by the General Partner to the Investment Limited Partner of (x) a legal opinion of independent counsel to the Partnership, the General Partner, the Developer and the Guarantors, which opinion(s) must be satisfactory to the Investment Limited Partner as to form, content and identity of counsel and (y) a photocopy of a binding commitment, in form and substance satisfactory to the Special Limited Partner, to issue the Title Policy and any endorsements thereto in form and substance reasonably satisfactory to the Special Limited Partner. In no event shall any Installment become due until all of the conditions for all of the Installments listed prior to the Installment in question in Section 5.1(a) shall have been satisfied and all of such prior Installments shall have become due. Notwithstanding the foregoing, however, if at any time prior to the date when an Installment becomes due and payable, the Partnership has an Operating Deficit which the General Partner would be required to fund pursuant to Section 6.10 as a result of which the Payment Certificate cannot be delivered, then, provided that all other conditions to the Installment in question are met, the Investment Limited Partner may, at its option, waive the requirement of the delivery of the Payment Certificate or any other condition with respect to part or all of such Installment and pay such part or all of such Installment, provided that the proceeds of the amount so paid are used by the Partnership to fully fund such Operating Deficit; provided, however, that if the proceeds of such amount so paid are designated in Section 6.12 to be used to pay fee(s), then such proceeds shall be utilized to pay such fee(s) and the recipient(s) thereof shall be required to, and hereby agree to, utilize the proceeds of such fee(s) to fund such Operating Deficit, in which case the Investment Limited Partner is hereby authorized to directly fund such Operating Deficit, with the funds so applied being deemed to have been paid as aforesaid.

(c)     The Payment Certificate for each Installment shall be dated and delivered not less than ten (10) nor more than thirty (30) days prior to the due date for such Installment.

(d)     If, as of the date when an Installment would otherwise be due, any statement required to be made in the Payment Certificate for such Installment cannot be truthfully made, the General Partner shall notify the Investment Limited Partner of the reason why such statement would be untrue if made, and the Investment Limited Partner shall not be required to pay such Installment; provided, however, that if (i) any such statement can subsequently be truthfully made and (ii) the Investment Limited Partner shall not have irrevocably lost, in the good faith judgment of the Investment General Partner, any material tax or other benefits hereunder (other than tax benefits for which the Investment Limited Partner has been fully compensated pursuant to the provisions of paragraphs (e), (f) and (g) of this Section 5.1), then the Investment Limited Partner shall pay such Installment to the Partnership thirty (30) days after delivery by the General Partner to the Investment Limited Partner of the Payment Certificate together with an explanation of the manner in which each such statement had become true.

(e)     In the event that as of or any time prior to Cost Certification (the "Initial Adjustment Date") or as a result of a subsequent audit, the Investment Limited Partner shall receive a written certification of the Auditors indicating that the aggregate Actual Credit during the Credit Period will be less than the aggregate Projected Credit during the Credit Period, then (i) the next succeeding Installments of the Capital Contributions of the Investment Limited Partner shall be reduced by an amount equal to the product of (X) the difference between (1) the aggregate Projected Credit during the Credit Period and (2) the aggregate Actual Credit during the Credit Period and (Y) 0.945, and (ii) the Projected Credit for each Fiscal Year shall thereafter be redefined to mean the Actual Credit, as so determined (the "Revised Projected Credit"). Any such reduction pursuant to this Section 5.1(e) shall be made first to the Installment, if any, next due to be paid by the Investment Limited Partner, and any balance of such amount payable by the General Partner in excess of the amount of such Installment shall be applied to succeeding Installments, if any, provided that if the amount of any such reductions exceeds the sum of the remaining Installments, if any, then an amount equal to the amount of such excess shall be paid by the General Partner to the Partnership as a Capital Contribution and immediately distributed to the Investment Limited Partner promptly after demand is made therefor (or, to the extent such General Partner Capital Contribution would in the opinion of counsel to the Investment Limited Partner cause tax benefits intended for the Investment Limited Partner to be lost or reallocated to another Partner, then payments due from the General Partner shall be made, on an after tax basis, directly to the Investment Limited Partner, as a payment of damages for breach of warranty), regardless of the reason for the occurrence of such event (unless such reduction was caused by an act or omission of the Investment Limited Partner or its Affiliates, in which event no such reduction or payment shall be required). No reduction of any Installment pursuant to this Section 5.1(e) shall be deemed to be a Capital Contribution by the General Partner to the Partnership.

(f)     If for any reason, including without limitation, a Recapture Event, with respect to any Fiscal Year all or a portion of which occurs during the Initial Operating Period, the Actual Credit is or was less than the Projected Credit (or the Revised Projected Credit, if applicable) for such Fiscal Year (a "Reduction Year"), then the General Partner shall pay to the Investment Limited Partner the Reduction Amount. The Reduction Amount shall be equal to the sum of (A) the excess of the Projected Credit (or the Revised Projected Credit, if applicable) for such Fiscal

Year over the Actual Credit for such Fiscal Year multiplied by 0.945 (except that such decimal shall be 0.35 for Projected Credit shortfalls for 2007 to the extent the Tax Credits comprising such shortfall shall be allocable to the Investment Limited Partner in 2017), plus (B) the Recapture Amount as determined pursuant to Section 10.6 and, to the extent not already accounted for, any interest or penalties payable by the limited partners and/or holders of beneficial assignee certificates of the Investment Limited Partner as a result of such shortfall or Recapture Event, assuming that each limited partner and/or a beneficial assignee certificate in the Investment Limited Partner used all of the Tax Credits allocated to it in the Fiscal Year of allocation. The Auditors shall make their determination of the amount of the Actual Credit with respect to each Reduction Year within thirty (30) days following the end of such Fiscal Year. The Investment Limited Partner shall be eligible to be paid a Reduction Amount as hereinabove described with respect to each Reduction Year. Any Reduction Amount shall first be applied to the Installment next due to be paid by the Investment Limited Partner, with any portion of such Reduction Amount in excess of the amount of such Installment then being applied to succeeding Installments, provided that if no further Installments remain to be paid or if the Reduction Amount shall exceed the sum of the amounts of the remaining Installments, then the entire Reduction Amount or the balance of the Reduction Amount, as the case may be, shall be paid by the General Partner to the Partnership as a Capital Contribution and immediately distributed to the Investment Limited Partner promptly after demand is made therefor (or, to the extent such General Partner Capital Contribution would in the opinion of counsel to the Investment Limited Partner cause tax benefits intended for the Investment Limited Partner to be lost or reallocated to another Partner, then payments due from the General Partner shall be made, on an after tax basis, directly to the Investment Limited Partner, as a payment of damages for breach of warranty), regardless of the reason for the occurrence of such event (unless such reduction was caused by an act or omission of the Investment Limited Partner or its Affiliates, in which event no Reduction Amount shall be payable). No restriction of any Installment pursuant to this Section 5.1(f) shall be deemed to be a Capital Contribution to the Partnership.

(g)     In the event that, for any reason, including without limitation, a Recapture Event, at any time after the end of the Initial Operating Period the amount of the Actual Credit shall be less than the Projected Credit (or the Revised Projected Credit, if applicable) with respect to any Fiscal Year of the Partnership (such difference being hereinafter referred to as a "Credit Shortfall"), the Investment Limited Partner shall be treated as having made a constructive advance to the Partnership with respect to such Fiscal Year (a "Credit Recovery Loan"), which shall be deemed to have been made on January 1 of such Fiscal Year in an amount equal to the sum of (A) the Credit Shortfall for such Fiscal Year plus (B) the Recapture Amount as determined pursuant to Section 10.6 and, to the extent not already accounted for, any interest or penalties payable by the limited partners and/or the holders of beneficial assignee certificates of the Investment Limited Partner as a result of the Credit Shortfall for such Fiscal Year, assuming that each limited partner and/or holder of a beneficial assignee certificate in the Investment Partnership used all of the Tax Credits allocated to him in the Fiscal Year of allocation. Credit Recovery Loans shall be deemed to bear simple (not compounded) interest from the respective dates on which such principal advances shall have been deemed to have been made under this Section 5.1(g) at a rate of nine percent (9%) per annum. Credit Recovery Loans shall be payable by the Partnership as provided in Sections 10.2(a) and (b).

(h)     In the event that each Investment Limited Partner shall receive a written certification of the Auditors indicating that the aggregate Actual Credit during the Credit Period will be greater than the aggregate Projected Credit during the Credit Period, then (i) the final Installment of the Capital Contributions of the Investment Limited Partner shall be increased by an amount (up to a maximum amount of $936,401) equal to the product of (X) the difference between (1) the aggregate Actual Credit during the Credit Period as certified by the Auditors and (2) the aggregate Projected Credit during the Credit Period and (Y) a prevailing market credit price at the time as reasonably determined by the Investment Limited Partner, and (ii) the Projected Credit for each Fiscal Year shall thereafter be redefined to mean the Revised Projected Credit, provided, however, that the provisions of this Section 5.1(h) shall not apply in the event that the Investment Limited Partner does not have sufficient funds to make the additional Capital Contribution and, after a diligent good faith effort, the Investment Limited Partner cannot cause any of its Affiliates to make such additional Capital Contribution. Further, in the event that each Investment Limited Partner shall receive a written certification of the Auditors indicating that the Actual Credit during 2007 will be greater than the Projected Credit for such year, then (i) the final Installment of the Capital Contributions of the Investment Limited Partner shall be increased by an amount (up to a maximum amount of $50,000) equal to the product of (X) the difference between (1) the Actual Credit for 2007 as certified by the Auditors and (2) the Projected Credit for such respective year(s) and (Y) 0.35, and (ii) the Projected Credit for each such Fiscal Year shall thereafter be redefined to mean the Revised Projected Credit, provided, however, that the provisions of this Section 5.1(h) shall not apply in the event that the Investment Limited Partner does not have sufficient funds to make the additional Capital Contribution and, after a diligent good faith effort, the Investment Limited Partner cannot cause any of its Affiliates to make such additional Capital Contribution. Additional Capital Contributions made pursuant to this Section 5.1(h) shall be applied first to the payment of the Development Fee if so required by the Special Limited Partner in its reasonable discretion.

(i)     In the event a Investment Limited Partner fails to contribute any Installment of its Capital Contribution following full satisfaction of each condition precedent thereto in accordance with the terms of this Agreement, and such failure continues for a period of thirty (30) days after delivery of notice of such failure to such Investment Limited Partner, the General Partner may cause the Partnership to pursue all rights and remedies available at law. Without limiting the generality of the foregoing, neither a Investment Limited Partner, nor any of its partners (general or limited), shall have any personal liability with regard to the covenants or obligations undertaken by such Investment Limited Partner under this Agreement. In the event a Investment Limited Partner shall be in default under any of the terms of this Agreement, the sole recourse of any party hereto for any obligations due hereunder or any damages resulting from such default shall be against the Interest of the Investment Limited Partner.

5.2.    Return of Capital Contributions

(a)     Failure to Achieve Development and/or Tax Credit Benchmarks and Standards. Upon the occurrence of any of the events (a "Repurchase Event") listed below in this Section 5.2(a), within five (5) days of the occurrence thereof, the General Partner shall send to the Investment Limited Partner notice of such event and of the General Partner's obligation to repurchase the Interests of the Investment Limited Partner by paying to the Investment Limited Partner an amount in cash (the "Repurchase Amount") equal to each such Partner's Invested

Amount minus the portion, if any, of such Partner's Capital Contribution which shall not yet have been paid (or deemed to have been paid) to the Partnership plus the outstanding principal and accrued interest in respect of any loans made by the Limited Partners to the Partnership and the amount of any third-party costs, including, without limitation, attorney's fees incurred by or on behalf of such Partner in implementing this Section 5.2(a) in the event the Investment Limited Partner requires such a repurchase plus interest thereon at the AFR commencing on the fifth (5th) day after delivery of the notice referred to in the next sentence. If the Investment Limited Partner elects to require a repurchase of its Interest and the payment to it of an amount equal to its Repurchase Amount, it shall send notice thereof to the Partnership within thirty (30) days after the mailing date of the General Partner's notice, or at any time after the occurrence of any of the foregoing if the General Partner shall not have sent a notice thereof, and the General Partner shall within thirty (30) days after the Partnership receives any such notice from a Partner requesting the purchase of its Interest repurchase the Interest of such Partner by paying to such Partner an amount equal to its Repurchase Amount. If funds are insufficient, the Interest of the Investment Limited Partner shall be purchased first, then the Special Limited Partner Interest shall be purchased. Upon the payment of the Repurchase Amount to the Investment Limited Partner and the Special Limited Partner such Partner shall withdraw as limited partners of the Partnership. If, following receipt of the General Partner's notice, any Partner fails to send notice to the General Partner by the end of such thirty (30)-day period requesting the General Partner to purchase its Interest, such Partner, as the case may be, shall be deemed to have waived its right to cause the General Partner to purchase its Interest as a result of the event described in the General Partner's notice. No such waiver, however, shall affect the right of the Investment Limited Partner to cause the General Partner to purchase its Interest upon the occurrence of any other event described in this Section 5.2(a), or upon any subsequent occurrence of the event described in the General Partner's notice. The Repurchase Events are as follows:

(i)     each of the buildings in the Apartment Complex shall not have been placed in service by December 31, 2008 (for purposes of satisfying the requirements of Section 42(h)(1)(E)(i) of the Code); or

(ii)    by December 31, 2008, the Completion Date shall not have occurred; or

(iii)   construction or operation of the Apartment Complex shall have been enjoined by a final order (from which no further appeals are possible) of a court having jurisdiction and such injunction shall continue for a period of ninety (90) days; or

(iv)    Permanent Mortgage Commencement shall not have been achieved prior to June 1, 2009 ; or

(v)     if at any time it shall be determined by the Service or by the Tax Accountants that a Carryover Certification could not be issued or was issued in error; or

(vi)    State Designation shall not have occurred by October 1, 2008, (or any later date fixed by the General Partner with the Consent of the Investment Limited Partner) and by said date the General Partner shall not have made any payment as described in the next to last sentence of Section 5.1(e) or, if the Investment Limited Partner shall have elected to have all or a portion of any payment under Section 5.1(e) applied toward future

Installment obligations of the Investment Limited Partner, amendments to this Agreement shall not have been adopted and filed in the Filing Office, reflecting such event; or

(vii)   if by the date which is nine (9) months following the Completion Date, Rental Achievement shall not have been achieved, provided that the Investment Limited Partner must exercise its rights hereunder as to this clause (vii) before the third anniversary of the Completion Date, and provided further that a Repurchase Event shall not be deemed to exist under this clause (vii) unless an Operating Deficit exists over any period of six (6) consecutive months; or

(viii)   the Partnership shall fail to meet the Minimum Set-Aside Test or the Rent Restriction Test by the close of the first year of the Credit Period and/or fails to continue to meet either of such tests or any other tenant set-asides required by the Credit Agency at any time during the sixty (50)-month period commencing on such date; or

(ix)   (A) foreclosure proceedings shall have commenced under any Mortgage and such proceedings shall not have been dismissed within ninety (90) days, (B) any of the commitments of a Lender to provide a Mortgage Loan and/or any subsidy financing shall be terminated or withdrawn and not reinstated or replaced within sixty (60) days with terms at least as favorable to the Partnership or terms for which the Consent of the Investment Limited Partner and any Requisite Approvals shall have been obtained, or (C) the Construction Lender, acting in good faith and in accordance with the provisions of the Construction Loan Documents, shall have irrevocably refused to make any further advances under the Construction Loan Documents and such decision shall not have been reversed or the Construction Lender replaced within sixty (60) days; or

(x)   at any time the General Partner fails to advance Subordinated Loans or timely repay a Bridge Loan and such failure continues for ten (10) days; or

(xi)   any action is commenced to foreclose any mechanics, or any other lien (other than the lien of a Mortgage) against the Apartment Complex and such action has not within thirty (30) days been either bonded against in such a manner as to preclude the holder of such lien from having any recourse to the Apartment Complex or to the Partnership for payment of any debt secured thereby, or affirmatively insured against by the title insurance policy or an endorsement thereto issued to the Partnership by a reputable title insurance company (which insurance company will not have indemnity from or recourse against Partnership assets by reason of any loss it may suffer by reason of such insurance) in an amount satisfactory to the Investment Limited Partner; or

(xii)   a casualty occurs resulting in substantial destruction of all or a portion of the Apartment Complex, and the insurance proceeds (if any) are insufficient to restore the Apartment Complex or the Apartment Complex is not so restored within twenty-four (24) months following such casualty.

(b)   Lender/Agency Disapproval.  If any Agency or Lender shall disapprove, or fail to give any required approval of, the Investment Limited Partner and/or the Special Limited Partner as a Limited Partner hereunder within one hundred eighty (180) days of the Admission Date,

then the Partner being disapproved or not approved shall, effective as of such time or such later time as may be elected by the Partner being disapproved or not approved as may be specified by such Agency or Lender in its disapproval, at the option of the Partner being disapproved or not approved (if not directed by such Agency or Lender to withdraw), cease to be a Limited Partner. The General Partner shall, within ten (10) days of the effective date of such cessation, pay to the Partner being disapproved or not approved an amount equal to its paid-in Capital Contributions and the outstanding balance of any loans made by the Limited Partners to the Partnership plus the amount of any third party costs, including, but not limited to attorney's fees, incurred by or on behalf of such Partner in implementing this Section 5.2(b).

(c)     Substitution and Indemnification.  Upon the receipt by the Investment Limited Partner and/or the Special Limited Partner of the amount due to it pursuant to either Section 5.2(a) or Section 5.2(b), the Interest of such Partner shall terminate, and the General Partner shall indemnify and hold harmless such Partner from and against any Adverse Consequences to which such Partner (as a result of its participation hereunder) may be subject, provided that such Adverse Consequences do not result from such Partner's acts or omissions.

(d)     Waiver of Repurchase Right.  Each of the Investment Limited Partner and the Special Limited Partner shall have the right to irrevocably waive its right to have its Interest repurchased pursuant to any clause or clauses of Section 5.2(a), or any portion thereof, at any time during which any of such rights shall be in effect.  Such a waiver shall be exercised by delivery to the General Partner of a written notice stating that the rights being waived pursuant to any specified clause or clauses of Section 5.2(a), or any specified portion thereof, are thereby waived for a specified period of time.

(e)     Additional General Partner.  If the General Partner shall fail to make on the due date therefor any payment required under Section 5.2(a) or Section 5.2(b), time being of the essence, at any time thereafter the Special Limited Partner shall have the option, exercisable in its sole discretion, to cause itself or its designee to be admitted as an additional General Partner, receiving from the existing General Partner, in consideration of the payment of ten dollars ($10.00), an interest in the Profits, Losses, Tax Credits and distributions of the Partnership sufficient in the opinion of counsel to the Special Limited Partner to cause the Special Limited Partner to become a General Partner of the Partnership, with the Special Limited Partner retaining its status as such and its economic interest in the Partnership as the Special Limited Partner (or its designee as an additional General Partner).  If the Special Limited Partner exercises the option described in this Section 5.2(e), each of the other General Partners hereby agrees that all of its rights and powers hereunder as a General Partner shall automatically be irrevocably delegated to the Special Limited Partner pursuant to Section 6.13 without the necessity of any further action by any Partner.  Each Partner hereby grants to the Special Limited Partner an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to take any action and to execute, deliver and file or record any and all documents and instruments on behalf of such Partner and the Partnership as the Special Limited Partner may deem necessary or appropriate in order to effectuate the provisions of this Section 5.2(e) and to allow the additional General Partner to manage the business of the Partnership.  The admission of the Special Limited Partner or its designee as an additional General Partner shall not relieve any other General Partner of any of its economic obligations hereunder, and each other General Partner shall fully indemnify and hold harmless the additional General Partner on an after-tax

basis from and against any and all Adverse Consequences sustained by such additional General Partner in connection with its status as a General Partner (other than Adverse Consequences arising solely from the gross negligence or willful misconduct of such additional General Partner) for so long as such additional General Partner remains a General Partner of the Partnership. Any such additional General Partner shall withdraw (notwithstanding the provisions of Article VII), as such and remain only as the Special Limited Partner upon the payment of all amounts due under Sections 5.2(a) and 5.2(b).

ARTICLE VI
Rights, Powers and Duties of General Partner

6.1.   Authorized Acts

Subject to the provisions of Section 6.2, Section 6.3, Section 6.15 and all other provisions of this Agreement, the General Partner for, in the name and on behalf of the Partnership, is hereby authorized, in furtherance of the purposes of the Partnership:

(i)   to acquire by purchase, lease, exchange or otherwise any real or personal property;

(ii)   to construct, rehabilitate, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property;

(iii)   to borrow money and issue evidences of indebtedness and to secure the same by mortgage, pledge or other lien on the Apartment Complex or any other assets of the Partnership;

(iv)   to execute the Mortgage Loan Documents and the other Project Documents and all such other documents as the General Partner deems to be necessary or appropriate in connection with the acquisition, development, construction and financing of the Apartment Complex;

(v)   subject to Section 3.2, to prepay in whole or in part, refinance or modify any Mortgage Loan or other financing affecting the Apartment Complex;

(vi)   to employ the Management Agent (which may be an Affiliate of the General Partner) and, subject to the provisions of Article XI, to pay reasonable compensation for its services;

(vii)   to employ its Affiliates (including, without limitation, the Contractor) to perform services for, or sell goods to, the Partnership provided that (except with respect to any contract specifically authorized by this Agreement) the terms of any such transaction with an Affiliate shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length;

(viii)   to execute contracts with any Agency, the State or any subdivision or agency thereof or any other Governmental Authority to make apartments or tenants in the Apartment Complex eligible for any public-subsidy program;

(ix)   to execute leases of some or all of the apartment units of the Apartment Complex to individuals and/or to a public housing authority and/or to a non-profit corporation, cooperative or other non-profit Entity;

(x)   to employ or engage such engineers, architects, technicians, accountants, attorneys and other Persons, as may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership; and

(xi)   to enter into any kind of activity and to perform and carry out contracts of any kind which may be lawfully carried on or performed by a partnership and to file all certificates and document which may be required under the laws of the State.

6.2.   Restrictions on Authority

(a)   Notwithstanding any other Section of this Agreement, the General Partner shall have no authority to perform any act in violation of the Act, any other applicable law, Agency or other government regulations, the requirements of any Lender, or the Project Documents. In the event of any conflict between the terms of this Article VI and any applicable Regulations or requirements of any Lender, the terms of such Regulations or the requirements of such Lender, as the case may be, shall govern. Subject to the provisions of Section 6.2(b), the General Partner, acting in its capacity as General Partner, shall not have the authority, without the Consent of the Special Limited Partner:

(i)   to have unsecured borrowings in excess of twenty-five thousand dollars ($25,000.00) in the aggregate at any one time outstanding, except borrowings constituting Subordinated Loans or Credit Recovery Loans;

(ii)   to borrow from the Partnership or commingle Partnership funds with the funds of any other Person;

(iii)   following the Completion Date, to construct any new or replacement capital improvements on the Apartment Complex which substantially alter the character or use of the Apartment Complex or which cost in excess of ten thousand dollars ($10,000.00) in a single Fiscal Year, except (x) replacements and remodeling in the ordinary course of business or under emergency conditions or (y) construction paid for from insurance proceeds;

(iv)   other than with respect to easements or rights of way granted or acquired in the ordinary course of operating the Apartment Complex, to acquire any real property in addition to the Apartment Complex;

(v)   to borrow any Permanent Loan on terms other than as approved by the Limited Partners in the Project Documents on the date hereof or to increase, decrease or modify the terms of or refinance any Mortgage Loan;

(vi)   to rent apartments in the Apartment Complex such that the Apartment Complex would not meet the requirements of the Minimum Set-Aside Test or the Rent Restriction Test;

(vii)   to sell, exchange or otherwise convey or transfer the Apartment Complex or substantially all the assets of the Partnership;

(viii)   to terminate any Material Agreement;

(ix)   to cause the Partnership to commence a proceeding seeking any decree, relief, order or appointment in respect to the Partnership under the federal bankruptcy

laws, as now or hereafter constituted, or under any other federal or state bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) for the Partnership or for any other substantial part of the Partnership's business or property, or to cause the Partnership to consent to any such decree, relief, order or appointment initiated by any Person other than the Partnership;

(x)  to execute material contracts with any Agency, the State or any subdivision or agency thereof or any other Governmental Authority to make apartments or tenants in the Apartment Complex eligible for any public-subsidy program;

(xi)  other than as allowed by Section 6.2(a)(xiv), to amend any construction or rehabilitation contract;

(xii)  to pledge or assign any of the Capital Contributions of the Investment Limited Partner or the proceeds thereof (except to the extent required by the terms of the Construction Loan Documents and agreed to in writing by the Special Limited Partner);

(xiii)  to amend any Project Document, or to permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver would be to eliminate, diminish or defer any obligation or undertaking of the Partnership, the General Partner or its Affiliates which accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the Investment Limited Partner (notwithstanding that the Investment Limited Partner is neither a party to nor express beneficiary of such provision or was not a partner when such provision became effective);

(xiv)  to approve any changes to the Plans and Specifications for the Apartment Complex which would result, either individually or in the aggregate, in an overall development cost increase or decrease in excess of $25,000;

(xv)  to permit the merger, termination or dissolution of the Partnership;

(xvi)  to do any act required to be approved or ratified by all limited partners under the Act;

(xvii)  to admit any additional Partner to the Partnership;

(xviii)  to make any discretionary capital calls;

(xix)  to confess any judgment on behalf of the Partnership;

(xx)  to cause the Partnership to settle, compromise, mediate or other relinquish any claim (actual or prospective), or to release, waive or diminish any material Partnership rights in any litigation or arbitration matter involving a claim in excess of $10,000; or

(xxi)  to change the nature of the Partnership's business.

(b)     In the event that any General Partner violates any provision of Section 6.2(a), the Special Limited Partner in its sole discretion and without prejudice to its rights under Sections 4.5(b) and 7.6(a), may cause itself or its designee to be admitted as an additional General Partner without any further action by any other Partner.  Upon any such admission of an additional General Partner, each existing General Partner shall be deemed to have assigned proportionally to the additional General Partner, automatically and without further action, such portion of its General Partnership Interest so that the additional General Partner shall receive an interest in the Profits, Losses, Tax Credits and distributions of the Partnership sufficient in the opinion of counsel to the Special Limited Partner to cause such additional General Partner to be a Partner of the Partnership, in consideration of one dollar ($1.00) and any other consideration which may be agreed upon.  An additional General Partner so admitted shall automatically become the Managing General Partner and shall be irrevocably delegated all of the power and authority of all of the General Partner pursuant to Section 6.13.  Any such additional General Partner shall have the right to withdraw as a General Partner at any time, leaving the prior General Partner once again as the only General Partner, the provisions of Article VII notwithstanding.  Each Partner hereby grants to the Special Limited Partner a special power of attorney, irrevocable to the extent permitted by law and coupled with an interest, to amend this Agreement and to do anything else which, in view of the Special Limited Partner, may be necessary or appropriate to accomplish the purposes of this Section 6.2(b) or to enable any additional General Partner admitted pursuant to this Section 6.2(b) to manage the business of the Partnership.  The admission of an additional General Partner shall not relieve any other General Partner of any of its economic obligations hereunder, and each other General Partner on an after-tax basis shall fully indemnify and hold harmless the additional General Partner from and against any and all Adverse Consequences sustained by the additional General Partner in connection with its status as a General Partner (other than Adverse Consequences arising solely from the gross negligence or willful misconduct of such additional General Partner).

6.3.   Personal Services; Other Business Ventures

No General Partner or Affiliate thereof shall receive any salary or other direct or indirect compensation for any services or goods provided in connection with the Partnership or the Apartment Complex, except as may be specifically provided in Section 6.12, Section 6.15 and Article XI or as to which the Consent of the Special Limited Partner shall have been obtained to the precise terms thereof prior to the commencement of such services or the provision of such goods. Any Partner may engage independently or with others in other business ventures of every nature and description, including the ownership, operation, management, syndication and development of real estate; neither the Partnership nor any other Partner shall have any rights in and to such independent ventures or the income or profits derived therefrom.

6.4.   Business Management and Control

(a)     Subject to the provisions of this Agreement, the General Partner shall have the exclusive right to control the business of the partnership.  If at any time there is more than one General Partner, the powers and duties of the General Partners hereunder shall be exercised in the first instance by a Managing General Partner who, subject to the terms and provisions of this Agreement, shall manage the business and affairs of the Partnership. The Managing General Partner may bind the Partnership by executing and delivering, in the name and on behalf of the

Partnership, any documents which this Agreement authorizes the General Partners to execute hereunder without the requirement that any other General Partner execute such documents. The initial Managing General Partner shall be RPALLC; if it is unwilling or unable to serve in such capacity or shall cease to be a General Partner, the remaining General Partners may from time to time designate a new Managing General Partner. If for any reason no designation is in effect, the powers of the Managing General Partner shall be exercised by a majority in interest of the General Partners. Any action required or permitted to be taken by a corporate General Partner hereunder may be taken by such of its proper officers or agents as it shall validly designate for such purpose.

(b)     The Managing General Partner shall have control over the business of the Partnership and shall have all rights, powers and authority conferred by law as necessary, advisable or consistent in connection therewith. Without limiting the generality of the foregoing, the Managing General Partner shall have the right, power and authority to execute any documents relating to the acquisition, financing, rehabilitation, operation and sale of all or any portion of the Apartment Complex with the prior approval of the other General Partners, if any. The Managing General Partner shall be responsible for administering any construction loan draw requests for the development of the Apartment Complex.

(c)     Neither the Investment Limited Partner nor the Special Limited Partner shall have any right to take part in the management or control of the business of the Partnership or to transact any business in the name of the Partnership. No provision of this Agreement which makes the Consent of the Investment Limited Partner or the Consent of the Special Limited Partner a condition for the effectiveness of an action taken by the General Partner is intended, and no such provisions shall be construed, to give the Investment Limited Partner or the Special Limited Partner, as the case may be, any participation in the control of the Partnership business. Each of the Special Limited Partner and the Investment Limited Partner hereby consents to the exercise by the General Partner of the powers conferred on it by law and this Agreement, and the General Partner agrees to exercise control of the business of the Partnership only in accordance with the provisions of this Agreement. Notwithstanding the foregoing, in no event may the provisions of this Section 6.4 be invoked by any General Partner or by any other Person as a defense against or as an impediment to the ability of either the Investment Limited Partner or the Special Limited Partner to take any action hereunder.

6.5.   Duties and Obligations

(a)     The General Partner shall manage the affairs of the Partnership to the best of its ability, shall use its best efforts to carry out the purpose of the Partnership, and shall devote to the Partnership such time as may be necessary for the proper performance of its duties and the business of the Partnership. The General Partner shall promptly take all action which may be necessary or appropriate for the proper development, construction, maintenance and operation of the Apartment Complex in accordance with the provisions of this Agreement, the Project Documents and any applicable laws and Regulations. The General Partner is responsible for the management and operation of the Partnership, including the oversight of the rent-up and operational stages of the Apartment Complex.

(b)     Subject to the provisions of Section 6.5(g), the General Partner shall use its diligent good faith efforts to cause the Partnership to generate Cash Flow for distribution to the Partners at the maximum realizable level in view of (i) any applicable Regulations, (ii) the Minimum Set-Aside Test, (iii) the Rent Restriction Test and (iv) the Projected Rents, and, if necessary, the General Partner also shall use its best efforts to obtain approvals and implementation of appropriate adjustments in the rental schedule of the Apartment Complex.

(c)     The General Partner shall cause the Partnership to obtain and keep in force, during the term of the Partnership, insurance policies in accordance with the Insurance Requirements set forth on Exhibit D hereto. Throughout the term of the Partnership, the General Partner shall provide copies of all such policies (or binders) to the Investment Limited Partner within thirty (30) days after their receipt thereof. The General Partner shall cause the applicable insurer to name the Investment Limited Partner as an "additional insured" on each Partnership insurance policy. Each Partnership insurance policy shall include a provision requiring the insurance company to notify the Investment Limited Partner in writing no less than thirty (30) days prior to any cancellation, non-renewal or material change in the terms and conditions of coverage. The General Partner shall review regularly all of the Partnership and Apartment Complex insurance coverage to insure that it is adequate and continuing. In particular, the General Partner shall review at least annually the insurance coverage required by this Section 6.5(c) to insure that it is in an amount at least equal to the then current full replacement value of the Apartment Complex.

Without limitation of the foregoing, the General Partner shall deliver to the Investment Limited Partner on or before the Admission Date one or more certificates or memoranda of insurance, in form reasonably acceptable to the Investment Limited Partner, evidencing, (i) the existence of the insurance policies and coverages specified on Exhibit D, (ii) that the Partnership and its Partners (including the Investment Limited Partner) are named insured on such policies, and (iii) that such insurance policies will not be cancelled by the insurers except within thirty (30) days' written notice to the Investment Limited Partner. From time to time following the Admission Date, the General Partner shall deliver to the Investment Limited Partner such further certificates or memoranda of insurance as the Investment Limited Partner may reasonably require to confirm that such insurance and notice provisions with respect to insurance under this Agreement have been complied with.

(d)     If at any time there is more than one General Partner, the obligations of the General Partners hereunder shall be the joint and several obligations of each General Partner. Except as otherwise provided in Sections 4.5(b) and 7.1, such obligations shall survive any Withdrawal of a General Partner from the Partnership.

(e)     (i)     The General Partner shall on the Completion Date establish and thereafter maintain reasonable reserves (the "Replacement Reserve") to provide for working capital needs, improvements, replacements and any other contingencies of the Partnership. At a minimum, the General Partner shall cause the Partnership to annually deposit $94,860 (or such greater amount as required by any Lender or Agency) from Cash Flow into the Replacement Reserve (which requirement shall be offset against and not be in addition to any similar capital replacement reserve requirement of any Lender); to the extent that Cash Flow (as determined before

- 50 -

deduction of such reserve deposit) for any Fiscal Year shall be insufficient to make such deposit in full, the General Partner shall fund such shortfall from its own funds as a Subordinated Loan.

(ii)     In addition to the requirements of Section 6.5(e)(i), in order to fund Operating Deficits, the General Partner (or its designee), shall deposit $492,000 into a segregated reserve account (the "Operating Reserve") to secure the General Partner's obligation to fund Operating Deficits, not less than $27,109 of which funds shall be deposited at the time of the satisfaction of the conditions to the payment of the Third Installment and the remainder of which shall be deposited no later than the time of the satisfaction of the conditions to the payment of the Fourth Installment. Funds held in the Operating Reserve may be released to pay operating expenses only after Rental Achievement and with the reasonable approval of the Special Limited Partner and, if required, any Lender. The Operating Reserve may be terminated by the General Partner and upon such termination the funds, if any, remaining in the Operating Reserve shall be released and distributed as Cash Flow in accordance with the provisions of Section 10.2(a), upon the later of (A) the third (3rd) anniversary of Rental Achievement or (B) the achievement of 93% occupancy in the Apartment Complex and a Debt Service Coverage Ratio of 1.15, in each case averaged over a period of twelve (12) consecutive months. Any funds utilized from the Operating Reserve to pay Partnership operating expenses shall not constitute Subordinated Loans. Upon the utilization of such funds from the Operating Reserve, the General Partner shall use its best good faith efforts to redeposit Partnership funds in the Operating Reserve in an amount sufficient to maintain the minimum balances required herein. At the option of the General Partner, all or a portion of the Operating Reserve may be funded by providing a letter of credit in form and substance and from a lending institution approved by the Investment Limited Partner. Further, funded cash operating reserves or similar letters of credit required by any Lender or Agency shall be credited against the requirements of this Section 6.5(e)(ii).

(f)     Each General Partner shall be bound by the provisions of the Project Documents, and no additional General Partner shall be admitted if he, she or it has not first agreed to be bound by this Agreement (and assume the obligations of a General Partner hereunder) and by the Project Documents to the same extent and under the same terms as each of the other General Partners.

(g)     The General Partner shall take all actions appropriate to ensure that the Investment Limited Partner receives the full amount of the Projected Credit, including, without limitation, the rental of apartments to appropriate tenants and the filing of annual certifications as may be required. In this regard, the General Partner shall, inter alia, cause (i) the Partnership to satisfy the Minimum Set-Aside Test, the Rent Restriction Test and all other requirements imposed from time to time under the Code, the Carryover Allocation or otherwise by the Credit Agency with respect to rental levels and occupancy by qualified tenants by the close of the first year of the Credit Period and throughout the Compliance Period so as to permit the Partnership to be entitled to the maximum available Tax Credit (ii) the Partnership to comply with all Tax Credit monitoring procedures of the State, (iii) all dwelling units in the Apartment Complex to be leased for initial periods of not less than six months to individuals satisfying the Rent Restriction Test, (iv) the Partnership to make all appropriate Tax Credit elections in a timely fashion, and (v) all rental units in the Apartment Complex to be of equal quality with comparable amenities available to low-income tenants on a comparable basis without separate fees.

(h)     The General Partner shall cause the Partnership to exclude from its Eligible Basis the amount of the HSF Loan unless directed otherwise by the Special Limited Partner. Further, the Partnership shall not carry on its books as debt any loans other than the permanent phase of the Construction Loan, the Section 236 Loan, and MHFA Subordinate Loan, and the HSF Loan.

(i)     The General Partner shall (i) not store or dispose of (except in compliance with all laws, ordinances, and regulations pertaining thereto) any Hazardous Material at the Apartment Complex, or at or on any other Site or Vessel owned, occupied, or operated either by any General Partner, any Affiliate of a General Partner, or any Person for whose conduct any General Partner is or was responsible; (ii) neither directly nor indirectly transport or arrange for the transport of any Hazardous Material (except in compliance with all laws, ordinances, and regulations pertaining thereto); (iii) provide the Investment Limited Partner with written notice (x) upon any General Partner's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Apartment Complex or any other Site or Vessel owned, occupied, or operated by any General Partner, any Affiliate of a General Partner or any Person for whose conduct any General Partner is or was responsible or whose liability may result in a lien on the Apartment Complex; (y) upon any General Partner's receipt of any notice to such effect from any federal, state, or other Governmental Authority; and (z) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such government authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any General Partner may be liable or for which expense or loss a lien may be imposed on the Apartment Complex.

(j)     The General Partner shall promptly request in writing of the Permanent Lender that the Permanent Lender cause the Special Limited Partner to be named as an "interested party" in the Permanent Loan Documents, so that the Permanent Lender will notify the Special Limited Partner of any default under the Permanent Mortgage or the General Partner shall itself notify the Special Limited Partner of any such default.

(k)     The General Partner shall provide the Special Limited Partner with a true and accurate copy of each Construction Loan requisition and any supporting documents and information which has been submitted for approval by the Construction Lender (whether submitted before or after the Admission Date).

(l)     The General Partner shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in its immediate possession or control. The General Partner shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership. No General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners.

(m)     The General Partner shall cause the Partnership to comply with all of the duties and obligations of the Apartment Complex owner under the Construction Loan Documents and the Permanent Loan Documents.

(n)     The General Partner shall cause the Partnership to provide all social services which the Partnership is obligated to provide in connection with the Apartment Complex, including, without limitation, any such social services described in the Partnership's Tax Credit

application. In addition to the foregoing, the General Partner shall take all action necessary to cause the Partnership to pay all amounts incurred by the Partnership in connection with the provisions of any such social services.

(o)     If required by any Lender of a Mortgage Loan or any Project Document, the General Partner will cause the payment for the rehabilitation of the Apartment Complex to be made in conformity with the requirement of any so-called "Davis-Bacon" or other prevailing wage statutes.

(p)     The General Partner shall cause the amount of the Residual Receipts Loan to be excluded from the Partnership's Eligible Basis.

6.6.    Representations and Warranties

Each General Partner jointly and severally represents and warrants to the Investment Limited Partner and the Special Limited Partner as follows:

(a)     The Partnership is a duly organized limited partnership validly existing and in good standing under the laws of the State and has complied with all filing requirements necessary for its existence and to preserve the limited liability of the Investment Limited Partner and the Special Limited Partner.

(b)     No event or proceeding has occurred or is pending or, is to the Best Knowledge of the General Partner, threatened which would (i) materially adversely affect the Partnership or its properties, or (ii) materially adversely affect the ability of the General Partner or any of its Affiliates to perform their respective obligations hereunder or under any other agreement with respect to the Apartment Complex, other than legal proceedings which have been bonded against without recourse to Partnership assets in such manner as to stay the effect of the proceedings or otherwise have been adequately provided for. This subparagraph shall be deemed to include, without limitation, the following: (w) the occurrence and continuation of a Material Event; (x) legal actions or proceedings before any court, commission, administrative body or other Governmental Authority having jurisdiction over the zoning applicable to the Apartment Complex; (y) labor disputes; and (z) acts of any Governmental Authority.

(c)     No default (or event which, with the giving of notice or the passage of time or both, would constitute a default) has occurred and is continuing under this Agreement or under any material provision of the Project Documents, and the Project Documents are in full force and effect.

(d)     Except as specifically permitted under Section 3.1, no Partner or Related Person bears (or will bear) the Economic Risk of Loss with respect to the Permanent Mortgage Loan. No General Partner has, either on its own behalf or on behalf of the Partnership, incurred any financial obligation with respect to the Partnership prior to the Admission Date, other than as disclosed in writing to the Special Limited Partner prior to the Admission Date.

(e)     The Apartment Complex will be, is being or has been constructed in a timely manner in conformity with the Project Documents. There is no violation by the Partnership or the General Partner of any zoning, environmental or similar regulation applicable to the

Apartment Complex which could have a material adverse effect thereon, and the Partnership has complied and will comply with all applicable municipal and other laws, ordinances and regulations relating to such construction and use of the Apartment Complex. All appropriate public utilities, including, but not limited to, water, electricity, gas (if called for in the Plans and Specifications), and sanitary and storm sewers, are or will be available and operating properly for each unit in the Apartment Complex at the time of the initial occupancy of such unit.

(f)     The Partnership owns good and marketable fee simple title to the Apartment Complex and will at all times be considered to be the owner of the Apartment Complex for federal income tax purposes, subject to no material liens, charges or encumbrances other than those which (i) are both permitted by the Project Documents and are noted or excepted in the Title Policy, (ii) do not materially interfere with use of the Apartment Complex (or any part thereof) for its intended purpose or, other than the permitted Mortgages, have a material adverse effect on the value of the Apartment Complex, or (iii) have been bonded or insured against in such a manner as to preclude the holder of such lien or such surety or insurer from having any recourse to the Apartment Complex or the Partnership for payment of any debt secured thereby, which bond(s) or insurance have been approved by the Lenders.

(g)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken pertaining to the Partnership or the Apartment Complex by each Affiliate of a General Partner which is a corporation or limited liability company have been or will be duly authorized by all necessary corporate or other actions, and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws of such Affiliate or any agreement by which such Affiliate or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree.

(h)     Any General Partner (or partner or member of a General Partner) which is a corporation or limited liability company (a "Corporation/LLC") has been duly organized, is validly existing and in good standing under the laws of its state of organization and has all requisite corporate and other power to be a General Partner and to perform its duties and obligations as contemplated by this Agreement and the Project Documents. Neither the execution and delivery by any Corporation/LLC of this Agreement nor the performance of any of the actions of any Corporation/LLC contemplated hereby has constituted or will constitute a violation of (a) the articles of incorporation, operating agreement, by-laws and any other organizational documents of such Corporation/LLC, (b) any agreement by which such Corporation/LLC is bound or to which any of its property or assets is subject, or (c) any law, administrative regulation or court decree.

(i)     No Event of Bankruptcy has occurred with respect to the Partnership, any General Partner, the Developer or any Guarantor.

(j)     All accounts of the Partnership required to be maintained under the terms of the Project Documents, including, but not necessarily limited to, any account for replacement reserves, are currently funded to the levels required by any Agency or Lender.

#3915778_v6

- 54 -

(k)     The General Partner(s) and Guarantors have a combined net worth which satisfies the Designated Net Worth Requirements.

(l)     All anticipated payments and expenses required to be made or incurred in order to complete the construction of the Apartment Complex in conformity with the Project Documents, to fund any reserves hereunder or under any other Project Document required to be funded at or prior to the later of the Admission Date or Rental Achievement, to satisfy all requirements under the Project Documents and to pay the Development Fee and all other fees, have been or will be paid or provided for utilizing only (i) the funds available from the Construction Loan, (ii) the Capital Contributions of the Investment Limited Partner, (iii) the Capital Contributions of the General Partner in the amounts set forth on Schedule A as of the Admission Date, (iv) the available net rental income, if any, earned by the Partnership prior to Rental Achievement (to the extent that it is permitted to be used for such purposes by any Agency or Lender), (v) any Cash Flow generated subsequent to Rental Achievement (to the extent provided in Section 10.2(a)), (vi) any insurance proceeds and (vii) any funds furnished by the General Partner pursuant to Sections 6.5(e) and 6.11(a).

(m)     The aggregate amount of Tax Credit which is expected to be allocated by the Partnership to the Investment Limited Partner is as set forth in the definition of Projected Credit, provided, however, that the General Partner shall have no liability to the Investment Limited Partner or the Special Limited Partner for any breach of the representation contained in this paragraph (m) if (but only to the extent that) the adjuster provisions set forth in Sections 5.1(e), (f) and (g) have become operative and all required payments or adjustments have been made thereunder in accordance with the terms thereof.

(n)     The Apartment Complex will be, is being or has been constructed and operated in a manner which satisfies Section 42 of the Code and shall continue to satisfy all existing and anticipated restrictions applicable to projects generating Tax Credits.

(o)     No General Partner, Affiliate of a General Partner or Person for whose conduct any General Partner is or was responsible has ever: (i) owned, occupied, or operated a Site or Vessel on which any Hazardous Material was or is stored, transported, or disposed of, except if such storage, transport or disposition was and is at all times in compliance with all laws, ordinances, and regulations pertaining thereto; (ii) directly or indirectly transported, or arranged for transport, of any Hazardous Material (except if such transport was and is at all times in compliance with all laws, ordinances and regulations pertaining thereto); (iii) caused or was legally responsible for any release or threat of release of any Hazardous Material; (iv) received notification from any federal, state or other Governmental Authority of (x) any potential, known, or threat of release of any Hazardous Material from the Apartment Complex or any other Site or Vessel owned, occupied, or operated by any General Partner, by any Affiliate of a General Partner, or by any Person for whose conduct any General Partner is or was responsible or whose liability may result in a lien on the Apartment Complex; or (y) the incurrence of any expense or loss by any such Governmental Authority or by any other Person in connection with the assessment, containment, or removal of any release or threat of release of any Hazardous Material from the Apartment Complex or any such Site or Vessel.

(p)     To the Best Knowledge of the General Partner, no Hazardous Material was ever or is now stored on, transported, or disposed of on the land comprising the Apartment Complex, except to the extent any such storage, transport or disposition was at all times in compliance with all laws, ordinances, and regulations pertaining thereto. The General Partner has provided to the Investment Limited Partner a complete copy of a "Phase I" hazardous waste site assessment report for the Apartment Complex, prepared in accordance with ASTM standards.

(q)     The General Partner has fulfilled and will continue to fulfill all of its duties and obligations under Section 6.5.

(r)     The General Partner has completed or will complete on a timely basis all of the Due Diligence Recommendations.

(s)     The Partnership's basis in the Apartment Complex as of December 31, 2006 (or such later date as allowed by the Credit Agency and Section 42) will be greater than 10% of the Partnership's reasonably expected basis in the Apartment Complex as of December 31, 2008 and all conditions set forth in Section 42 of the Code, the Treasury Regulations, Service notices, rulings or releases and any other authorities to the validity of the allocation of tax credit have been or will be satisfied in a timely manner.

(t)     To the General Partner's Best Knowledge, all consents or approvals of any governmental authority, or any other Person, necessary in connection with the transactions contemplated by this Agreement or necessary to admit the Investment Limited Partner to the Partnership as a Limited Partner have been obtained by the General Partner and as of the Admission Date, each Investment Limited Partner is duly admitted as a Limited Partner of the Partnership owning an aggregate 99.99% limited partnership interest in the Partnership free and clear of any and all claims, liens, charges and encumbrances.

(u)     The General Partner and the Partnership are under no obligation under any federal or state law, rule, or regulation to register the Interests or to take any action in order to comply with any exemption available for the sale of Interests without registration.

(v)     None of the loans evidenced by the Mortgages constitutes a "federal grant" within the meaning of Section 42(d)(5)(A) of the Code.

(w)     The Partnership and the Credit Agency have entered or, prior to the end of the first year of the Credit Period, will enter, into the "extended low-income housing commitment" within the meaning of Section 42(h)(6)(B) of the Code and such commitment shall remain in full force and effect throughout the entire extended use period as defined in Section 42(h)(6)(D) of the Code.

(x)     ORDC will make the election under Section 168(h)(6) of the Code and no portion of the Apartment Complex is or will be treated as "tax exempt use property" as defined in Section 168(h) of the Code.

(y)     The General Partner shall not act in any manner which will cause (i) the Partnership to be treated for federal income tax purposes as an association taxable as a corporation, (ii) the Partnership to fail to qualify as a limited partnership under the Act, or (iii)

the Limited Partner to be liable for Partnership obligations, including, without limitation, the obligations set forth in the Mortgage documents.

(z)     The General Partner shall not employ any person as an employee of the Partnership.

(aa)     The Apartment Complex was acquired by the Partnership by "purchase" (as defined in Sections 179(d)(2) and 42(d)(2)(B)(i) of the Code).

(bb)     A period of at least 10 years elapsed between the date of the acquisition of the Apartment Complex by the Partnership and the later of (i) the date it was last placed in service, or (ii) the date of the most recent "nonqualified substantial improvement" (as defined in Section 42(d)(2)(D)(i)) to the Apartment Complex. For purposes of the representation contained in this paragraph, there shall not be taken into account any placement in the service described in clauses (I) through (V) of Section 42(d)(2)(D)(ii) of the Code.

(cc)     The Apartment Complex was not previously placed in service by the Partnership or by any person who was a "related person" (as defined in Section 42(d)(2)(D)(iii)(II) of the Code) with respect to the Partnership as of the last time the Apartment Complex was placed in service.

(dd)     There have been no transfers totaling fifty percent (50%) or more of the interests in the seller of the Apartment Complex during any twelve (12) month period over the ten (10) years period prior to the Partnership's acquisition of the Apartment Complex. Neither the seller, nor any of the seller's constituents partners, has made an election under Code Section 754 with respect to basis in the Apartment Complex during any one of the prior ten (10) years from the date the Partnership acquired the Apartment Complex.

6.7.   Liability on Mortgages

Neither any General Partner nor any Related Person shall at any time bear the Economic Risk of Loss for the payment of any portion of any Mortgage Loan, and the General Partner shall not permit any other Partner or any Related Person to bear the Economic Risk of Loss for the payment of any portion of any Mortgage Loan, except as may be expressly permitted pursuant to the provisions of Article III with the Consent of the Special Limited Partner.

6.8.   Indemnification of the General Partner

(a)     Except as provided by Article V, no General Partner or any Affiliate thereof shall have liability to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of any General Partner or Affiliate thereof if such General Partner or Affiliate thereof in good faith determined that such course of conduct was in the best interest of the Partnership and such course of conduct did not constitute gross negligence or willful misconduct of such General Partner or Affiliate thereof.

(b)     A General Partner or any Affiliate thereof shall be indemnified by the Partnership from and against any Adverse Consequences sustained in connection with the business and operations of the Partnership, provided that all of the following conditions are met:  (i) such

General Partner has determined, in good faith, that the course of conduct which caused the loss, judgment, liability, expense or amount paid in settlement was in the best interests of the Partnership; and (ii) such Adverse Consequences were not the result of gross negligence or willful misconduct on the part of such General Partner or Affiliate thereof; and (iii) such indemnification or agreement to hold harmless is recoverable only out of the assets of the Partnership, and not from the Limited Partners.

(c)     Notwithstanding the above, no Partner or any Affiliate thereof performing services for the Partnership or any broker-dealer shall be indemnified for any Adverse Consequences arising from or out of an alleged violation of federal or state securities laws unless there has been a successful adjudication on the merits of each count involving securities laws violations as to the particular indemnitee and the court finds that indemnification of the settlement and related costs should be made. In any claim for indemnification for federal or state securities law violations, the party seeking indemnification shall, prior to seeking court approval for such indemnification, place before the court the positions of the Securities and Exchange Commission, the Massachusetts Securities Division and any other applicable state securities administrator with respect to the issue of indemnification for securities law violations.

(d)     The Partnership shall not incur the cost of the portion of any insurance, other than public liability insurance or course of construction insurance, which insures any party against any liability as to which such party is herein prohibited from being indemnified.

(e)     The Partnership may indemnify Affiliates of a General Partner under this Section 6.8 only if the loss involves an activity in which such Affiliates acted in the capacity of a General Partner.

(f)     For purposes of this Section 6.8 only, the term "Affiliate" shall mean (i) any Person performing services on behalf of the Partnership who (x) directly or indirectly controls, is controlled by or is under common control with a General Partner; (y) owns or controls ten percent (10%) or more of the outstanding voting securities of a General Partner or (z) is an officer, director, partner, member, manager or trustee of a General Partner; and (ii) any Person for whom the General Partner acts as an officer, director, partner or trustee. For purposes of this Section 6.8 only, the term "controls" and any form of such term shall mean the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise.

6.9.     Indemnification of the Partnership and the Limited Partners

(a)     Each General Partner jointly and severally will indemnify and hold the Partnership and the Limited Partners harmless from and against any and all Adverse Consequences which the Partnership or any Limited Partner may incur by reason of (i) the past, present or future actions or omissions of the General Partner or any of its Affiliates constituting gross negligence or willful misconduct, or (ii) any liabilities to which either the Partnership or the Apartment Complex is subject; provided, however, that the foregoing indemnification shall not be construed to (x) affect the non-recourse nature of any Mortgage or (y) limit the Partnership's primary liability for contractual obligations incurred pursuant to the requirements

of any Agency or Lender in connection with the operation of the Apartment Complex in the ordinary course of business.

(b)     Notwithstanding the foregoing, no General Partner shall be liable to a Limited Partner or the Partnership for any act or omission for which the Partnership is required to indemnify such General Partner under Section 6.8, except as provided by Article V.

(c)     Each General Partner shall jointly and severally indemnify, defend, and hold the Limited Partners harmless on an after-tax basis from and against any Adverse Consequences related to or arising out of the presence of any Hazardous Material at the Apartment Complex (other than any Adverse Consequences resulting from the acts or omissions of the Limited Partners). Any claim or loss described in the immediately preceding sentence may be defended, compromised, settled, or pursued by the Limited Partners with counsel of the Limited Partners' selection, but at the expense of the General Partner. Notwithstanding anything else set forth herein, this indemnification shall survive the withdrawal of any General Partner and/or the termination of this Agreement.

6.10.  Operating Deficits

Subject to any Requisite Approvals, the General Partners shall be obligated during the period from Rental Achievement until the third (3rd) anniversary of Rental Achievement, provided that the Partnership achieved on average a Debt Service Coverage Ratio of 1.15 to 1.00 for the immediately preceding twelve (12) months, with such period to be extended until such Debt Service Coverage Ratio is met (the "Subordinated Loan Period"), to promptly advance funds to eliminate any Operating Deficit, provided however, that the General Partners, collectively, shall not be obligated to have Subordinated Loans outstanding at any one time in excess of $750,000 and each General Partner, individually, shall not be obligated to have Subordinated Loans outstanding at any one time in excess of $375,000. In any case in which the General Partners otherwise would be required to advance funds under this Section 6.10, any amounts then held in the Operating Reserve may be released and disbursed for the purpose of eliminating the Operating Deficit before the General Partners shall be required to advance their own funds. In the event that a General Partner shall fail to make any such advance as aforesaid, (a) the Partnership shall utilize amounts (the "Applied Amounts") otherwise payable to the General Partners or their Affiliates under Section 6.12 and/or Article X to meet the obligations of the General Partners pursuant to this Section 6.10, with such utilization of Applied Amounts constituting payment and satisfaction of the corresponding amounts payable to the General Partners or their Affiliates under Section 6.12 and/or Article X, with the proceeds thereof being applied to such obligations, and with the obligation of the Partnership to make such payments to the General Partners or their Affiliates pursuant to Section 6.12 and/or Article X being deemed to have been satisfied to the extent thereof and (b) the Special Limited Partner shall have the option, exercisable in its sole discretion, to cause it or one or more of its designees to be admitted to the Partnership as additional General Partner(s). An additional General Partner so admitted shall automatically, without the need for any further action by any Partner, become the Managing General Partner and shall be delegated all of the powers and authority of all of the General Partners pursuant to Section 6.13. Each Partner hereby grants to any such additional General Partner a power of attorney, coupled with an interest and irrevocable to the extent permitted by law, to execute and deliver any and all instruments and documents which it believes to be

necessary or appropriate in order to accomplish the purposes of this Section 6.10 and to manage the business of the Partnership. The admission of an additional General Partner shall not relieve any other General Partner of any of its economic obligations hereunder, and each other General Partner shall indemnify and hold harmless the additional General Partner from and against any and all Adverse Consequences sustained in connection with the additional General Partner's status as a General Partner (other than Adverse Consequences arising solely out of the negligence or misconduct of such additional General Partner). Any additional General Partner admitted under this paragraph shall withdraw (notwithstanding the provisions of Article VII) as such and remain only as the Special Limited Partner upon payment by the General Partner of all amounts due under this paragraph. For the purpose of this Section 6.10, all expenses shall be paid on a thirty (30)-day current basis. Moreover, any General Partner may in its sole discretion at any time advance funds to the Partnership to pay operating expenses and/or debt service of the Partnership in order to facilitate the Partnership's compliance with the Rent Restriction Test. All advances pursuant to Section 6.5(e) and this Section 6.10 (including any Applied Amounts), except advances from the Operating Reserve, shall constitute non-interest-bearing Subordinated Loans. Subordinated Loans shall be repaid in accordance with the provisions of Article X. The form and provisions of all Subordinated Loans shall conform to any applicable Regulations.

6.11. Obligation to Complete the Construction of the Apartment Complex

(a)    To the extent the Developer fails to do so under the Development Agreement, the General Partner shall be obligated to complete the construction of the Apartment Complex and pay all costs necessary to achieve Rental Achievement in the manner set forth in this Agreement and the Development Agreement.

(b)    The completion of the Apartment Complex shall be secured by a completion assurance agreement and letter of credit approved by the Investment Limited Partner and by the Guaranty.

6.12. Certain Payments to the General Partner and Others

(a)    As reimbursement for certain advances and as compensation for the Developer's services in connection with the development and rehabilitation of the Apartment Complex, the Partnership shall pay to the Developer a development fee (the "Development Fee") in the amount and at the times set forth in the Development Agreement. If the Development Fee has not been fully paid by the twelfth (12th) anniversary of the Completion Date, the General Partner shall make a Capital Contribution to the Partnership in an amount sufficient to enable the Partnership to pay any unpaid portion of the Development Fee.

(b)    The Partnership shall pay to the Special Limited Partner or an Affiliate thereof a fee (the "Asset Management Fee") commencing in 2006 for its services in connection with the Partnership's accounting matters relating to the Investment Limited Partner and assisting with the preparation of tax returns and the reports required by Section 12.7 in the annual amount of $5,000, increased each year by a factor equal to the percentage increase in the Consumer Price Index for such year. The Asset Management Fee shall be payable from Cash Flow in the manner and priority set forth in Section 10.2(a); provided however, that if in any Fiscal Year, Cash Flow is insufficient to pay the full amount of the Asset Management Fee, the General Partner shall

£ 3915778_v6

advance the amount of such deficiency to the Partnership as a Subordinated Loan.  If for any reason the Asset Management Fee is not paid in any Fiscal Year, the unpaid portion thereof shall accrue and be payable on a cumulative basis in the first Fiscal Year in which there is sufficient Cash Flow or Capital Proceeds as provided in Article X.

(c)     In consideration of the services of the General Partners in managing the day-to-day business and affairs of the Partnership, the Partnership shall pay to the General Partners an annual fee (to be split between the General Partners 50-50) (the "Partnership Management Fee") commencing in 2006 in the amount of $5,000, increased each year by a factor equal to the percentage increase in the Consumer Price Index for such year, payable from Cash Flow in the manner set forth in Section 10.2(a).  The Partnership Management Fee shall be noncumulative so that if there is not sufficient Cash Flow in any Fiscal Year to pay the amount of the Partnership Management Fee specified for such use in Section 10.2(a), the Partnership shall have no obligation to pay such shortfall in any future Fiscal Year.

(d)     The Partnership also shall pay to the General Partners the Incentive Management Fee as set forth in the Incentive Management Agreement.

6.13.   Delegation of General Partner Authority

(a)     If there shall be more than one General Partner serving hereunder, each General Partner may from time to time, by an instrument in writing, delegate all or any of his powers or duties hereunder to another General Partner or General Partners.

(b)     Each contract, deed, mortgage, lease and other instrument executed by any General Partner shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof (i) the Partnership was in existence, (ii) this Agreement had not been amended in any manner so as to restrict the delegation of authority among General Partners (except as shown in certificates or other instruments duly filed in the Filing Office) and (iii) the execution and delivery of such instrument was duly authorized by the General Partners.  Any Person may always rely on a certificate addressed to him and signed by any General Partner hereunder:

(1)     as to who are the General Partners or Limited Partners hereunder;

(2)     as to the existence or nonexistence of any fact which constitutes a condition precedent to acts by the General Partners or in any other manner germane to the affairs of the Partnership;

(3)     as to who is authorized to execute and deliver any instrument or document of the Partnership;

(4)     as to the authenticity of any copy of this Agreement and any amendments thereto; or

(5)     as to any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

6.14.   Assignment to Partnership

The Developer and the General Partner hereby transfer and assign to the Partnership all of their right, title and interest in and to the Apartment Complex and in and to all of the Project Documents, including, but not limited to, the following: (i) all contracts with architects, supervising architects, engineers and contractors with respect to the development of the Apartment Complex; (ii) all plans, specifications and working drawings heretofore prepared or obtained in connection with the Apartment Complex; (iii) all governmental commitments and approvals obtained, and applications therefore, including, but not limited to those relating to planning, zoning, building permits and Tax Credits; (iv) any and all commitments with respect to any Mortgage(s); and (v) any and all contracts or rights with respect to any agreements with any Agency or Lender.

6.15.   Contracts with Affiliates

(a)       The General Partner or any Affiliate thereof may act as Management Agent upon the terms and conditions set forth in Article XI.

(b)       The General Partner or any Affiliates thereof shall have the right to contract or otherwise deal with the Partnership for the sale of goods or services to the Partnership in addition to those set forth herein, if (i) compensation paid or promised for such goods or services is reasonable (i.e., at fair market value) and is paid only for goods or services actually furnished to the Partnership, (ii) the goods or services to be furnished shall be reasonable for and necessary to the Partnership, (iii) the fees, terms and conditions of such transaction are at least as favorable to the Partnership as would be obtainable in an arm's-length transaction, and (iv) no agent, attorney, accountant or other independent consultant or contractor who also is employed on a full-time basis by the General Partner or any Affiliate shall be compensated by the Partnership for his services. Other than the Construction Contract, any contract covering such transactions shall be in writing and shall be terminable without penalty on sixty (60) days written notice. Any payment made to the General Partner or any Affiliate for such goods or services shall be fully disclosed to all Limited Partners in the reports required under Article XII. Neither the General Partner nor any Affiliate shall, by the making of lump-sum payments to any other Person for disbursement by such other Person, circumvent the provisions of this Section 6.15(b).

6.16.   Tax Matters Partner

(a)       The Managing General Partner hereby is designated as Tax Matters Partner of the Partnership, and shall engage in such undertakings as are required of the Tax Matters Partner of the Partnership as provided in treasury regulations pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.

(b)       With the Consent of the Investment Limited Partner, the Tax Matters Partner hereby is authorized, but not required:

(i)      to enter into any settlement agreement with the Service with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other Partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and treasury regulations thereunder) files a statement with the Service providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner;

(ii)     in the event that a notice of final administrative adjustment at the Partnership level of any item required to be taken into account by a Partner for tax purposes (a "Final Adjustment") is mailed to the Tax Matters Partner, to seek judicial review of such Final Adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Claims Court;

(iii)    to intervene in any action brought by any other Partner for judicial review of a Final Adjustment;

(iv)    to file a request for an administrative adjustment with the Service at any time and, if any part of such request is not allowed by the Service, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request;

(v)     to enter into an agreement with the Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or Regulations.

(c)     The Partnership shall indemnify and reimburse the Tax Matters Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Partners.  The payment of all such expenses shall be made before any distributions are made from Cash Flow or any discretionary reserves are set aside by the General Partner.  The General Partner shall have the obligation to provide Partnership funds for such purpose, but only to the extent of available Partnership resources.  The taking of any action and the incurring of any expense by the Tax Matters Partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Partner and the provisions on limitations of liability of the General Partner and indemnification set forth in Section 6.8 of this Agreement shall be fully applicable to the Tax Matters Partner in its capacity as such.

ARTICLE VII
Withdrawal of a General Partner; New General Partners

7.1.    Voluntary Withdrawal

No General Partner shall have the right to Withdraw voluntarily from the Partnership or to sell, assign or encumber its Interest without the Consent of the Investment Limited Partner and each of the other General Partners (if any) and, if required, any Requisite Approvals.

7.2.    Reconstitution

In the event of the Withdrawal of a General Partner, the Partnership shall not be dissolved or required to be wound up if (i) at the time of such Withdrawal there is at least one remaining General Partner and that General Partner carries on the business of the Partnership (any such remaining General Partner being hereby authorized to carry on the business of the Partnership), or (ii) within ninety (90) days after such Withdrawal all remaining Partners agree in writing to continue the business of the Partnership and to the appointment, effective as of the date of such Withdrawal, of one or more additional General Partners.   Within ten (10) days after the occurrence of such Withdrawal, the remaining General Partners, if any, shall notify the Investment Limited Partner thereof:

(i)    The reconstituted limited partnership shall continue until the occurrence of a Liquidating Event as provided in Section 2.4;

(ii)    If the successor General Partner is not a former General Partner, then the provisions of Section 7.4(d) shall apply; and

(iii)    All necessary steps shall be taken to cancel this Agreement and the Certificate and to enter into a new partnership agreement and certificate of limited partnership, and the successor General Partner shall be obligated to take such steps.

7.3.    Successor General Partner

(a)    Upon the occurrence of any Withdrawal, the remaining General Partners may designate a Person to become a successor General Partner to the Withdrawing General Partner. Any Person so designated, subject to any Requisite Approvals, the Consent of the Investment Limited Partner and, if required by the Act or any other applicable law, the consent of any other Partner so required, shall become a successor General Partner upon his written agreement to be bound by the Project Documents and by the provisions of this Agreement.

(b)    If any Withdrawal shall occur at a time when there is no remaining General Partner and the Partners do not unanimously elect to continue the business of the Partnership in accordance with the provisions of clause (ii) of Section 7.2(a) above, then the Investment Limited Partner shall have the right, subject to any Requisite Approvals, to designate a Person to become a successor General Partner upon his written agreement to be bound by the Project Documents and by the provisions of this Agreement.

(c)     If the Investment Limited Partner elects to reconstitute the Partnership and admit a successor General Partner pursuant to this Section 7.3, the relationship of the Partners in the reconstituted Partnership shall be governed by this Agreement.

7.4.    Interest of Predecessor General Partner

(a)     No assignee or transferee of all or any part of the Interest as a General Partner of a General Partner shall have any automatic right to become a General Partner.  Until the acquisition of the Interest of a Withdrawing General Partner pursuant to Section 7.4(d) or 7.6, such Interest shall be deemed to be that of an assignee and the holder thereof shall be entitled only to such rights as an assignee may have as such under the laws of the State.

(b)     Anything herein contained to the contrary notwithstanding, any General Partner who Withdraws voluntarily in violation of Section 7.1 shall remain liable for all of its obligations under this Agreement, for all its other obligations and liabilities hereunder incurred or accrued prior to the date of its Withdrawal and for any loss or damage which the Partnership or any of its Partners may incur as a result of such Withdrawal (except as provided in Section 6.8(a)).

(c)     The estate (which term, for purposes of this Section 7.4(c), shall include the heirs, distributees, estate, executors, administrators, guardian, committee, trustee or other personal representative) of a Withdrawn General Partner shall be liable for all his liabilities and obligations hereunder, except as provided in this Section 7.4(c).  In the event of the death, insanity or incompetency of a General Partner, his estate shall remain liable for all of his obligations and liabilities hereunder incurred or accrued prior to the date of such event, and for any damages arising out of any breach of this Agreement by him, but his estate shall not have any obligation or liability on account of the business of the Partnership or the activities of the other General Partners after his death, insanity or incompetency unless it becomes a General Partner pursuant to Section 7.3(a).

(d)     The Disposition of the General Partner Interest of a General Partner who or which Withdraws voluntarily in compliance with this Agreement shall be accomplished in such manner as shall be acceptable to the remaining General Partners and shall be approved by Consent of the Investment Limited Partner.  Except as provided in the preceding sentence, upon the Withdrawal of a General Partner (other than a General Partner who or which is removed as such pursuant to Section 4.5), such Withdrawn General Partner shall be deemed to have automatically transferred to the remaining General Partners, in proportion to their respective General Partner Interests, or, if there shall be no remaining General Partner, then to the Partnership for the benefit of the remaining Partners, all or such portion of the General Partner Interest of such Withdrawn General Partner which, when aggregated with the existing General Partner Interests of all such remaining General Partners, will be sufficient in the opinion of the Tax Accountants to assure such remaining General Partners a sufficient interest in all Profits, Losses, Tax Credits and distributions of the Partnership under Article X so as to be deemed to be a Partner of the Partnership for federal income tax purposes.  No documentation shall be necessary to effectuate such transfer, which shall be automatic, and no consideration shall be payable therefor.  For the purposes of Article X, the effective date of the transfer pursuant to the provisions of this Section 7.4(d) of the General Partner Interest of a Withdrawn General Partner shall be deemed to be the date on which such Withdrawal occurs.  That portion of the General Partner Interest (the

"Remaining Interest") of the Withdrawing General Partner which shall not have been transferred pursuant to this Section 7.4(d) (except in respect of a removed General Partner), shall be retained by such Withdrawing General Partner (or pass to legal representatives thereof) who or which shall have the status of a special Limited Partner, but with the right to receive only that share of the Profits, Losses, Tax Credits and distributions of the Partnership to which the Withdrawing General Partner, as such, would have been entitled had he or it remained, reduced to the extent of the General Partner Interest transferred hereunder, but such Withdrawing General Partner (or his or its legal representatives, as the case may be) shall not be considered to be a Special Limited Partner for the purpose of exercising any rights reserved to the Special Limited Partner under this Agreement or sharing the benefits allocated to the Special Limited Partner under Article X hereof and shall not participate in the votes or consents of the Limited Partners hereunder; provided, however, that in the case of a General Partner who or which Withdraws involuntarily without violation of this Agreement, the Partnership shall have the option (but not the obligation), exercisable by notice to the holder of such Interest within six (6) months following the date of such Withdrawal, to acquire the Remaining Interest of such Withdrawing General Partner (or the Special Limited Partner Interest deriving therefrom) in accordance with the valuation and payment provisions of Section 7.6.

7.5.   Amendment of Certificate; Approval of Certain Events

(a)   Upon the admission of a new General Partner pursuant to the preceding provisions of this Article VII, Schedule A shall be amended to reflect such admission and an amendment to the Certificate, also reflecting such admission, shall be filed as required by the Act.

(b)   Each Partner hereby consents to and authorizes any admission or substitution of a General Partner or any other transaction, including, without limitation, the continuation of the Partnership business, which has been authorized under the provisions of this Agreement, and hereby ratifies and confirms each amendment of this Agreement necessary or appropriate to give effect to any such transaction.

7.6.   Valuation and Sale of Interest of Former General Partner

(a)   Subject to the provisions of Section 7.4(d), if the business of the Partnership is continued after the Withdrawal of a General Partner, or if, following such event, the Partnership is reconstituted and continued, in each case as contemplated by this Agreement, the Partnership shall purchase such General Partner's Interest if such removal is without cause or if such Withdrawal is not in violation of this Agreement (which term, and words of like import, as used in this Section 7.6 shall refer only to the "Remaining Interest" of such Withdrawing General Partner as defined in Section 7.4(d) in all cases where applicable) each for a price equal to the fair market value thereof. Such fair market value shall be determined by two independent appraisers, one selected by the former General Partner or its representative and one by the Partnership. If such appraisers are unable to agree on the value of the former General Partner's Interest, they shall jointly appoint a third independent appraiser whose determination shall be final and binding. The appraisers may act with or without a hearing, and the cost of the appraisal will be shared equally between such former General Partner and the Partnership. If a General Partner is removed by the Investment Limited Partner for cause, or if a General Partner has

- 66 -

voluntarily withdrawn from the Partnership in contravention of the terms of this Agreement, the General Partner shall forfeit its Interest to the Partnership, not as a penalty but as liquidated damages to compensate the Partnership for the action of such General Partner leading to its removal, or for the fact of its violation of the terms of this Agreement.

(b)    Promptly after the determination of the purchase price of a former General Partner's Interest pursuant to Section 7.5(a), the Partnership shall deliver to such former General Partner a promissory note of the Partnership for such purchase price, payable in five equal consecutive annual installments commencing on the first anniversary of the date of such note. Such promissory note shall bear simple interest at the rate per annum which is at all times the AFR, payable on the last day of each calendar quarter during which such note is outstanding. Within one hundred twenty (120) days after the determination of the purchase price of the former General Partner's Interest, the Partnership may, with the consent of all remaining General Partners and the Consent of the Investment Limited Partner, sell such Interests to one or more Persons, who may be Affiliates of the remaining General Partner or General Partners, and admit such Person or Persons to the Partnership as substitute General Partners; provided, however, that the purchase price to be paid to the Partnership for the Interest of the former General Partner shall not be less than its purchase price as determined by the appraisal and, if applicable, arbitration described above.  Such substitute General Partners may pay said purchase price in installments in the manner set forth above in this Section 7.6(b).

7.7.    Designation of New General Partners

The General Partner may, with the written consent of all Limited Partners, at any time designate new General Partners, each with such Interest as a General Partner in the Partnership as the General Partner may specify, subject to any Requisite Approvals.

Any new General Partner shall, as a condition of receiving any interest in the Partnership property, agree to be bound by the Project Documents and any other documents required in connection therewith and by the provisions of this Agreement, to the same extent and on the same terms as any other General Partner.

## ARTICLE VIII
### Transferability of a Limited Partner's Partnership Interests

8.1.   Assignments

(a)   Each of the Limited Partners may each assign all or any part of its Partnership Interest without the consent of any other Partner.

(b)   An assignee of a Limited Partner who does not become a Substituted Limited Partner shall have, and shall only have, the right to receive the share of allocations and distributions of the Partnership to which the assigning Limited Partner would have been entitled with respect to the Partnership Interest (or portion thereof) so assigned if no such assignment had been made by such Limited Partner. Any assigning Limited Partner whose assignee becomes a Substituted Limited Partner shall thereupon cease to be a Limited Partner and shall no longer have any of the rights or privileges of a Limited Partner. Where the assignee does not become a Substituted Limited Partner, the Partnership shall recognize such assignment not later than the last day of the calendar month following receipt of notice of assignment and all documentation required in connection therewith.

(c)   Every assignee of a Limited Partner's Partnership Interest (or any portion thereof) who desires to make a further assignment of its Partnership Interest shall be subject to all the provisions of this Article VIII.

8.2.   Substituted Limited Partner

Each Limited Partner shall have the right to substitute an assignee as Limited Partner in its place without the consent of any other Partner; provided that any Substituted Limited Partner shall execute such instrument or instruments as shall be reasonably required by the General Partners to signify the agreement of such Substituted Limited Partner to be bound by all the provisions of this Agreement.

8.3.   Restrictions

(a)   No Disposition of a Limited Partner Interest may be made if such Disposition would violate the provisions of Sections 8.1, 8.2 or 13.1.

(b)   In no event shall all or any part of a Limited Partner Interest be Disposed of to a minor (other than to a descendant by reason of death) or to an incompetent.

(c)   The General Partner may, in addition to any other requirement it may impose, require as a condition of any Disposition of a Limited Partner Interest that the transferor (i) assume all costs incurred by the Partnership in connection therewith and (ii) furnish the Partnership and the other Partners with an opinion of counsel satisfactory to counsel to the Partnership that such Disposition complies with applicable federal and state securities laws.

(d)   Any sale, exchange, transfer or other Disposition of a Limited Partner Interest in contravention of any of the provisions of this Section 8.3 shall be void and ineffectual and shall not bind or be recognized by the Partnership.

## ARTICLE IX
### Borrowings

All Partnership borrowings shall be subject to the terms of this Agreement and the Project Documents and may be made from any source, including Partners and their Affiliates. Any Partnership borrowings from any Partner shall be subject to any Requisite Approvals. If any Partner shall lend any monies to the Partnership, the amount of any such loan shall not increase such Partner's Capital Contribution. If any Partner shall so lend monies, each such loan (a "Voluntary Loan") shall be an obligation of the Partnership and (except for Subordinated Loans) shall be repayable to such Partner on the same basis and with the same rate of interest as would be applicable to a comparable loan to the Partnership from a third party. Funds advanced by the General Partner to the Partnership as Subordinated Loans shall not constitute borrowings for the purposes of this Article IX or for any other purposes.

## ARTICLE X
### Profits, Losses, Tax Credits, Distributions and Capital Accounts

10.1. <u>Profits, Losses and Tax Credits</u>

(a)     Subject to the provisions of Section 10.1(b) and Section 10.4, for each Partnership Fiscal Year or portion thereof, all Operating Profits and Losses, tax-exempt income, losses, non-deductible non-capitalizable expenditures and Tax Credits incurred or accrued on or after the Commencement Date shall be allocated 99.99% to the Investment Limited Partner, 0.005% to RPALLC and 0.005% to ORDC.

(b)     Except as otherwise specifically provided in this Article, all Profits and Losses arising from a Capital Transaction shall be allocated to the Partners as follows:

<u>*As to Profits*</u>:

<u>*First*</u>, that portion of Profits (including any Profits treated as ordinary income for federal income tax purposes) shall be allocated to the Partners who have negative Capital Account balances in proportion to the amounts of such balances, provided that no Profits shall be allocated to a Partner under this Clause <u>First</u> to increase any such Partner's Capital Account above zero; and

<u>*Second*</u>, Profits in excess of the amounts allocated under Clause <u>First</u> above shall be allocated to and among the Partners in the same percentages as cash is distributed under Clause <u>Sixth</u> of Section 10.2(b);

<u>*As to Losses*</u>:

<u>*First*</u>, an amount of Losses shall be allocated to the Partners to the extent and in such proportions as shall be necessary such that, after giving effect thereto, the respective balances in all Partners' Capital Accounts shall be in the ratio of 99.99% for the Investment Limited Partner, 0.005% to RPALLC and 0.005% to ORDC;

<u>*Second*</u>, an amount of Losses shall be allocated to the Partners until the balance in each Partner Capital Account equals the amount of such Partner's Capital Contribution (after the allocation under Clause <u>First</u> above);

<u>*Third*</u>, an amount of Losses shall be allocated to the Partners to the extent of and in proportion to such Partners' Capital Account balances (after the allocations under Clauses <u>First</u> and <u>Second</u> above); and

<u>*Fourth*</u>, any remaining amount of Losses after the allocation under Clauses <u>First</u>, <u>Second</u> and <u>Third</u> above shall be allocated to the Partners in accordance with the manner in which they bear the Economic Risk of Loss associated with such Loss; provided, however, that in the event that no Partner bears an Economic Risk of Loss then any remaining Losses shall be allocated 99.99% to the Investment Limited Partner, 0.005% to RPALLC and 0.005% to ORDC.

10.2.   Cash Distributions Prior to Dissolution

(a)     Cash Flow

Subject to any Requisite Approvals and except as otherwise required under the documents evidencing the Residual Receipts Loan, Cash Flow for each Fiscal Year or portion thereof shall be applied as follows:

*First,* to the pro rata payment to each Investment Limited Partner of the full amount (including interest) of any Credit Recovery Loans;

*Second,* to the payment of the Asset Management Fee for such Fiscal Year and for any previous Fiscal Year(s) as to which the Asset Management Fee shall not yet have been paid in full;

*Third,* to the payment of any unpaid portion of the Development Fee;

*Fourth,* to the repayment of any Subordinated Loans;

*Fifth,* to the distribution to the General Partner (or its designee) of any portion of the Operating Reserve which may be released and disbursed in accordance with the provisions of Section 6.5(e)(ii);

*Sixth,* to the payment of the Partnership Management Fee for such Fiscal Year;

*Seventh,* to the payment of the Incentive Management Fee; and

*Eighth,* the balance thereof, if any, shall be distributed annually, seventy-five (75) days after the end of the Fiscal Year, 10% to the Investment Limited Partner and 90% to the General Partner (to be shared between the General Partners 45% to RPALLC and 45% to ORDC), provided however, that such percentages shall be altered under this Clause Eighth to the extent necessary to cause not less than 10% of Cash Flow available for distribution after giving effect to Clause Fourth above to be distributed to the Investment Limited Partner.

(b)     Distributions of Capital Proceeds

Prior to dissolution, if Capital Proceeds are available for distribution from a Capital Transaction, such Capital Proceeds shall be applied or distributed as follows:

*First,* to the payment of all matured debts and liabilities of the Partnership (including, but not limited to, all expenses of the Partnership incident to such Capital Transaction), excluding (i) debts and liabilities of the Partnership to Partners or their Affiliates, (ii) all unpaid fees owing to the General Partner or its Affiliates and (iii) notes delivered and payable pursuant to Section 7.6(b); and to the establishment of any reserves which the General Partner and the Auditors shall deem reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Partnership;

*Second*, to the payment to the Investment Limited Partner of the full amount (including interest) of any Credit Recovery Loans;

*Third*, to the payment of any accrued and unpaid Asset Management Fees;

*Fourth*, to the repayment of any Subordinated Loans;

*Fifth*, to the repayment of any remaining unpaid debts and liabilities owed to Partners or Affiliates thereof by the Partnership for Partnership obligations (exclusive of Credit Recovery Loans and Subordinated Loans) to any of them, including, but not limited to, accrued and unpaid amounts due in respect of any and all fees (including but not limited to the Development Fee) due and payable to the General Partner or its Affiliates as set forth in Section 6.12; provided, however, that any debts or obligations to be repaid to any Limited Partner or Affiliate thereof pursuant to this Clause *Fifth* shall be repaid prior to the repayment of any such debts or obligations to any General Partner or Affiliate thereof; and

*Sixth*, subject to the provisions of Section 10.3(a), any balance 9.999% to the Investment Limited Partner, .001% to the Special Limited Partner and 90% to the General Partner (to be shared between the General Partners 45% to RPALLC and 45% to ORDC).

10.3.   Distributions Upon Dissolution

(a)     Upon dissolution and termination, after payment of, or adequate provision for, the debts and obligations of the Partnership, the remaining assets of the Partnership shall be distributed to the Partners in accordance with the positive balances in their Capital Accounts after taking into account all Capital Account adjustments for the Partnership Fiscal Year, including adjustments to Capital Accounts pursuant to Sections 10.1(b) and 10.3(b). In the event that a General Partner has a negative balance in its Capital Account following the liquidation of the Partnership or such Partner's Interest, after taking into account all Capital Account adjustments for the Partnership Fiscal Year in which such liquidation occurs, such Partner shall pay to the Partnership in cash an amount equal to the negative balance in such Partner's Capital Account. Such payment shall be made by the end of such Fiscal Year (or, if later, within ninety (90) days after the date of such liquidation) and shall, upon liquidation of the Partnership, be paid to recourse creditors of the Partnership or distributed to other Partners in accordance with the positive balances in their Capital Accounts.

(b)     With respect to assets distributed in kind to the Partners in liquidation or otherwise, (i) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be Profits and Losses realized by the Partnership immediately prior to the liquidation or other distribution event; and (ii) such Profits and Losses shall be allocated to the Partners in accordance with the provisions of Section 10.1(b), and any property so distributed shall be treated as a distribution of an amount in cash equal to the excess of such fair market value over the outstanding principal balance of and accrued interest on any debt by which the property is encumbered. For the purposes of this Section 10.3(b), the terms "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market

value of such assets, taking into account the fair market value of the associated financing (but subject to the provisions of Section 7701(g) of the Code), and the Partnership's adjusted basis for such assets as determined under the applicable provisions of the Allocation Regulations. This Section 10.3(b) is merely intended to provide a rule for allocating unrealized gains and losses upon liquidation or other distribution event, and nothing contained in this Section 10.3(b) or elsewhere herein is intended to treat or cause such distributions to be treated as sales for value. The fair market value of such assets shall be determined by an appraiser to be selected by the General Partner with the Consent of the Special Limited Partner.

(c)     The Investment Limited Partner may, prior to the time prescribed by law for filing of the Partnership's federal income tax return for any Fiscal Year (not including extensions), elect to be unconditionally obligated to restore all or a portion of any deficit in the Investment Limited Partner's Capital Account upon liquidation of its Interest in the Partnership. Any such election shall be evidenced by written notice to the General Partner, delivered prior to such time, specifying the amount of any deficit for which the Investment Limited Partner elects a deficit restoration obligation. Any amount owing pursuant to a deficit restoration obligation shall be payable upon the later of (a) the end of the Fiscal Year in which Investment Limited Partner's Interest is liquidated or (b) ninety (90) days after the date of such liquidation. The amount of any such election shall automatically be reduced to the extent the deficit in the Investment Limited Partner's Capital Account (after reduction for the items described in (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)) is subsequently reduced or eliminated as of the end of the Partnership's taxable year without affecting the validity of prior allocations. If an allocation or distribution thereafter increases the deficit in the Investment Limited Partner's Capital Account, unless the Investment Limited Partner elects otherwise under (i) below, the Investment Limited Partner will be obligated to restore the deficit only to the extent of the lesser of (i) the deficit amount the Investment Limited Partner has previously elected to restore or (ii) the smallest deficit balance in the Investment Limited Partner's Capital Account (after reduction for the items described in (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)) as of the end of the Partnership's taxable year subsequent to the taxable year for which the election above was made. For purposes of determining the amount referred to in (ii), the income, gain, losses and deductions of the Partnership shall be allocated under an interim closing of the books method.

10.4.     Special Provisions

(a)     Except as otherwise provided in this Agreement, all Profits, tax-exempt income, Losses, non-deductible non-capitalizable expenditures, Tax Credits and cash distributions shared by a class of Partners shall be shared by each Partner in such class in the ratio of such Partner's paid-in Capital Contribution to the paid-in Class Contribution of the class of Partners of which such Partner is a member.

(b)     Notwithstanding the foregoing provisions of this Article X:

(i)     If (a) the Partnership incurs recourse obligations or Partner Nonrecourse Debt (including, without limitation, Voluntary Loans or Subordinated Loans) or (b) the Partnership incurs Losses from extraordinary events which are not recovered from insurance or otherwise (collectively "Recourse Obligations") in respect of any

Partnership Fiscal Year, then the calculation and allocation of Profits and Losses shall be adjusted as follows:   first, an amount of deductions attributable to the Recourse Obligations shall be allocated to the General Partner; and second, the balance of such deductions shall be allocated as provided in Section 10.1(a).

(ii)    If any Profits arise from the sale or other disposition of any Partnership asset which shall be treated as ordinary income under the depreciation recapture provisions of the Code, then the full amount of such ordinary income shall be allocated among the Partners in the proportions that the Partnership deductions from the depreciation giving rise to such recapture were actually allocated.   In the event that subsequently-enacted provisions of the Code result in other recapture income, no allocation of such recapture income shall be made to any Partner who has not received the benefit of those items giving rise to such other recapture income.

(iii)    If the Partnership shall receive any purchase money indebtedness in partial payment of the purchase price of the Apartment Complex and such indebtedness is distributed to the Partners pursuant to the provisions of Section 10.2(b) or Section 10.3, the distributions of the cash portion of such purchase price and the principal amount of such purchase money indebtedness hereunder shall be allocated among the Partners in the following manner:   On the basis of the sum of the principal amount of the purchase money indebtedness and cash payments received on the sale (net of amounts required to pay Partnership obligations and fund reasonable reserves), there shall be calculated the percentage of the total net proceeds distributable to each class of Partners based on Section 10.2(b) or Section 10.3, as applicable, treating cash payments and purchase money indebtedness principal interchangeably for this purpose, and the respective classes shall receive such respective percentages of the net cash purchase price and purchase money principal.   Payments on such purchase money indebtedness retained by the Partnership shall be distributed in accordance with the respective portions of principal allocated to the respective classes of Partners in accordance with the preceding sentence, and if any such purchase money indebtedness shall be sold, the sale proceeds shall be allocated in the same proportion.

(iv)    Income, gain, loss and deduction with respect to any asset which has a variation between its basis computed in accordance with the applicable provisions of the Allocation Regulations and its basis computed for federal income tax purposes shall be shared among the Partners so as to take account of such variation in a manner consistent with the principles of Section 704(c) of the Code and Section 1.704-1(b)(2)(iv)(g) of the Allocation Regulations.

(v)    The terms "Profits" and "Losses" used in this Agreement shall mean income and losses, and each item of income, gain, loss, deduction or credit entering into the computation thereof, as determined in accordance with the accounting methods followed by the Partnership and computed in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).   Profits and Losses for federal income tax purposes shall be allocated in the same manner as set forth in this Article X, except as provided in Section 10.4(b)(iv).

(vi)    Nonrecourse Deductions shall be allocated 0.005% to RPALLC, 0.005% to ORDC and 99.99% to the Investment Limited Partner.

(vii)   Partner Nonrecourse Deductions shall be allocated to and among the Partners in the manner provided in the Allocation Regulations.

(viii)  Subject to the provisions of Section 10.4(b)(xix), if there is a net decrease in Partnership Minimum Gain for a Partnership Fiscal Year, the Partners shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-(2)(f) of the Allocation Regulations.

(ix)    Subject to the provisions of Section 10.4(b)(xix), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain for a Partnership Fiscal Year then any Partner with a Share of such Partner Nonrecourse Debt Minimum Gain shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(i)(4) of the Allocation Regulations.

(x)     Subject to the provisions of 10.4(b)(vi) through 10.4(b)(ix) above, in the event that any Limited Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Allocation Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Allocation Regulations, the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible.  This Section 10.4(b)(x) is intended to constitute a "qualified income offset" provision within the meaning of the Allocation Regulations and shall be interpreted consistently therewith.

(xi)    Subject to the provisions of Sections 10.4(b)(vi) through 10.4(b)(x) above, in no event shall any Limited Partner be allocated Losses which would cause it to have an Adjusted Capital Account Deficit as of the end of any Partnership Fiscal Year.  Any Losses which are not allocated to a Limited Partner by reason of the application of the provisions of this Section 10.4(b)(xi) shall be allocated to the General Partner.

(xii)   Subject to the provisions of Sections 10.4(b)(vi) through 10.4(b)(xi) above, in the event that any Limited Partner has an Adjusted Capital Account Deficit at the end of any Partnership Fiscal Year, items of Partnership income and gain shall be specially allocated to each such Limited Partner in the amount of such Adjusted Capital Account Deficit as quickly as possible.

(xiii)  Syndication Expenses for any Fiscal Year or other period shall be specially allocated to the Investment Limited Partner.

(xiv)   For purposes of determining the Profits, Losses, Tax Credits or any other items allocable to any period, Profits, Losses, Tax Credits and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(xv)   To the extent that interest on loans (or other advances which are deemed to be loans) made by a General Partner to the Partnership is determined to be deductible by the Partnership in excess of the amount of interest actually paid by the Partnership, such additional interest deduction(s) shall be allocated solely to such General Partner.

(xvi)   To the extent the Partnership earns interest income on the deposit or investment of Mortgage Loan proceeds, an equal amount of gross income shall be specially allocated to the General Partners, pro rata between them.

(xvii)   For purposes of determining each Partner's proportionate share of the excess Nonrecourse Liabilities of the Partnership pursuant to Section 1.752-3(a)(3) of the Allocation Regulations, the Investment Limited Partner shall be deemed to have a 99.99% interest in Profits, RPALLC shall be deemed to have a 0.005% interest in Profits and ORDC shall be deemed to have a 0.005% in Profits.

(xviii)   Any recapture of any Tax Credit shall be allocated to and among the Partners in the same manner in which the Partners share the expenditures giving rise to such Tax Credit.

(xix)   If for any Fiscal Year the application of the minimum gain chargeback provisions of Section 10.4(b)(viii) or Section 10.4(b)(ix) of this Agreement would cause distortion in the economic arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partner may request a waiver from the Commissioner of the Service of the application in whole or in part of Section 10.4(b)(viii) or Section 10.4(b)(ix) in accordance with Section 1.704-2(f)(4) of the Allocation Regulations. Furthermore, if additional exceptions to the minimum gain chargeback requirements of the Allocation Regulations have been provided through revenue rulings or private letter rulings issued to the Partnership, the General Partner is authorized to cause the Partnership to take advantage of such exceptions if to do so would be in the best interest of a majority in interest of the Partners.

(xx)   In the event that any fee payable to any for profit General Partner or any for profit Affiliate thereof shall instead be determined to be a non-deductible, non-capitalizable distribution from the Partnership to a Partner for federal income tax purposes, then there shall be allocated to such General Partner an amount of gross income equal to the amount of such distribution.

(xxi)   In applying the provisions of Article X with respect to distributions and allocations, the following ordering of priorities shall apply:

(1)   Capital Accounts shall be deemed to be reduced by Qualified Income Offset Items.

(2)   Capital Accounts shall be reduced by distributions of Cash Flow under Clause Eighth of Section 10.2(a).

(3)     Capital Accounts shall be reduced by distributions of Capital Proceeds under Clause <u>Sixth</u> of Section 10.2(b).

(4)     Capital Accounts shall be increased by any minimum gain chargeback under Section 10.4(b)(viii) or Section 10.4(b)(ix).

(5)     Capital Accounts shall be increased by any qualified income offset required under Section 10.4(b)(x).

(6)     Capital Accounts shall be increased by allocations of Operating Profits under Section 10.1(a).

(7)     Capital Accounts shall be reduced by allocations of Operating Losses under Section 10.1(a).

(8)     Capital Accounts shall be reduced by allocations of Losses under Section 10.1(b).

(9)     Capital Accounts shall be increased by allocations of Profits under Section 10.1(b).

(xxii)  To the maximum extent permitted under the Code, allocations of Profits and Losses shall be modified so that the Partners' Capital Accounts reflect the amount they would have reflected if adjustments required by Sections 10.4(b)(x), 10.4(b)(xi) and 10.4(b)(xii) had not occurred.

(xxiii)  In the event any Investment Limited Partner shall give notice to the General Partner that, in the reasonable judgment of the Investment Limited Partner, its Capital Account as of the close of the tax year in which such notice is given either will have a zero balance or there will be an increase in Partnership Minimum Gain for such year, the General Partner shall take all such action as may be necessary to assure that any outstanding balance of the deferred portion of the Development Fee shall constitute "nonrecourse liability" of the Partnership as such term is defined in Treasury Regulation Section 1.752-1(a)(2) or any successor regulation.  One such action shall be the assignment of the outstanding balance of the deferred portion of the Development Fee to any entity which is not a "related person," as defined in Section 42(d)(2)(D)(iii) of the Code, with respect to the Partnership.

10.5.    <u>Authority of the General Partner to Vary Allocations to Preserve and Protect the Partners' Intent</u>

(a)     It is the intent of the Partners that each Partner's distributive share of Profits, tax-exempt income, Losses, non-deductible non-capitalizable expenditures and Tax Credits (and items thereof) shall be determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code and the Allocation Regulations.  In order to preserve and protect the determinations and allocations provided for in this Agreement, the General Partner is hereby authorized and directed to allocate Profits, tax-exempt income, Losses, non-deductible non-capitalizable expenditures and credits (and items thereof) arising in any

Fiscal Year differently than otherwise provided for in this Agreement to the extent that allocating Profits, tax-exempt income, Losses, non-deductible non-capitalizable expenditures or credits (or any item thereof) for herein would cause the determinations and allocations of each Partner's distributive share of Profits, tax-exempt income, Losses, non-deductible non-capitalizable expenditures or credits (or any item thereof) not to be permitted by Section 704(b) of the Code. Any allocation made pursuant to this Section 10.5 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Agreement and shall only be made with the Consent of the Investment Limited Partner.

(b)     In making any allocation (the "New Allocation") under Section 10.5(a), the General Partner is authorized to act only with the Consent of the Investment Limited Partner after having been advised in writing by the Tax Accountants that, under Section 704(b) of the Code and/or the Allocation Regulations. (i) the New Allocation is necessary, and (ii) the New Allocation is the minimum modification of the allocations otherwise provided for in this Agreement necessary in order to assure that, either in the then-current Fiscal Year or in any preceding Fiscal Year, each Partner's distributive share of Profits, tax-exempt income, Losses, non-deductible non-capitalizable expenditures and Tax Credits (or any item thereof) is determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code and the Allocation Regulations.

(c)     New Allocations made by the General Partner under Section 10.5 shall be deemed to be made pursuant to the fiduciary obligation of the General Partner to the Partnership and the Limited Partners, and no such allocation shall give rise to any claim or cause of action by any Limited Partner.

10.6.   Recapture Amount

(a)     If at any time during the "compliance period" (as defined in Section 42(i)(1) of the Code), the Apartment Complex ceases to be a "qualified low income housing project" (as defined in Section 42(g)(1) of the Code), any Low-Income Unit in the Apartment Complex ceases to be a "low income unit" (as defined in Section 42(i)(3) of the Code), or for any other reason all or any portion of credits allowed to the Partnership and its Partners under Section 42 of the Code are subject to recapture pursuant to Section 42(j) of the Code (such an occurrence being referred to herein as a "Recapture Event"), the Investment Limited Partner shall become entitled to receive funds equal to the "Recapture Amount". The Recapture Amount shall be in the form of an offset against future Installments, a cash distribution or payment to the Investment Limited Partner or a Credit Recovery Loan, in each case as set forth in Sections 5.1(e), (f) and/or (g).

(b)     The Recapture Amount is an amount equal the sum of (i) the "credit recapture amount" allocable to the Investment Limited Partner as defined in Section 42(j) of the Code plus (ii) all income taxes payable by the Investment Limited Partner (or its partners or members) as computed under Section 10.6(d).

(c)     Any Recapture Amount distributable to the Investment Limited Partner pursuant to the foregoing provisions shall be distributed as funds become available for such distributions, but such distributions shall not be made prior to (i) in the case of the "credit recapture amount",

the year of the Recapture Event and (ii) in the case of any credits disallowed with respect to any year subsequent to the Recapture Event, in each such subsequent year.

(d)     Determination of the Recapture Amount shall be made on the assumption that receipt or accrual by each partner of the Investment Limited Partner of any amounts distributable to such partner under Subsection (c) above will currently be subject to United States federal and State income tax at the highest marginal rate applicable to corporations for the year(s) in question (and assuming the non-applicability of the alternative minimum tax).

(e)     All computations required under this Section 10.6 shall be made reasonably by the Investment Limited Partner, and the results of such computations, together with a statement describing in reasonable detail the manner in which such computations were made, shall be delivered to the Managing General Partner in writing. Within fifteen (15) days following receipt of such computation, the Managing General Partner may request that the Auditors determine whether such computations are reasonable and are not erroneous. If the Auditors determine that such computations are unreasonable or contain errors, then the Auditors shall determine what they believe to be the appropriate computations. If the Investment Limited Partner does not agree with the determination of the Auditors, then another accounting firm other than the Auditors to be selected jointly by the Investment Limited Partner and the Managing General Partner or, if they cannot agree, by the American Arbitration Association, from among the ten largest national accounting firms, shall make such computations. The computations of the Investment Limited Partner, the Auditors, or the other accounting firm so selected, whichever is applicable, shall be final, binding and conclusive upon the parties. All fees and expenses payable to an accounting firm other than the Auditors under this paragraph shall be borne solely by the Managing General Partner.  All fees and expenses payable to the American Arbitration Association shall be borne equally by the General Partner and the Investment Limited Partner

ARTICLE XI
Management Agent

11.1.   <u>General</u>

The General Partner shall engage the Management Agent to manage the Apartment Complex pursuant to the Management Agreement. The Management Agent shall receive a Management Fee of those amounts payable from time to time by the Partnership to the Management Agent for management services in accordance with a management contract approved by any Agency or Lender with the right to approve the same, or, when any such management contract is not subject to the approval of any Agency or Lender, in accordance with a reasonable and competitive fee arrangement. The initial Management Agent shall be FHRC Management Corporation. From and after the Admission Date, the Partnership shall not enter into any Management Agreement or modify or extend any Management Agreement unless (i) the General Partner shall have obtained the prior Consent of the Special Limited Partner to the identity of the Management Agent and the terms of the Management Agreement or the modification or extension thereof and (ii) such new Management Agreement or modified or extended Management Agreement provides that it is terminable by the Partnership on thirty (30) days' notice by the Partnership in the event of any change in the identity of the General Partner. The Management Agent shall maintain insurance in accordance with the applicable Insurance

Requirements set forth in Exhibit D. Copies of such policies (or binders) shall be provided to the Partnership and the Investment Limited Partner within thirty (30) days after the effective date of the Management Agreement and annually thereafter.

11.2.   Fees

Notwithstanding the provisions of Section 11.1, however, should the Investment General Partner or an Affiliate thereof perform property management services for the Partnership, property management, rent-up or leasing fees shall be paid to the Investment General Partner or such Affiliate only for services actually rendered and shall be in an amount equal to the lesser of (i) fees competitive in price and terms with those of non-affiliated Persons rendering comparable services in the locality where the Apartment Complex is located and which could reasonably be available to the Partnership, or (ii) five percent (5%) of the gross revenues of the Apartment Complex. No duplicate property manager fees shall be paid to any Person.

11.3.   Removal and Replacement

If (i) the Apartment Complex shall be subject to a substantial building code violation which shall not have been cured within six (6) months after notice from a Governmental Authority or (ii) the Partnership shall not have achieved a 1.10 to 1.00 Debt Service Coverage Ratio during any Fiscal Year commencing on January 1, 2008, or (iii) an Event of Bankruptcy shall occur with respect to the Management Agent, or (iv) the Management Agent shall commit willful misconduct or gross negligence in its conduct of its duties and obligations under the Management Agreement or (v) there is any change in the Persons acting as General Partners (to which the Special Limited Partner has not consented), or (vi) the Management Agent is cited by the Credit Agency or any other Tax Credit monitoring or compliance agency of the State or any other Governmental Authority for a material violation or alleged material violation of any applicable rules, regulations or requirements, including, without limitation, non-compliance with the Minimum Set-Aside Test, the Rent Restriction Test or any other Tax Credit-related provision, and such violation is not cured within 45 days notice thereof, then, upon request by the Special Limited Partner and subject to Agency and Lender approval, if required, the General Partner shall cause the Partnership to promptly terminate the Management Agreement with the Management Agent and appoint a new Management Agent selected by the Special Limited Partner, which new Management Agent shall not be an Affiliate of a General Partner. Each General Partner hereby grants to the Special Limited Partner an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to take any action and to execute and deliver any and all documents and instruments on behalf of such General Partner and the Partnership as the Special Limited Partner may deem to be necessary or appropriate in order to effectuate the provisions of this Article XI. Subject to any Requisite Approvals, the Partnership shall not enter into any future management arrangement or renew or extend any existing management arrangement unless such arrangement is terminable without penalty upon the occurrence of the events described in this Article XI.

11.4.   Lack of Management Agent

The General Partner shall have the duty to manage the Apartment Complex during any period when there is no Management Agent.

## ARTICLE XII
### Books and Records, Accounting, Tax Elections, Etc.

12.1.   Books and Records

   The Partnership shall maintain all books and records which are required under the Act or by any Governmental Authority and may maintain such other books and records as the General Partner in its discretion deems advisable.   Each Limited Partner, or its duly authorized representatives, shall have access to the records of the Partnership at the principal office of the Partnership at any and all reasonable times, and may inspect and copy any of such records. A list of the name and addresses of all of the Limited Partners shall be maintained as part of the books and records of the Partnership and shall be mailed to any Limited Partner upon request.   The Partnership may require reimbursement for any out of pocket expenses which it incurs as a result of the exercise by any Limited Partner of its rights under this Section 12.1, including, without limitation, photocopying expenses.   The General Partner shall cause the Partnership to maintain at all times all informational and qualification files of each tenant of the Apartment Complex in fire proof storage facilities (whether paper files or micro fiche or film) and in a secure location controlled by the Partnership.

12.2.   Bank Accounts

   The bank accounts of the Partnership shall be maintained in the Partnership's name with such financial institutions as the General Partner shall determine.   Withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partner may determine.   All deposits (including security deposits and other funds required to be escrowed by any Lender or Agency) and other funds not needed in the operation of the business shall be deposited, if required by applicable law and to the extent permitted by applicable Agency or Lender requirements, in interest bearing accounts or invested in United States Government obligations maturing within one year.

12.3.   Auditors

   (a)   The Auditors shall prepare, for execution by the General Partner, all tax returns of the Partnership.   Prior to the filing of the Partnership tax returns, and in no event later than February 1 of each Fiscal Year, the Auditors shall deliver the tax returns for the prior Fiscal Year to the Tax Accountants for their review and comment.   If a dispute arises between the Auditors and the Tax Accountants over the proper preparation of the tax returns and such dispute cannot be resolved by the Auditors and the Tax Accountants by March 1 of such Fiscal Year, then the Tax Accountants shall make the final decision with respect to whether any changes are necessary   The Partnership shall reimburse the Investment Limited Partner and its Affiliates for all costs and expenses paid to the Tax Accountants for the aforementioned services.

   (b)   The Auditors shall certify all annual financial reports to the Partners in accordance with generally accepted auditing standards.

   (c)   If the Partnership fails to fulfill any of its obligations under Section 12.7(a)(i) and/or Section 12.7(a)(ii) within the time periods set forth therein, at any time thereafter upon written notice from the Special Limited Partner, the General Partner shall appoint replacement

Auditors. If no such notice from the Special Limited Partner is delivered, the Consent of the Special Limited Partner must be received to the appointment of replacement Auditors. If the General Partner fails to appoint replacement Auditors within thirty (30) days of the notice from the Special Limited Partner to replace the Auditors, then the Special Limited Partner shall appoint replacement Auditors of its own choosing, the cost of which shall be borne by the Partnership as a Partnership expense. All of the Partners hereby grant to the Special Limited Partner a special power of attorney, irrevocable to the extent permitted by law, coupled with an interest, to so appoint replacement Auditors and to anything else which in the judgment of the Special Limited Partner may be necessary or appropriate to accomplish the purposes of this Section 12.3(c).

(d)     On or prior to the date which is thirty (30) days after the Admission Date, the General Partner shall cause the Partnership (i) in writing, to engage the Auditors to perform the services required herein and (ii) to deliver to the Investment Limited Partner copies of all such engagement letters and agreements.

12.4.   Cost Recovery and Elections

(a)     With respect to all depreciable assets for which cost recovery deductions are permitted, the Partnership shall elect to use, so far as permitted by the provisions of the Code, accelerated cost recovery methods. However, with the Consent of the Investment Limited Partner, the Partnership may change to another method of cost recovery if such other method is, in the opinion of the Auditors, more advantageous to the Investment Limited Partner (and the limited partners and/or holders of beneficial assignee certificates thereof).

(b)     Subject to the provisions of Section 12.5, all other elections required or permitted to be made by the Partnership under the Code shall be made by the General Partner with the Consent of the Investment Limited Partner, in such manner as will, in the opinion of the Auditors, be most advantageous to the Investment Limited Partner and the limited partners and/or holders of beneficial assignee certificates thereof.

12.5.   Special Basis Adjustments

In the event of a transfer of all or any part of the Interest of the Investment Limited Partner or a transfer of all or any part of an interest of a partner and/or a holder of a beneficial assignee certificate of the Investment Limited Partner, the Partnership shall elect, upon the request of the Investment Limited Partner, pursuant to Section 754 of the Code, to adjust the basis of the Partnership property. Any adjustments made pursuant to said Section 754 shall affect only the successor in interest to the transferring Partner or partner or holder of a beneficial assignee certificate thereof. Each Partner will furnish the Partnership all information necessary to give effect to any such election.

12.6.   Fiscal Year

Unless otherwise required by law, the Fiscal Year and tax year of the Partnership shall be the calendar year. The books of the Partnership shall be maintained on an accrual basis.

12.7.   Information to Partners

(a)   The General Partner shall cause to be prepared and distributed to all Persons who were Partners at any time during a Fiscal Year of the Partnership:

(i)   Within sixty (60) days after the end of each Fiscal Year of the Partnership, (A) a balance sheet as of the end of such Fiscal Year, a statement of income, a statement of partners' equity, and a statement of cash flows, each for the Fiscal Year then ended, all of which, except the statement of cash flows, shall be prepared in accordance with generally accepted accounting principles and accompanied by a report of the Auditors containing an opinion of the Auditors, and (B) a report of the activities of the Partnership during the period covered by the report.   With respect to any distribution to the Investment Limited Partner, the report called for shall separately identify distributions from (1) Cash Flow from operations during the period, (2) Cash Flow from operations during a prior period which had been held as reserves, (3) proceeds from disposition of property and investments, (4) lease payments on net leases with builders and sellers, (5) reserves from the gross proceeds of the Capital Contributions of the Investment Limited Partner, (6) borrowed monies, and (7) transactions outside of the ordinary course of business with a description thereof.

(ii)   Within forty-five (45) days after the end of each Fiscal Year of the Partnership, all information relating to the Partnership and/or the Apartment Complex which is necessary, in the view of the Tax Accountants, for the preparation of the Limited Partners' federal income tax returns for the prior Fiscal Year.

(iii)   Within thirty (30) days after the end of each quarter of a Fiscal Year of the Partnership, a report containing:

(A)   a balance sheet, which may be unaudited;

(B)   a statement of income for the quarter then ended, which may be unaudited;

(C)   a statement of cash flows for the quarter then ended, which may be unaudited;

(D)   a certification of the General Partner that the Apartment Complex and its tenants are in compliance with all applicable federal, state and local requirements and regulations;

(E)   a Tax Credit monitoring form, a copy of the rent roll for the Apartment Complex for each month during such quarter, a statement of income and expenses, an operating statement and an Occupancy/Rental Report, all in a form specified by the Special Limited Partner;

(F)   a certification of the General Partner that it has received no notice of a building, health or fire code violation or similar violation of a governing law,

ordinance or regulation against the Apartment Complex, or, if there is any such violation, a detailed description thereof; and

(G)     all other information which would be pertinent to a reasonable investor regarding the Partnership and its activities during the quarter covered by the report.

(b)     Within sixty (60) days after the end of each Fiscal Year of the Partnership a copy of the annual report to be filed with the United States Treasury concerning the status of the Apartment Complex as low-income housing and, if required, a certificate to the appropriate state agency concerning the same.

(c)     Upon the written request of the Investment Limited Partner for further information with respect to any matter covered in item (a) or item (b) above, the General Partner shall furnish such information within thirty (30) days of receipt of such request.

(d)     Prior to October 15 of each Fiscal Year, the Partnership shall send to the Investment Limited Partner an estimate of the Investment Limited Partner's share of the Tax Credits, Profits and Losses of the Partnership for federal income tax purposes for the current Fiscal Year. Such estimate shall be prepared by the General Partner and the Auditors and shall be in the form specified by the Special Limited Partner.

(e)     The General Partner shall send the Investment Limited Partner a detailed report within fifteen (15) days after the end of any calendar quarter during which any of the following events occur:

(i)     there is a material default by the Partnership under any Project Document or in the payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

(ii)     any reserve has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserve was established,

(iii)     any General Partner has received any notice of a material fact which may substantially affect further distributions or Tax Credit allocations to any Limited Partner, or

(iv)     any Partner has pledged or collateralized its Interest in the Partnership.

(f)     After the Admission Date, the Partnership shall send to the Investment Limited Partner copies of all applicable periodic reports covering the status of project operations and any matters relating to the Tax Credit as are required by any Lender or Agency. The General Partner shall deliver to the Investment Limited Partner copies of all construction draw requests (and all supporting documentation) submitted to the Lender prior to the Admission Date, if any, and shall deliver to the Investment Limited Partner simultaneously with their submission to the Lender copies of all construction draw requests (and all supporting documentation) submitted to the Lender on or after the Admission Date.

(g)     On or before May 1 of each Fiscal Year, the Partnership shall send to the Investment Limited Partner a report on operations, in the form supplied by the Special Limited Partner.

(h)     The General Partner hereby consents to each Lender or Agency providing the Investment Limited Partner with copies of all material communications between any such Lender or Agency and the General Partner and/or the Partnership, including, but not limited to, any notices of default.

(i)     If the earlier of (A) the Completion Date or (B) the date upon which tenants first occupied apartment units in the Apartment Complex after the construction of such units, shall have occurred six (6) months or more prior to the date on which the Investment Limited Partner acquired its Interest in the Partnership, then the General Partner shall cause to be prepared and delivered to the Investment Limited Partner within sixty (60) days of the Admission Date the following Items:

(i)     An unaudited statement of income of the Partnership for the year (or such shorter period as there may be from the date of the most recent audited statement of income of the Partnership) ended on the date upon which the Investment Limited Partner acquired its Interest in the Partnership; and

(ii)    An audited statement of income of the Partnership for any fiscal year of the Partnership ending between (A) the earlier of (1) the Completion Date or (2) the date upon which tenants first occupied apartment units in the Apartment Complex after the rehabilitation of such units and (B) the date upon which the Investment Limited Partner acquired its Interest in the Partnership.

(j)     Within thirty (30) days following the Completion Date, the General Partner shall prepare, or cause the Auditors to prepare, and deliver to each Limited Partner a Tax Credit basis worksheet for each building in the Apartment Complex, all in a form specified by the Special Limited Partner.

(k)     Promptly after Permanent Mortgage Commencement, the General Partner shall send to the Special Limited Partner a closing binder containing photocopies of the fully executed versions of all documents signed in connection with the Permanent Loan(s).  From and after any date upon which the General Partner receives notice from the Special Limited Partner that the Special Limited Partner would like copies of the monthly rent rolls for the Apartment Complex to be sent to the Special Limited Partner, the General Partner shall send copies of the rent rolls to the Special Limited Partner no later than ten (10) days after the expiration of each month.

(l)     If the General Partner does not cause the Partnership to fulfill its obligations under Section 12.7(a)(i) and/or Section 12.7(a)(ii) within the time periods set forth therein, the General Partner shall pay as damages the sum of $100 per day (plus interest at a rate equal to the Prime Rate plus three percent (3%)) to the Investment Limited Partner until such obligations shall have been fulfilled.  Such damages shall be paid forthwith by the General Partner, and the failure to pay any such damages shall constitute a material default by the General Partner hereunder.  In addition, if the General Partner shall fail to pay any such damages, the General

Partner and its Affiliates shall forthwith cease to be entitled to the distribution of any Cash Flow or Capital Proceeds to which they may otherwise be entitled hereunder. Such distributions of Cash Flow and Capital Proceeds shall be restored only upon the payment of such damages in full, and any amount of such damages not so paid shall be deducted against distributions of Cash Flow and Capital Proceeds otherwise due to the General Partner or its Affiliates.

(m)     On or before December 1 of each Fiscal Year, the General Partner shall cause the Partnership to send to the Investment Limited Partner an operating budget of the Apartment Complex for the upcoming Fiscal Year.

(n)     Notwithstanding anything to the contrary contained herein, the General Partner shall cause to be conducted and delivered to the Limited Partners pursuant to Section 5.1(a) an audit on one hundred (100%) percent of the initial leases or occupancy agreements executed in connection with the 193 units in the Apartment Complex which are to qualify for the Tax Credit in order to ensure compliance with the applicable Rent Restriction Test, Minimum Set Aside Test, or any other applicable tenant restriction test ("Initial Compliance Audit"). The Special Limited Partner shall select at its option, any combination of occupancy agreements on such 193 units which are to qualify for the Tax Credit, which shall comprise the Initial Compliance Audit (the "Selected Occupancy Agreements"). The Initial Compliance Audit shall consist of a review of the complete tenant files in connection with the Selected Occupancy Agreements, including but not limited to any tenant financial information. Further, the Initial Compliance Audit shall be conducted with the cooperation of, and at the sole cost and expense of the General Partner if the Initial Compliance Audit reveals an instance of material noncompliance. An instance of material noncompliance shall be deemed to exist if at least five (5) of the selected Occupancy Agreements reveal noncompliance or violations of any applicable tenant restriction test. If the Initial Compliance Audit does not reveal any instance of material noncompliance the Partnership shall bear the cost of such audit.

12.8.   Expenses of the Partnership

(a)     All expenses of the Partnership shall be billed directly to and paid by the Partnership.

(b)     Except in extraordinary circumstances, neither the Investment General Partner nor any Affiliate thereof shall be permitted to contract or otherwise deal with the Partnership for the sale of goods or services or the lending of money to the Partnership or the General Partners, except for (i) management services, subject to the restrictions set forth in Article XI, (ii) loans made by, or guaranteed by, the Investment General Partner or any of its Affiliates and (iii) those dealings, contracts or provision of services described in the Investment Partnership Agreement. Extraordinary circumstances shall only be presumed to exist where there is an emergency situation requiring immediate action and the services required are not immediately available from unaffiliated parties. All services rendered under such circumstances must be rendered pursuant to a written contract which must contain a clause allowing termination without penalty on sixty (60) days' notice. Goods and services provided under such circumstances must be provided at the lesser of actual cost or the price charged for such goods or services by independent parties.

(c)    In the event that extraordinary circumstances arise, the Investment General Partner and its Affiliates may provide construction services in connection with the Apartment Complex.  Neither the Investment General Partner nor any of its Affiliates shall provide such services unless it believes it has an adequate staff to do so and unless such provision of goods and construction services is part of its ordinary and ongoing business in which it has previously engaged, independent of the activities of the Investment Limited Partner.   Any such services must be reasonable for and necessary to the Partnership, actually furnished to the Partnership, and provided at the lower of one hundred percent (100%) of the construction contract rate with respect to the Apartment Complex or ninety percent (90%) of the competitive price charged for such services by independent parties for comparable goods and services in the same geographic location (except that in the case of transfer agent, custodial and similar banking-type fees, and insurance fees, the compensation, price or fee shall be at the lesser of costs or the compensation, price or fee of any other Person rendering comparable services as aforesaid).  Cost of services as used herein means the pro rata cost of personnel, including an allocation of overhead directly attributable to such personnel, based on the amount of time such personnel spend on such services or other method of allocation acceptable to the accountants for the Investment Limited Partner.

(d)    All services provided by the Investment General Partner or any Affiliate thereof pursuant to Section 12.8(c) must be rendered pursuant to the Investment Partnership Agreement or a written contract which precisely describes the services to be rendered and all compensation to be paid and shall contain a clause allowing termination without penalty upon sixty (60) days' notice to the Investment General Partner by a vote of a majority in interest of the limited partners and assignees of beneficial interests in the Investment Limited Partner.

(e)    No compensation or fees may be paid by the Partnership to the Investment General Partner or its Affiliates except as described in the Investment Partnership Agreement.

## ARTICLE XIII
### General Provisions

### 13.1.  Restrictions by Reason of Section 708 of the Code

No Disposition of an Interest may be made if the Interest sought to be Disposed of, when added to the total of all other Interests Disposed of within the period of twelve (12) consecutive months prior to the proposed date of the Disposition, would, in the opinion of the Tax Accountants or tax counsel to the Partnership, result in the termination of the Partnership under Section 708 of the Code, unless the transferring Partner agrees to indemnify the other Partners for any federal income tax liability resulting from such Disposition. This Section 13.1 shall have no application to any required repurchase of the Investment Limited Partner's Interest. Any Disposition in contravention of any of the provisions of this Section 13.1 shall be void ab initio and ineffectual and shall not bind or be recognized by the Partnership. Notwithstanding the foregoing provisions of this Section 13.1, however, the Investment Limited Partner may waive the provisions of this Section 13.1 at any time as to a Disposition or series of Dispositions, and in the event of such a waiver, this Section 13.1 shall have no force or effect upon such Disposition or series of Dispositions.

### 13.2.  Amendments to Certificates

Within one hundred twenty (120) days after the end of the Partnership Fiscal Year in which the Investment Limited Partner shall have received any distributions under Article X, the General Partner shall file an amendment to the Certificate reducing the amount of its allocable share of such distribution the amount of Capital Contribution of the Investment Limited Partner as stated in the last previous amendment to the Certificate. However, Schedule A shall not be amended on account of any such distribution.

The Partnership shall amend the Certificate at least once each calendar quarter to effect the substitution of Substitute Limited Partners, although the General Partner may elect to do so more frequently. In the case of assignments, where the assignee does not become a Substitute Limited Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of notice of assignment and all documentation required in connection therewith hereunder.

Notwithstanding the foregoing provisions of this Section 13.2, no such amendments to the Certificate need be filed by the General Partner if the Act does not require it and the Certificate does not identify the Limited Partners or their Capital Contributions in such capacity.

### 13.3.  Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given when the same are (i) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) delivered to a nationally recognized overnight delivery service, (iii) sent by telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case, to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Partnership:

(a)     If to the Partnership, at the office of the Partnership set forth in Section 2.2.

(b)     If to a Partner, at its address set forth in the Schedule, with copies to Douglas W. Clapp, Esq., Holland & Knight LLP, 10 St. James Avenue, Boston, MA 02116 and Edward M. Doherty, Esq., 50 Franklin Street, Suite 3A, Boston, MA 02110.

13.4.   Word Meanings

The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural, and vice versa, and each gender (masculine, feminine and neuter) shall include the other genders, unless the context requires otherwise. Each reference to a "Section" or an "Article" refers to the corresponding Section or Article of this Agreement, unless specified otherwise. References to Treasury Regulations (permanent or temporary) or Revenue Procedures shall include any successor provisions.

13.5.   Binding Effect

The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

13.6.   Applicable Law

This Agreement shall be construed and enforced in accordance with the laws of the State.

13.7.   Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

13.8.   Financing Regulations

(a)     So long as any of the Project Documents are in effect, (i) each of the provisions of this Agreement shall be subject to, and the General Partner covenants to act in accordance with, the Project Documents; (ii) the Project Documents shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns to the extent expressly provided therein; (iii) upon any dissolution of the Partnership or any transfer of the Apartment Complex, no title or right to the possession and control of the Apartment Complex and no right to collect the rent therefrom shall pass to any Person who is not, or does not become, bound by the Project Documents in a manner satisfactory to the Lenders and any Agency (to the extent that its approval is required); (iv) no amendment to any provision of the Project Documents shall become effective without the prior written consent of any Lender and/or Agency (to the extent that its approval is required); and (v) the affairs of the Partnership shall be subject to the Regulations, and no action shall be taken which would require the consent or approval of any Lender and/or Agency unless the prior consent or approval of such Lender and/or Agency, as the case may be, shall have been obtained. No new Partner shall be admitted to the Partnership, and

no Partner shall withdraw from the Partnership or be substituted for without the consent of any Lender and/or Agency (if such consent is then required).  No amendment to this Agreement relating to matters governed by the Regulations or requirements shall become effective until any Requisite Approvals to such amendment shall have been obtained.

(b)   Any conveyance or transfer of title to all or any portion of the Apartment Complex required or permitted under this Agreement shall in all respects be subject to all conditions, approvals and other requirements of any Regulations applicable thereto.

13.9.   Separability of Provisions

Each provision of this Agreement shall be considered separable and (a) if for any reason any provision is determined to be invalid, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and (b) if for any reason any provision would cause the Investment Limited Partner or the Special Limited Partner (in its capacity as a Limited Partner) to be bound by the obligations of the Partnership (other than the Regulations and the other requirements of any Agency or Lender), such provision or provisions shall be deemed void and of no effect.

13.10.   Paragraph Titles

All article and section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any article or section.

13.11.   Amendment Procedure

This Agreement may be amended by the General Partner only with the Consent of the Investment Limited Partner and the Consent of the Special Limited Partner.

13.12.   Extraordinary Limited Partner Expenses

Any and all costs and expenses incurred by a Partner hereof in connection with exercising rights and remedies against any other Partner with respect to this Agreement, including, without limitation, reasonable attorneys' fees, shall be paid by such defaulting Partner on demand.  All amounts due to such enforcing Partner pursuant to this provision shall bear interest from demand at a rate of nine percent (9%) per annum.

13.13.   Time of Admission

The Investment Limited Partner shall be deemed to have been admitted to the Partnership as of the Commencement Date for all purposes of this Agreement, including Article X, provided, however, that if treasury regulations are issued under the Code or an amendment to the Code is adopted which would require, in the opinion of the Auditors, that the Investment Limited Partner be deemed admitted on a date other than as of the Commencement Date, then the General Partner shall select a permitted admission date which is most favorable to the Investment Limited Partner.

13.14. <u>Tax Shelter Provisions</u>

The Partnership and its Partners shall be permitted to disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure (as defined in Treasury Regulation Section 1.6011-4(c) or its successor) of the transaction contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and tax structure. The General Partners will notify the Partners of any "reportable transaction" under Treasury Regulation Section 1.6011-4 (or its successor) in which the Partnership shall engage.

WITNESS the execution hereof under seal as of the date first written above.

ORIGINAL (WITHDRAWING)       <u>GENERAL PARTNERS:</u>
<u>LIMITED PARTNER:</u>

ROCKLAND PLACE APARTMENTS, LLC,      ROCKLAND PLACE APARTMENTS,
a Massachusetts limited liability company, by     LLC, a Massachusetts limited liability
Connolly and Partners, LLC, its Manager      company, by Connolly and Partners, LLC, its
                                         Manager

By: _____          By: _____
    William Connolly, Manager                 William Connolly, Manager


                                           OMNI ROCKLAND DEVELOPMENT
                                           CORPORATION, a Massachusetts
                                           corporation

                                           By: _____
                                             Joseph Caffey, President

SPECIAL LIMITED PARTNER:

BCCC, INC., a Massachusetts corporation

By: _____

Jeffrey H. Goldstein,
Executive Vice President


INVESTMENT LIMITED PARTNER:

BOSTON CAPITAL CORPORATE TAX
CREDIT FUND XXV, A LIMITED
PARTNERSHIP, a Massachusetts limited
partnership, by its general partner, BCCTC
Associates XXV, LLC, a Massachusetts
limited liability company, by its manager,
BCCTC Associates, Inc., a Massachusetts
corporation

By: _____

Jeffrey H. Goldstein,
Executive Vice President


INVESTMENT LIMITED PARTNER:

BOSTON CAPITAL CORPORATE TAX
CREDIT FUND XXVI, A LIMITED
PARTNERSHIP, a Massachusetts limited
partnership, by its general partner, BCCTC
Associates XXVI, LLC, a Massachusetts
limited liability company, by its manager,
BCCTC Associates, Inc., a Massachusetts
corporation

By: _____

Jeffrey H. Goldstein,
Executive Vice President


# 3915778_v6

- 94 -

## CONSENT AND AGREEMENT

The undersigned hereby executes this Agreement for the sole purpose of agreeing to the provisions of Article XI of the foregoing First Amended and Restated Agreement of Limited Partnership notwithstanding any provision of the Management Agreement to the contrary.

FHRC   MANAGEMENT   CORPORATION,   a
Delaware corporation

By: _____

Neil Ellis, President

ROCKLAND PLACE APARTMENTS LIMITED PARTNERSHIP

SCHEDULE A

As of November 1, 2006

| General Partners | Capital Contribution | Percentage Interests of Operating Profits and Losses | Percentage Interests of Tax Credits |
|---|---|---|---|
| Rockland Place Apartments, LLC<br>8 Faneuil Hall Marketplace<br>Boston, MA 02109 | $100 | 0.005% | 0.005% |
| Omni Rockland Development Corporation<br>150 Colfax Street<br>Providence, RI 02905 | $100 | 0.005% | 0.005% |

| Special Limited Partner | Capital Contribution | Percentage Interests of Operating Profits and Losses | Percentage Interests of Tax Credits |
|---|---|---|---|
| BCCC, Inc.<br>c/o Boston Capital Partners, Inc.<br>One Boston Place, 21st Floor<br>Boston, MA 02108 | $10 | 0% | 0% |

| Investment Limited Partner | Total Agreed-to Capital Contribution | Paid-In Capital Contribution* | Percentage Interests of Operating Profits and Losses and Tax Credits | Sharing Ratio |
|---|---|---|---|---|
| Boston Capital Corporate Tax Credit Fund XXV, A Limited Partnership<br>One Boston Place, 21st Floor<br>Boston, MA 02108 | $1,872,803 | $936,401 | 19.998% | 20% |

| Investment Limited Partner | Total Agreed-to Capital Contribution | Paid-In Capital Contribution* | Percentage Interests of Operating Profits and Losses and Tax Credits | Sharing Ratio |
|---|---|---|---|---|
| Boston Capital Corporate Tax Credit Fund XXVI, a limited partnership One Boston Place, 21st Floor Boston, MA 02108 | $7,491,211 | $3,745,606 | 79.992% | 80% |

*Paid-in Capital Contribution as of the date of this Schedule A. Future Installments of Capital Contribution are subject to adjustment and are due at the times and subject to the conditions set forth in the Agreement to which this Schedule is attached.

EXHIBIT A
LEGAL DESCRIPTION

f: 391577R_v6

Real property in the County of Plymouth, Commonwealth of Massachusetts, described as follows:

A certain parcel of land situated on the southerly side of John A. Dunn Memorial Drive in Rockland, Plymouth County, Massachusetts, being shown as Parcel D-4 upon a plan entitled "Plan of Land in Rockland, Mass., for Del Prete Construction Co., Inc., September 30, 1966, Lamont R. Healy, Inc., Land Surveyors", which plan is filed with the Plymouth County Registry of Deeds in Plan Book 14, Page 446, and which parcel is further bounded and described, according to said plan, as follows:

| | |
|---|---|
| NORTHERLY | by Southerly curved line of John A. Dunn Memorial Drive, by two bounds measuring 206.24 feet and 59.06 feet, respectively; |
| SOUTHEASTERLY | by Parcel D-8 by a curved line, 39.27 feet; |
| EASTERLY | by said Parcel D-8, 161.86 feet; |
| NORTHERLY | again by said Parcel D-8, 212.32 feet; |
| EASTERLY | again by Parcel D-5, and by lands now or formerly of Town of Rockland, William H. & Marguerite Chapman and of Frank P. & Dominic M. Del Prete, by the middle of a stream, 460 feet, more or less; |
| SOUTHERLY | by land now or land now or formerly of Thomas V. Murrill, by two lines measuring 503 feet and 413.64 feet, respectively; |
| WESTERLY | by land now or formerly of Vivian Petersen, 152.22 feet; |
| SOUTHERLY | again by land now or formerly of Vivian Petersen, 166.93 feet; |
| WESTERLY | again by Spring Street, 15.02 feet; |
| NORTHERLY | again by lands now or formerly of Margaret M. O'Brien and of Patrick T. & Theresa A. Spillane, by two lines measuring 167.10 feet and 201.90 feet, respectively; |
| WESTERLY | again by said land now or formerly of Patrick T. & Theresa A. Spillane, 162.39 feet; |
| NORTHERLY | again by Parcel D-3, 276.41 feet; and |
| WESTERLY | again by said Parcel D-3, 390 feet. |

Parcel is also shown as the parcel marked "9.3 Acres" on plan entitled "Plan of Land in Rockland, Mass. for DelPrete Realty Trust" dated June 17, 1971, Lamont R. Healy, Inc., Land Surveyors, which plan is filed with the Plymouth Registry of Deeds as Plan #517 of 1971, Plan Book 15, Page 1148.

EXHIBIT B
PROJECTED RENTS

## Maximum Eligible & Projected Rents

| | Set Aside | | | | | | | | | | Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 bedroom | 13 | 650 | 50% | 37.5% | 788 | 788 | 658 | 658 | 80% | 106,810 |
| 2 bedroom | 15 | 850 | 50% | 45.0% | 946 | 946 | 878 | 878 | 83% | 157,950 |
| 3 bedroom | 23 | 1,050 | 50% | 52.0% | 1,093 | 1,057 | 1,045 | 1,045 | 86% | 298,420 |
| 1 bedroom | 59 | 650 | 60% | 45.0% | 946 | 946 | 656 | 656 | 74% | 326,664 |
| 1 bedroom | 74 | 650 | 60% | 54.0% | 945 | 908 | 878 | 878 | 77% | 779,664 |
| 2 bedroom | 29 | 1,050 | 60% | 62.4% | 1,135 | 1,097 | 1,045 | 1,045 | 80% | 393,060 |
| 3 bedroom | | 650 | MKT | | 1,312 | 0 | 608 | 608 | | 393,060 |
| 1 bedroom | 4 | 650 | MKT | | 0 | 0 | 786 | 786 | | 33,504 |
| 2 bedroom | 4 | 850 | MKT | | 0 | 0 | 898 | 898 | | 42,144 |
| 3 bedroom | 3 | 1,050 | MKT | | 0 | 0 | 1,097 | 1,045 | | 37,620 |
| | | | | | 0 | 0 | 0 | | | 0 |
| | | | | | 0 | 0 | 0 | | | 0 |
| | | | | | 0 | 0 | 0 | | | 0 |
| | | | | | 0 | 0 | 0 | | | 0 |
| | | | | | 0 | 0 | 0 | | | 0 |

Total  204      $2,138,430      $0

4 person very low income x 2:   $84,100

### BOSTON CAPITAL

| Set Aside | 30% | | 40% | | 50% | | 60% | |
|---|---|---|---|---|---|---|---|---|
| 0 bedroom | 21.0% | 442 | 28.0% | 589 | 35.0% | 735 | 42.0% | 883 |
| 1 bedroom | 22.5% | 473 | 30.0% | 631 | 37.5% | 788 | 45.0% | 946 |
| 2 bedroom | 27.0% | 568 | 36.0% | 757 | 45.0% | 948 | 54.0% | 1135 |
| 3 bedroom | 31.2% | 655 | 41.6% | 875 | 52.0% | 1093 | 62.4% | 1312 |
| 4 bedroom | 34.8% | 732 | 46.4% | 976 | 58.0% | 1219 | 69.6% | 1463 |
| 5 bedroom | 38.4% | 807 | 51.2% | 1076 | 64.0% | 1346 | 78.8% | 1615 |

### Other Income

| | |
|---|---|
| Laundry Machine Collections | $2 |
| Late Fees | $0 |
| Application Fees | $0 |
| Security Deposit Forfeitures | $0 |
| Tenant Charges and Other | $8 |
| | Total per Month |
| | Total per Year |

| | |
|---|---|
| | 408 |
| | 1,224 |
| | 1,632 |
| | 19,584 |
| Gross Potential Income | 2,158,020 |
| Vacancy | (851,061) |
| Commercial Income per year | |
| Net Income | 2,006,959 |

Rockland Place Apartments, LP

### EXHIBIT C
### DUE DILIGENCE RECOMMENDATIONS

# ROCKLAND PLACE APARTMENTS
## Rockland, Massachusetts
## Environmental Recommendations

Assistant Vice President:
Environmental Consultant:
Date of Report:

Amy Coghlin
GZA GeoEnvironmental, Inc.
January 30, 2006

| Concluded | Item | Recommendation/Open Item - Environmental | G.P. Response | BCP Comments |
|---|---|---|---|---|
| ■ | 1. | The ESA is almost one-year old, approaching the "shelf life" for reports of this nature, and would not normally require an update. However, due to the fact that surficial observations of soils, transformers, etc. could not be made due to the presence of snow cover during the conduct of this ESA, Boston Capital should request an update including a new Site inspection. | General Partner provided Phase 1 update from GEC, dated February 16, 2006. | BCP accepts. |
| ■ | 2. | Although the ESA does not list wetlands as an environmental resource associated with the Site, the ESA notes that "French Stream abuts the Site to the north and flows southeast partially through the Site and along the Site's eastern border…" Boston Capital should request that GEC confirm the presence or absence of wetlands on, or adjacent to, the Site. | There is no new construction of buildings. All renovation work will be performed within footprint of existing structures. | BCP accepts. |
| ■ | 3. | The ESA does not comment on lead-based paint (LBP). Due to the age of construction of on-Site buildings (1973), Boston Capital should request LBP testing prior to any planned renovation/demolition activities. LBP coated surfaces that are to remain on-Site should be covered by an LBP Operations & Maintenance (O&M) Plan. | GEC obtained a lead-based paint inspections and certifications of compliance report, dated August 3, 1994. Rockland Place was inspected for LBP in 1993 and all of the apartments onsite were determined not to contain dangerous levels of lead. | BCP accepts. |
| ■ | 4. | The ESA notes the presence of suspect asbestos-containing materials ACMs on-Site including vinyl floor tiles and drywall/plaster ceilings. Boston Capital should request ACM testing prior to any planned renovation/demolition activities. ACMs that are to remain on-Site should be covered by an ACM O&M Plan. | General Partner submitted an Inspection Report for Asbestos-Containing Material (ACM), dated May 8, 2006, noting evidence of non-friable ACM in a variety of building materials.<br><br>General Partner has provided an O&M Manual to address the proper abatement of ACM during renovations. | BCP accepts. |

- 1 -

AOS14203ENV

| Concluded | Item | Recommendation/Open Item - Environmental | G.P. Response | BCP Comments |
|-----------|------|------------------------------------------|---------------|--------------|
| ■ | 5. | The ESA does not comment on the potential for elevated radon concentrations in on-Site buildings. Boston Capital should request that GBC provide an opinion with respect to the likelihood of elevated radon levels in future Site buildings, based on either published values for the area of the Site or on testing conducted in an existing structure located in the immediate area of the Site and representing similar conditions. Unless actual radon measurements at or in close proximity to the project Site confirm a radon level less than 4 pCi/L, then, in accordance with Boston Capital policy, a passive "radon system" (which can be made active in the future if required) should be installed to provide adequate building ventilation. If post-construction radon testing does not indicate that actual radon levels are below 4 pCi/L, then the passive system must be converted to an active system. | General Partner submitted radon test results taken from 8 different building locations. All tests indicated a radon level of 0.1 pCi/L, which is within acceptable EPA guidelines. | BCP accepts. |

Assistant Vice President   _Anna Coplin_   Date _12/11/2006_

Director of Acquisitions   _____   Date _12/11/2006_

Chief Underwriter   _____   Date _12/1/2006_

-2-

AOSI4203ENV

# ROCKLAND PLACE APARTMENTS
## Rockland, Massachusetts
## Architectural and Engineering Recommendations

Assistant Vice President:
Engineering Consultant:
Date of Report:

Amy Coghlin
EDD Advisors, Inc.
June 22, 2006

| Concluded | Item | Recommendation/Open Item – A&E | G.P. Response | BCP Comments |
|---|---|---|---|---|
| ■ | 1. | The developer should provide assurance of the timely availability of the building permit for the proposed rehabilitation. | Building permits will be obtained for each construction trade by the selected subcontractor. This will minimize the building permit fees. The Town of Rockland has agreed to expedite the process. | BCP accepts. |
| ■ | 2. | Boston Capital should obtain and examine the forthcoming addendum and the forthcoming construction documents for:<br>• Landscape improvements<br>• Office/community building refurbishments<br>• Pool/spa repair/replacement<br>• Common area accessibility improvements | Landscaping and common area accessibility are already provided in the plans and specs. The scope of Office/Community Building and pool repairs will be determined based on savings from other line items. | BCP accepts. |
| ■ | 3. | The developer and design team should provide Boston Capital with an opinion of the durability through the investment team of the entrance driveway bridge. | The entrance drive passes over a concrete culvert approximately four feet in diameter. The concrete tub is surrounded by reinforced soil and covered with approximately 18 inches of soil, crushed stone, and asphalt pavement. There is no "bridge." There is no reason to believe that the culvert will require repair or replacement within the investment period. | BCP accepts. |
| ■ | 4. | The developer should provide Boston Capital with details of the proposed office and community building exterior and interior refurbishment. | See Rec. 02 above. | BCP accepts. |
| ■ | 5. | The developer should identify the source of funding for new gas service to the site. | New gas service to Rockland Place will be provided free of charge by the utility company (Keyspan). Keyspan will bring gas to the boilers and domestic water heaters. | BCP accepts. |

- 1 -

AOS143664A&E

| Concluded | Item | Recommendation/Open Item - A&E | G.P. Response | BCP Comments |
|---|---|---|---|---|
| ■ | 6. | The developer should provide Boston Capital with assurance of the timely delivery of gas service to the buildings. | Keyspan will begin installation of the new lines upon closing. | BCP accepts. |
| ■ | 7. | Laundry room dryer vents should be made permanent and covered. | The laundry rooms are vented. Covers are neither required nor necessarily advisable. Covers provide shelter for bird nests. | BCP accepts. |
| ■ | 8. | The developer should provide Boston Capital with details of the proposed pool, spa, and deck improvements. | See Rec. 02 above. | BCP accepts. |
| ■ | 9. | Consideration should be given to providing play areas for children. | Plans include multiple play areas. | BCP accepts. |
| ■ | 10. | The developer should consider removal and replacement of the hardboard siding. | Based on review by three architectural firms and two capital needs assessments, removal of siding is unnecessary. In the event of sufficient savings from other line items, the developer will consider vinyl siding to minimize future painting expense. | BCP accepts. |
| ■ | 11. | The developer should consider the use of wood or fiber cement rather than hardboard products at the soffits, fascia, trim, and gable end walls. | Addressed in plans. | BCP accepts. |
| ■ | 12. | Boston Capital should discuss with the developer the need for evaluation of moisture conditions within the most suspect areas of the exterior walls. | Addressed in plans. | BCP accepts. |
| ■ | 13. | Consideration should be given to obtaining a 15-year warranty for the low slope roof coverings. | The specifications call for a one-sheet seamless repair, with implied 10-year warranty. Replacement would be superior to buying an additional five-year warranty. | BCP accepts. |
| ■ | 14. | The Contractor's unit interior survey should be assembled by the architect into a tabulated matrix and incorporated into the construction contract and/or the construction documents. | This is in process and will be completed prior to closing. | BCP accepts. |
| ■ | 15. | Consideration should be given to installing ducted exhaust fans within the bathtub compartments in the three-bedroom unit types. | Addressed in plans. | BCP accepts. |

-2-

AOS143566A&E

| Concluded | Item | Recommendation/Open Item – A&E | G.P. Response | BCP Comments |
|---|---|---|---|---|
| ■ | 16. | In conjunction with the installation of new gas service and the pavement resurfacings the developer should consider exposing underground water service piping in order to assess its condition and estimate its future capital needs. | Keyspan is installing the service at their expense, up to the heating appliances (boilers) and domestic water heaters (DHW). We will not have nor do we want access to their trench. The gas lines will not necessarily follow the water piping lines.<br><br>The paving in the budget is a top coating, not a replacement of the entire paving system. Several small areas are scheduled for replacement. | BCP accepts. |
| ■ | 17. | Boston Capital should seek certification from the architect regarding the projects consistency with applicable handicap accessibility requirements. | As required by law and DHCD/MHFA, architect will certify that its work product will comply with handicap accessibility requirements. | BCP accepts. |
| ■ | 18. | The rear access road should be cleared and made passable, if it a fire access lane. | There is only a utility easement at the rear of the property; it is not a fire access lane. | BCP accepts. |
| ■ | 19. | Boston Capital should consider the need for a wood destroying insect and organism survey as well as limited moisture probes. | Rockland Place currently has pest protection service contracts in place that will remain in after the closing.<br><br>As to moisture, see Rec. 12 above. | BCP accepts. |

Assistant Vice President   _(signature)_   Date _12/5/2006_

Director of Acquisitions   _(signature)_   Date _12/7/2006_

Chief Underwriter   _(signature)_   Date _12/7/2006_

-3-

## EXHIBIT D
## INSURANCE REQUIREMENTS

I.   Builder's Risk "All Risk" for Buildings under Construction/Renovation

Through the Completion Date, or such later date as may be required by any Agency or any Lender, the General Partner shall cause to maintain "all risk" builder's risk insurance in favor of the Partnership and the General Contractor in an amount not less than the greater of (i) the full replacement value of the Apartment Complex and coverage for new construction or (ii) such other amount as shall be required by any Agency or Lender. For those properties under renovation, the limit of insurance must be equal to the value of the building(s) after the demolition portion is completed, plus full construction/rehabilitation value including cost of labor with soft cost contingency. This coverage shall include flood (if applicable); earthquake (if applicable); hail, wind and hurricane (if applicable); and boiler and machinery coverage for all properties that have a central boiler or heating system, sprinklers, central air conditioning, generators, other machinery and equipment and/or elevators.

II.   Comprehensive General Liability (Commercial General Liability) for Buildings under Construction/Renovation

The General Partner shall cause to be maintained commercial general liability insurance in favor of the Partnership and the General Contractor, during the construction period, in an amount not less than $2,000,000 in the general aggregate (per project) , $1,000,000 products and completed operations aggregate, $1,000,000 each occurrence (combined single limit), $50,000 fire damage and $5,000 medical expenses.

Coverage for hostile fire must be included/endorsed onto policy with no points of exclusion.

III.   Worker's Compensation and Employer's Liability

The General Partner shall cause to be maintained worker's compensation and employer's liability insurance in favor of the General Contractor, during the construction period, in an amount required by the State's laws governing such insurance.

IV.   Comprehensive Automobile Liability for Buildings under Construction/Renovation

The General Partner shall cause to be maintained comprehensive automobile coverage, including any automobile liability, in favor of the Partnership and the General Contractor in an amount not less than $1,000,000 (combined single limit).

V.   Excess or Umbrella Liability for Buildings under Construction/Renovation

The General Partner shall cause to be maintained excess or umbrella liability insurance in favor of the Partnership and the General Contractor in an amount not less than $4,000,000 per

#3915778_v6

occurrence and $4,000,000 in the aggregate. Blanket policies will be evaluated on a case-by-case basis.

VI.   Architect's Errors and Omissions

The Architect shall maintain non-project-specific errors and omissions insurance under commercial general liability coverage in an amount equal to the greater of $250,000 or 10% of the construction contract amount.

VII.   Comprehensive Casualty (All Risk Property Coverage) for Completed/Operational Buildings:

The General Partner shall cause to be maintained comprehensive casualty insurance including, but not limited to; 100% Replacement Cost coverage with an Agreed Amount Endorsement and a deductible no more than $5,000 for properties of 100 units or less and $10,000 for properties of more than 100 units (a blanket policy is acceptable as long as the policy includes a Stated Value and Agreed Amount Endorsement); Loss of Rents coverage in an amount equal to the actual loss sustained on rents and extra expense; loss caused by fire; earthquake (if applicable); hail, wind and hurricane; flood (if applicable); coverage for loss or damage attributable to mold, fungus, moisture, microbial contamination or pathogenic organisms in connection with another covered peril (e.g. mold in connection with water damage caused by storm or fire) (Unless Investment Limited Partner determines in it's reasonable judgment that such insurance is unavailable or that such a policy would create economic hardship on the Partnership); and boiler and machinery coverage for all properties that have a central boiler or heating system, sprinklers, central air conditioning, generators, other machinery and equipment and/or elevators.

VIII.   Comprehensive General Liability (Commercial General Liability) for Completed/Operational Buildings:

The General Partner shall cause to be maintained commercial general liability insurance in favor of the Partnership, in an amount not less than $2,000,000 in the general aggregate (per project) , $1,000,000 products and completed operations aggregate, $1,000,000 each occurrence (combined single limit), $50,000 fire damage and $5,000 medical expenses.

Coverage for hostile fire must be included/endorsed onto policy with no points of exclusion.

IX.   Comprehensive Automobile Liability for Completed/Operational Buildings:

The General Partner shall cause to be maintained comprehensive automobile coverage, including all owned autos, hired autos and non-owned autos in favor of the Partnership in an amount not less than $1,000,000 (combined single limit).

X.   <u>Excess or Umbrella Liability for Completed/Operational Buildings:</u>

The General Partner shall cause to be maintained excess or umbrella liability insurance in favor of the Partnership in an amount not less than $4,000,000 per occurrence and $4,000,000 in the aggregate.  Blanket policies will be evaluated on a case-by-case basis.

XI.   <u>Management Agent</u>

The Management Agent shall maintain for the term of the Management Agreement, worker's compensation insurance in accordance with the State's laws governing such insurance and a fidelity bond in the amount of not less than six (6) months of the Apartment Complex's projected gross rent.

XII.   <u>General Requirements</u>

All the policies required above must be issued by insurance carriers that are currently rated by Best as A-7 or better.

Throughout the term of the Partnership, the General Partner shall provide copies of all such insurance certificates to the Investment Limited Partner promptly after their receipt thereof or upon request but no less frequently than annually.

30 days prior to the expiration date for any such insurance policy, the General Partner shall deliver to the Investment Limited Partner a copy of the comparable new or replacement insurance certificate(s), including all endorsements, exhibits and riders thereto.

The General Partner shall cause the applicable insurer to name each Investment Limited Partner and the Special Limited Partner as an "additional insured" on each insurance policy and as "loss payee" on each Comprehensive Casualty and/or Builder's Risk policy.

In the event that the Partnership has a property insurance claim in excess of $50,000, then the Special Limited Partner shall have the right to approve the General Partner's intended use of the insurance proceeds.

# TABLE OF CONTENTS

ARTICLE I Defined Terms...................................................................................................1

ARTICLE II Name and Business ........................................................................................23

   2.1.   Name; Continuation .................................................................................23
   2.2.   Office and Registered Agent.....................................................................23
   2.3.   Purpose ....................................................................................................23
   2.4.   Term and Dissolution ..............................................................................23
   2.5.   Nature of Partnership Interests.................................................................24

ARTICLE III Mortgage, Refinancing and Disposition of Property ...................................25

   3.1.   Personal Liability .....................................................................................25
   3.2.   Refinancings; Permanent Loan Documents..............................................25
   3.3.   Sale of Assets ..........................................................................................25
   3.4.   Real Estate Commissions ........................................................................26
   3.5.   Sale of the Apartment Complex ...............................................................26
   3.6.   Investor Provisions ..................................................................................27
   3.7.   Option to Purchase Promissory Notes......................................................27
   3.9.   Mass Housing Provisions ........................................................................29

ARTICLE IV Partners; Capital ..........................................................................................32

   4.1.   Capital and Capital Accounts...................................................................32
   4.2.   General Partner........................................................................................33
   4.3.   Limited Partners .....................................................................................33
   4.4.   Liability of the Limited Partners..............................................................33
   4.5.   Special Rights of the Special Limited Partner ..........................................34
   4.6.   Meetings .................................................................................................35

ARTICLE V Capital Contributions of the Investment Limited Partner and the Special Limited
Partner ................................................................................................................................36

   5.1.   Payments.................................................................................................36
   5.2.   Return of Capital Contributions ..............................................................40

ARTICLE VI Rights, Powers and Duties of General Partner..............................................45

   6.1.   Authorized Acts ......................................................................................45
   6.2.   Restrictions on Authority.........................................................................46
   6.3.   Personal Services; Other Business Ventures .............................................48
   6.4.   Business Management and Control ...........................................................48
   6.5.   Duties and Obligations ............................................................................49
   6.6.   Representations and Warranties................................................................53
   6.7.   Liability on Mortgages ............................................................................57
   6.8.   Indemnification of the General Partner ....................................................57
   6.9.   Indemnification of the Partnership and the Limited Partners ....................58
   6.10.  Operating Deficits ...................................................................................59
   6.11.  Obligation to Complete the Construction of the Apartment Complex.........60
   6.12.  Certain Payments to the General Partner and Others.................................60

6.13.  Delegation of General Partner Authority.................................................61
6.14.  Assignment to Partnership.......................................................................62
6.15.  Contracts with Affiliates...........................................................................62
6.16.  Tax Matters Partner...................................................................................62

ARTICLE VII Withdrawal of a General Partner; New General Partners....................64

7.1.  Voluntary Withdrawal................................................................................64
7.2.  Reconstitution.............................................................................................64
7.3.  Successor General Partner.........................................................................64
7.4.  Interest of Predecessor General Partner...................................................65
7.5.  Amendment of Certificate; Approval of Certain Events.........................66
7.6.  Valuation and Sale of Interest of Former General Partner....................66
7.7.  Designation of New General Partners.......................................................67

ARTICLE VIII Transferability of a Limited Partner's Partnership Interests          68

8.1.  Assignments...............................................................................................68
8.2.  Substituted Limited Partner......................................................................68
8.3.  Restrictions.................................................................................................68

ARTICLE IX Borrowings.................................................................................................69

ARTICLE X Profits, Losses, Tax Credits, Distributions and Capital Accounts..........70

10.1.  Profits, Losses and Tax Credits...............................................................70
10.2.  Cash Distributions Prior to Dissolution..................................................71
10.3.  Distributions Upon Dissolution...............................................................72
10.4.  Special Provisions.....................................................................................73
10.5.  Authority of the General Partner to Vary Allocations to Preserve and Protect the
        Partners' Intent..........................................................................................77
10.6.  Recapture Amount.....................................................................................78

ARTICLE XI Management Agent....................................................................................79

11.1.  General........................................................................................................79
11.2.  Fees.............................................................................................................80
11.3.  Removal and Replacement.......................................................................80
11.4.  Lack of Management Agent......................................................................80

ARTICLE XII Books and Records, Accounting, Tax Elections, Etc............................81

12.1.  Books and Records....................................................................................81
12.2.  Bank Accounts...........................................................................................81
12.3.  Auditors......................................................................................................81
12.4.  Cost Recovery and Elections....................................................................82
12.5.  Special Basis Adjustments........................................................................82
12.6.  Fiscal Year..................................................................................................82
12.7.  Information to Partners..............................................................................83
12.8.  Expenses of the Partnership......................................................................86

ARTICLE XIII General Provisions..................................................................................88

13.1.  Restrictions by Reason of Section 708 of the Code................................88

13.2.   Amendments to Certificates.........................................................................88
13.3.   Notices........................................................................................................88
13.4.   Word Meanings...........................................................................................89
13.5.   Binding Effect.............................................................................................89
13.6.   Applicable Law...........................................................................................89
13.7.   Counterparts................................................................................................89
13.8.   Financing Regulations.................................................................................89
13.9.   Separability of Provisions...........................................................................90
13.10. Paragraph Titles..........................................................................................90
13.11. Amendment Procedure................................................................................90
13.12. Extraordinary Limited Partner Expenses....................................................90
13.13. Time of Admission......................................................................................90
13.14. Tax Shelter Provisions................................................................................91

**EXHIBIT B**

**ROCKLAND PLACE DEVELOPERS LLC**

**a Massachusetts Limited Liability Company**

**Operating Agreement**

This Operating Agreement (this *"Agreement"*) is made and entered into as of the 17th day of July, 2006, by Connolly and Partners, LLC, a Massachusetts limited liability company as Manager and Member and Omni Development Corporation, a Rhode Island non-profit corporation as Member. The addresses of the Manager and Members are shown on the attached Exhibit A.

The parties have agreed to organize and operate the Company as a limited liability company under the Massachusetts Limited Liability Company Act, as amended from time to time (the *"Act"*), in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

**ARTICLE I**
**Definitions**

Unless otherwise expressly provided herein, the following terms used in this Agreement shall have the following meanings:

(a)    *"Act"* shall have the meaning set forth in the introductory paragraphs of this Agreement.

(b)    *"Additional Capital Contributions"* shall have the meaning set forth in Section 6.1.

(c)    *"Affiliate"* means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (ii) any Person owning or controlling fifty percent (50%) or more of the outstanding voting interests of such Person, (iii) any officer, director, manager, member, or general partner of such Person, or (iv) any Person who is an officer, director, manager, general partner, member, trustee, or holder of fifty percent (50%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls", "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

(d)    *"Agreement"* shall have the meaning set forth in the introductory paragraphs of this Agreement.

1

(e)   "*Capital Cash Flow*" shall mean, for purposes of this Agreement and for a given period of time, the net proceeds received by the Company from Company borrowings and the net proceeds of the sale or other disposition of any of the Company assets (other than any de minimus assets so disposed of), in each instance less reserves required as determined by Manager.

(f)   "*Capital Contribution*" shall mean any contribution by the Members to the capital of the Company in cash or other property or services rendered, or a promissory note or other obligation to contribute cash or property or to perform services, including, without limitation, the Initial Capital Contribution and any Additional Capital Contributions.

(g)   "*Certificate*" shall mean the Certificate of Organization filed with the Secretary of State of the Commonwealth of Massachusetts, as the same may be amended or restated from time to time hereafter.

(h)   "*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provisions of succeeding law.

(i)   "*Company*" shall have the meaning set forth in the introductory paragraphs of this Agreement.

(j)   "*Entity*" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization or any other legal form of incorporated or unincorporated entity.

(k)   "*Initial Capital Contribution*" shall have the meaning set forth in Section 6.1.

(l)   "*Manager(s)*" shall mean, initially, Connolly and Partners, LLC, and any successor Manager as may be designated by the initial Manager and any successor thereto.

(m)   "*Member Loan*" shall mean any loan made by any Member to the Company as permitted under this Agreement.

(n)   "*Member(s)*" shall mean, initially, Connolly and Partners, LLC, and Omni Development Corporation and their successors and assigns, as may be admitted pursuant to the terms hereof.

(o)   "*Operating Cash Flow*" shall mean, for purposes of this Agreement and for a given period of time, all cash received by the Company from any source (other than those described in the definition of Capital Cash Flow) less cash expended for the debts and expenses of the Company, principal and interest payments on any indebtedness of the Company, ground lease payments capital expenditures and, in each instance, such reserves as are determined by Manager.

(p)   "*Outstanding Capital Contribution*" means, with respect to each Member, the amount of such Member's Capital contribution reduced by distributions made pursuant to Section 6.2 hereof in respect of such Member's Capital Contribution.

2

(q)   *"Percentage Interest"* shall mean a Member's share of the profits and losses of the Company and the Member's percentage right to receive distributions of the Company's assets. The Percentage Interest of each Member shall be, initially, the percentage set forth opposite such Member's name on Exhibit A attached hereto and incorporated herein, as such exhibit shall be amended from time to time in accordance with the provisions hereof. The combined Percentage Interest of all Members shall at all times equal 100%.

(r)   *"Person"* shall mean any individual or Entity, and the heirs, executors, estate, administrators, legal representatives, successors, and assigns of such *"Person"* where the context so permits.

(s)   *"Property"* or *"Properties"* shall mean that certain property described on Exhibit B attached hereto and incorporated herein, and all other property and assets hereafter acquired and owned by the Company or in which it directly or indirectly owns an interest.

(t)   *"Treasury Regulations"* shall mean any proposed, temporary and final regulations promulgated under the Code as in effect from time to time and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

2.1   Formation:  The Company was formed effective as of the date hereof, upon the filing with the Office of the Secretary of State of the Commonwealth of Massachusetts of the Certificate, in accordance with and pursuant to the Act. The parties hereto do hereby confirm their intent and agreement that the Company shall be governed by the terms of this Agreement.

2.2   Name.  The name of the Company is Rockland Place Developers LLC provided that the Manager may elect to have the Company transact business in other names in those jurisdictions where the Manager deems it necessary for purposes of complying with the requirements of local law or otherwise in its sole determination.

2.3   Principal Place of Business.  The principal place of business of the Company shall initially be c/o Connolly and Partners, LLC, 8 Faneuil Hall Marketplace, Boston, MA 02109. The Company may relocate its principal place of business to any other place or places as the Manager may from time to time deem advisable. Additional offices may be maintained and acts done at any other place appropriate for accomplishing the purposes of the Company, all as may be determined by the Manager.

2.4   Resident Agent.  The Resident Agent for the Company shall be Julie Kaufman, c/o Connolly and Partners, LLC, 8 Faneuil Hall Marketplace, Boston, MA 02109. The Resident Agent and/or the address of the Resident Agent may be changed from time to time by an amendment to the Certificate filed with the Secretary of State of the Commonwealth of Massachusetts.

2.5   Term.  The term of the Company shall be perpetual, unless sooner terminated in accordance with the other provisions of this Agreement.

## ARTICLE III
### The Business of the Company

The business of the Company shall be to engage in any lawful act or activity whatsoever for which limited liability companies may be organized under the Act and which pertain to acquiring, owning, operating, managing, improving, renovating, redeveloping, leasing, financing, mortgaging, encumbering, selling, transferring, exchanging and otherwise dealing with the Property or Properties, as defined above, or which are incidental to or related to the foregoing. The Company shall have the power and authority to do all acts and things which are permitted under the Act and which are necessary, useful or desirable in connection with the foregoing.

## ARTICLE IV
### Rights and Duties of Manager

4.1    Management.

(a)    The Members hereby appoint Connolly and Partners, LLC as Manager. The Company shall be managed by the Manager, and, except as otherwise expressly set forth herein, all management of, and all decisions as to the Company shall be vested solely in, and shall be made solely by the Manager, and the affirmative action (regardless of whether written, oral, or by course of conduct) of a Manager on behalf of the Company shall constitute the due and valid act of the Company and shall be binding on the Company.

((b)    The Manager has the power to bind the Company as provided in this Article. The act of a Manager on behalf of the Company, regardless of whether such action is for the purpose of apparently carrying on in the usual way the business or affairs of the Company or otherwise, shall bind the Company, and no person dealing with the Company shall have any obligation to inquire into the power or authority of Manager acting on behalf of the Company.

(c)    The Manager shall have the power to appoint agents to act for the Company with such titles as Manager deems appropriate and to delegate to such agents such of the powers as are granted to Manager hereunder, including the power to execute documents on behalf of the Company, all as Manager, in its sole discretion, may determine, provided that any such appointment shall be in writing. The agents so appointed may include persons holding titles such as Chairperson, Chief Executive Officer, President, Vice President, Chief Operating Officer, Chief Financial Officer, Treasurer or Controller. Unless the authority of the agent designated as the officer in question is limited in the document appointing such officer, any officer so appointed shall have the same authority to act for the Company, subject to the terms of this Agreement, as a corresponding officer of a Massachusetts corporation would have to act for a Massachusetts corporation; provided, however, that unless such power is specifically delegated in writing by Manager to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interest of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire security of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the

4

Company or to sell or lease all or any substantial portion of the assets of the Company. Manager, in its sole discretion, but subject to the other terms of this Agreement may by its written act, ratify any act previously taken by any agent acting on behalf of the Company.

(d)      Any Person dealing with the Company or the Members may rely on a certificate signed by a Manager:

     (i)      as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by Manager or are in any other manner germane to the affairs of the Company;

     (ii)      as to who is authorized to execute and deliver any instrument or document on behalf of the Company, and as to whether any approval, consent, or other action is necessary under this Agreement and/or as to whether any such action or consent has been obtained;

     (iii)      as to the authenticity of any copy of the Certificate, and as to the status of this Agreement and amendments hereto; or

     (iv)      as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Members.

(e)      Upon its resignation, a Manager shall designate a successor Manager for the Company.

    4.2      **Manager's Duty to Company**

(a)      The Manager shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company, it being expressly understood that Manager may be entering into transactions that are similar to the transactions into which the Company may enter.  The Company shall not have any right, by virtue of this Agreement, to share or participate in such transaction of Manager or to the income or proceeds derived therefore.  Manager shall not incur any liability to the Company as a result of engaging in any other business venture.

(b)      Manager does not violate a duty or obligation to the Company merely because Manager's conduct furthers Manager's own interest.  Manager and any Affiliate of Manager may lend money to and transact other business with the Company.  The rights and obligations of Manager lending money to or transacting business with the Company are the same as those of a person who is not a Member, subject to applicable law.  No transaction with the Company shall be voidable solely because Manager or any Affiliate of Manager has a direct or indirect interest in the transaction if the transaction is fair to the Company.

4.3      Duty of Care.  Manager's duty of care in the discharge of Manager's duties to the Company is limited to refraining from engaging in intentional misconduct.  In discharging its duties, Manager shall be fully protected in relying in good faith upon the records required to be maintained under Article X and upon such information, opinions, reports, or statements by any of its agents, or by any other person, as to matters Manager reasonably believes are within such

other person's professional or expert competence and who have been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Manager might properly be paid.

4.4     Indemnity of Members, Manager and Others.  Each Person or Entity who at any time is or shall have been a Member of the Company, or is or shall have been serving at the request of the Company as a Manager, officer, employee or agent of the Company, shall be indemnified and held harmless by this Company from and against any and all losses, liabilities or claims attributable to such status or to acts or failure to act in connection therewith, provided that the scope of this indemnification and agreement to hold harmless shall not extend to losses arising from the intentional misconduct of the indemnitee.  The Company may advance costs of defense of any proceedings to any Member, Manager or any other indemnitee.  The foregoing right of indemnification shall not be deemed exclusive of any other rights to which a Person seeking indemnification may be entitled under any other agreement, vote of Members or otherwise.  If authorized by the Members, the Company may purchase and maintain insurance on behalf of any Person (including the Members) to the fullest extent permitted by the Act.

4.5     Affiliated Compensation.  Manager may retain such Persons or Entities as it shall determine (including any Person or Entity in which Manager shall have an interest or of which Manager is an Affiliate) to provide services or goods to or on behalf of the Company for such compensation as Manager deems to be appropriate.

## ARTICLE V
### Rights and Obligations of Members

5.1     Limitation of Liability.  The Members' liability shall be limited as set forth in this Agreement, the Act and other applicable law, and in all events the Members shall not be liable, as a member, for any liabilities or other obligations of the Company.  The failure of the Company and/or the Members to observe any formalities or requirements relating to the exercise of the powers or management of the Company's business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for any liabilities or other obligations of the Company.

## ARTICLE VI
### Contributions and Distributions

6.1     Members' Capital in the Company.

(a)     The Members have contributed to the Company as its Initial Capital Contribution that amount as shown on Exhibit A, attached hereto (each, an "*__Initial Capital Contribution__*"). Thereafter the Members will respectively contribute cash as required by the Manager ("*__Additional Capital__*").  The Member shall not have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.  The obligation of the Members to

contribute to the capital of the Company is solely and exclusively for the benefit of the Company and the Members, and is not intended to, nor shall it confer rights on, any third party. Without limiting the generality of the foregoing, no creditor of the Company shall be deemed a third party beneficiary of any obligation of the Members to contribute capital or make advances to the Company.

In the event that Omni Development Corporation fails to contribute additional capital pursuant to the terms of this Agreement, then the funds not advanced shall be deemed due and payable from the funds otherwise due to Omni Development Corporation with interest at the rate of Wall Street Journal prime rate, plus 1%.

6.2     Distributions of Operating and Capital Cash Flow.

(a)     Subject to the terms of this Section 6.2, distributions of Operating Cash Flow and Capital Cash Flow shall be made to the Member in accordance with their Percentage Interests in the Company at such time or times as Manager shall determine. Such distributions need not be made concurrently or alternately.

(b)     No distribution shall be made unless, after the distribution is made, the assets of the Company are, in the reasonable opinion of Manager, in excess of the liabilities of the Company.

(c)     The Company shall distribute Operating Cash Flow to the Members in the following order and priority:

(i)     First, to the Members in amounts equal to each Member's Outstanding Capital Contributions until each Member's Outstanding Capital Contribution has been reduced to zero; and

(ii)     Second, to the Members in proportion to their respective Percentage Interests.

(d)     The Company shall distribute Capital Cash Flow to the Members in the following order and priority:

(i)     First, to the Member, in amounts equal the outstanding Member Loans with interest thereon at the Company Loan Rate until the outstanding Member Loans have been paid;

(ii)     Second, to the Members in amounts equal to each Member's Outstanding Capital Contribution until such Member's Outstanding Capital Contribution has been reduced to zero; and

(iii)     Finally, to the Members in the proportion to their respective Percentage Interests.

**ARTICLE VII**

7

**Transferability**

Each Member may transfer its interests in the Company in whole or in part (other than to creditors as provided below) with the prior written consent of the Manager. If a Member receives the requisite consent, then the assignee shall be admitted as a Member of the Company with all the rights of the Member which assigned its interest. However, no part of the interest of the Members shall be subject to the claims of any creditor or to legal process. No transfer (whether voluntary or involuntary) shall effect a dissolution of the Company. No Member shall have the right to withdraw from the Company except with the consent of the prior written consent of the Manager and upon such terms and conditions as may be specifically agreed upon between the Manager and the withdrawing Member. No event of bankruptcy described in the Act shall cause any Member to cease to be a Member. Upon the happening of any event of dissolution specified in any section of the Act (other than a determination made by the Members to dissolve pursuant to Section 9.1 of this Agreement), the Company shall not dissolve if the Members demonstrate an intent to continue the business of the Company at any time prior to when a Certificate of Cancellation is filed for the Company with the Secretary of the Commonwealth of Massachusetts or the Company's assets are liquidated and distributed pursuant to Section 9.2 below.

## ARTICLE VIII
### Additional Members

Any Person or Entity acceptable to the Manager may become a member in this Company subject to the conditions imposed by the Manager. At or about the time a new Member is admitted, this Agreement shall be amended or amended and restated as necessary or proper to reflect the admission of the new Member or Members.

## ARTICLE IX
### Dissolution and Termination

9.1     Dissolution. The Company shall be dissolved and its affairs wound up only upon (a) the written determination of the Manager that the Company dissolve, or (b) the judicial dissolution of the Company. Notwithstanding any provision of the Act to the contrary, the Company shall continue and shall not dissolve as a result of the death, retirement, resignation, expulsion, bankruptcy, or dissolution of any Member or any other event that terminated the continued membership of such Member.

9.2     Winding Up, Liquidation, and Distribution of Assets.

(a)     Upon dissolution, Manager shall proceed to wind up the affairs of the Company, and liquidate and distribute the assets of the Company as the Manager sees fit, subject to the Act. Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision

8

therefore has been made, and all of the remaining property and assets of the Company have been distributed to the Members. Upon the completion of winding up of the Company, the Manager shall deliver a Certificate of Cancellation to the Secretary of the Commonwealth of Massachusetts for filing. The Certificate of Cancellation shall set forth the information required by the Act.

## ARTICLE X
## Miscellaneous Provisions

10.1    Books of Account and Record. Proper and complete records and books of account shall be kept or shall be caused to be kept by Manager, or such representatives may be appointed, in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall at all times be maintained at the office of a Manager.

10.2    Application of Massachusetts Law; Inconsistency with the Act. This Agreement and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the Commonwealth of Massachusetts, and specifically the Act. If and to the extent of any inconsistency between this Agreement and the Act, then, except where expressly prohibited, void or ineffective under the Act, this Agreement shall govern. To the extent any provision of this Agreement is prohibited, void or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act. In the event the Act is subsequently amended or interpreted such a way as to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

10.3    Amendments. This Agreement may not be amended except by the written agreement of all the Members and Manager.

10.4    Severability. If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.5    Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

10.6    Rights of Creditors and Third Parties under Company Agreement. This Agreement is entered into between the Members for the exclusive benefit of the Members, and their respective successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person and no such creditor or third party shall have any rights under this Agreement or any agreement between the Members with respect to any Capital Contribution or otherwise.

10.7   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Rockland Place Developers LLC
Connolly and Partners, LLC Manager and
Member

By _____
        William Connolly, Manager


Omni Development Corporation,
Member

By _____
        Joseph Caffey, President

10

**EXHIBIT A**

Members and Manager of the Company, their Percentage Interests and their Initial Capital
Contributions Thereto

| Manager's Name and Address | Percentage Interest | Initial Capital Contribution |
|---|---|---|
| Connolly and Partners, LLC<br>8 Faneuil Hall Marketplace<br>Boston, MA  02109 | 0% | $0 |

| Member's Name and Address | | |
|---|---|---|
| Connolly and Partners, LLC<br>8 Faneuil Hall Marketplace<br>Boston, MA  02109 | 50% | $50.00 |
| Omni Development Corporation<br>810 Eddy Street<br>Providence, Rhode Island  02905 | 50% | $50.00 |
| | **100%** | **$100.00** |

11

**EXHIBIT B**

Description of the Property

Divider



FILED

JUL 17 2006

SECRETARY OF THE COMMONWEALTH
CORPORATIONS DIVISION

# CERTIFICATE OF ORGANIZATION
## OF
### ROCKLAND PLACE DEVELOPERS LLC

Pursuant to Section 12 of Chapter 156C of the Massachusetts General Laws (the "Act"), the undersigned hereby certifies as follows:

1. **Name of Limited Liability Company:** The name of the limited liability company formed hereby (the "LLC") is Rockland Place Developers LLC.

2. **Office of Limited Liability Company:** The address of the LLC in the Commonwealth required to be maintained by Section 5 of the Act is c/o Connolly and Partners, LLC, 8 Faneuil Hall Marketplace, Boston, MA 02109.

3. **Agent for Service of Process:** The name and address of the resident agent for service of process for the LLC is Julie Kaufmann, c/o Connolly and Partners, LLC, 8 Faneuil Hall Marketplace, Boston, MA 02109.

4. **Date of Dissolution:** The LLC is to have no specific date of dissolution.

5. **Managers:** At the time of formation of the LLC, its manager is Connolly and Partners, LLC, 8 Faneuil Hall Marketplace, Boston, MA 02109.

6. **Execution of Documents:** William Connolly or Neil Ellis are authorized to execute any documents to be filed with the Secretary of State of the Commonwealth of Massachusetts.

7. **Business of Limited Liability Company:** The sole purpose of the business of the LLC is to be a Developer of Rockland Place, Rockland, Massachusetts; to enter into contracts relating to the same.

2006 JUL 17 PM 3: 42
CORPORATIONS DIVISION
SECRETARY OF THE COMMONWEALTH

8.   <u>Execution of Documents Relating to Real Property</u>:  The Manager is authorized on
behalf of the LLC to execute, acknowledge, deliver and record any recordable instrument
purporting to affect an interest in real property, whether to be recorded with a registry of
deeds or a district office of the Land Court.

In Witness Whereof, the undersigned has executed this Certificate of Organization under
the penalties of perjury as of this  _l 7_  day of July, 2006.

Connolly and Partners, LLC, Manager

By: _____

William Connolly, Manager

2

# EXHIBIT C

<u>AMENDED AND RESTATED DEVELOPMENT AGREEMENT</u>

AGREEMENT made as of August 25, 2006 by and between ROCKLAND PLACE APARTMENTS LIMITED PARTNERSHIP, a Massachusetts limited partnership (the "Partnership"), and ROCKLAND PLACE DEVELOPERS LLC, a Massachusetts limited liability company (the "Developer").

<u>Recitals</u>

1.      The Partnership was formed to acquire, rehabilitate, develop, improve, maintain, own, operate, lease, dispose of and otherwise deal with an apartment project located in Rockland, Massachusetts, known as the Spring Gate Apartments (the "Apartment Complex").

2.      Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the First Amended and Restated Agreement of Limited Partnership of the Partnership of even date herewith (the "Partnership Agreement").

3.      The Apartment Complex, following the completion of rehabilitation, is expected to constitute a "qualified low-income housing project" (as defined in Section 42(g)(1) of the Code).

4.      An Affiliate of the Developer and certain other related parties, pursuant to that certain development agreement dated as of February 10, 2005 (the "Original Agreement"), have already provided and, pursuant to the terms hereof, the Developer will continue to provide certain services with respect to the Apartment Complex during the acquisition, development, rehabilitation and initial operating phases thereof.

5.      In consideration for such services, past and future, the Partnership has agreed to pay to the Developer certain fees computed and paid in the manner stated herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend and restate the Original Agreement (which Original Agreement is superseded hereby in all respects) as follows:

Section 1.      <u>Defined Terms.</u>

"<u>Construction Costs</u>" means any and all costs and expenses necessary to (i) cause the rehabilitation of the Apartment Complex to be completed, in a good and workmanlike manner, free and clear of all mechanics', materialmen's or similar liens, in accordance with the Plans and Specifications, (ii) equip the Apartment Complex with all necessary and appropriate fixtures, equipment and articles of personal property (including, without limitation, refrigerators and ranges), (iii) obtain all required certificates of occupancy for the apartment units and other space in the Apartment Complex, (iv) pay the Development Fee, (v) finance the rehabilitation of the Apartment Complex and achieve the Completion Date in accordance with the provisions of the Project Documents, (vi) discharge all Partnership liabilities and obligations arising out of any casualty generating insurance proceeds for the Partnership prior to the Completion Date, (vii)

fund any Partnership reserves required hereunder or under any of the Project Documents, (viii) repay and discharge the Construction Loan and (ix) pay any other costs or expenses necessary to achieve the Completion Date.

"Designated Construction Proceeds" means (i) the proceeds of all Mortgage Loans, (ii) the net rental income, if any, generated by the Apartment Complex prior to the Completion Date which is permitted by the Lenders to be applied to the payment of Construction Costs, (iii) the Capital Contributions of the Investment Limited Partners and the Special Limited Partner, (iv) the Capital Contributions of the General Partner in the amounts set forth in Schedule A of the Partnership Agreement as of the Admission Date and (v) any insurance proceeds arising out of casualties occurring prior to the Completion Date.

"Development Advances" has the meaning set forth in Section 2.

Section 2.    Obligation to Complete Rehabilitation and to Pay Construction Costs.

The Developer shall complete the rehabilitation of the Apartment Complex or cause the same to be completed in a good and workmanlike manner, free and clear of all mechanics', materialmen's or similar liens and shall equip the Apartment Complex or cause the same to be equipped with all necessary and appropriate fixtures, equipment and articles of personal property, including without limitation, refrigerators and ranges, provided for in the Project Documents and the Plans and Specifications. The Developer also shall cause the achievement of the Completion Date in accordance with the terms of the Partnership Agreement. If the Designated Construction Proceeds as available from time to time are insufficient to pay all Construction Costs and achieve the Completion Date, the Developer shall advance or cause to be advanced to the Partnership from time to time as needed all such funds as are required to pay such deficiencies. Any such advances ("Development Advances") shall, to the extent permitted under the Project Documents and any applicable Regulations or requirements of any Lender or Agency (or otherwise with any Requisite Approvals), be reimbursed at or prior to the payment of the Investment Limited Partner's final Capital Contribution only out of Designated Construction Proceeds available from time to time after payment of all Construction Costs. Any balance of the amount of each Development Advance not reimbursed at the time of the payment of the Investment Limited Partner's final Capital Contribution shall not be reimbursable, shall not be credited to the Capital Account of any Partner, or otherwise change the interest of any Person in the Partnership, but shall be borne by the Developer under the terms of this Agreement.

Section 3.    Development Services.

(a)    The Developer has heretofore performed certain services relating to the development of the Apartment Complex and shall continue to oversee the rehabilitation and development of the Apartment Complex, and shall perform the services and carry out the responsibilities with respect to the Apartment Complex as are set forth herein, and such additional duties and responsibilities as are reasonably within the general scope of such services and responsibilities and are designated from time to time by the General Partners.

(b)    The Developer's services shall be performed in the name and on behalf of the Partnership and shall consist of the duties set forth in subparagraphs (i) (xii) below of this

Section 3(b) and as provided elsewhere in this Agreement; provided, however, that if the performance of any duty of the Developer set forth in this Agreement is beyond the reasonable control of the Developer, the Developer shall nonetheless be obligated to (i) use its best efforts to perform such duty and (ii) promptly notify the General Partners that the performance of such duty is beyond its reasonable control.  The Developer has performed or shall perform the following:

      (i)     Negotiate and cause to be executed in the name and on behalf of the Partnership any agreements for architectural, engineering, testing or consulting services for the Apartment Complex, and any agreements for the rehabilitation of any improvements or tenant improvements to be constructed or installed by the Partnership or the furnishing of any supplies, materials, machinery or equipment therefor, or any amendments thereof, provided that no agreement shall be executed nor binding commitment made until the terms and conditions thereof and the party with whom the agreement is to be made have been approved by the General Partners unless the terms, conditions, and parties comply with guidelines issued by the General Partners concerning such agreements;

      (ii)    Establish and implement appropriate administrative and financial controls for the design and rehabilitation of the Apartment Complex, including but not limited to:

      (A)    coordination and administration of the Apartment Complex architect, the general contractor, and other contractors, professionals and consultants employed in connection with the design or rehabilitation of the Apartment Complex;

      (B)    administration of any construction contracts on behalf of the Partnership;

      (C)    participation in conferences and the rendering of such advice and assistance as will aid in developing economical, efficient and desirable design and rehabilitation procedures;

      (D)    the rendering of advice and recommendations as to the selection of subcontractors and suppliers;

      (E)    the review and submission to the General Partners for approval of all requests for payments under any architectural agreement, general contractor's agreement, or any loan agreements with any lending institutions providing funds for the benefit of the Partnership for the design or rehabilitation of any improvements;

      (F)    the submission of any suggestions or requests for changes which could in any reasonable manner improve the design, efficiency or cost of the Apartment Complex;

(G)     applying for and maintaining in full force and effect any and all governmental permits and approvals required for the lawful rehabilitation of the Apartment Complex;

(H)     compliance with all terms and conditions applicable to the Partnership or the Apartment Complex contained in any governmental permit or approval required or obtained for the lawful rehabilitation of the Apartment Complex, or in any insurance policy affecting or covering the Apartment Complex, or in any surety bond obtained in connection with the Apartment Complex;

(I)     furnishing such consultation and advice relating to the Apartment Complex as may be reasonably requested from time to time by the General Partners;

(J)     keeping the General Partners fully informed on a regular basis of the progress of the design and rehabilitation of the Apartment Complex, including the preparation of such reports as are provided for herein or as may reasonably be requested by the General Partners and which are of a nature generally requested or expected of construction managers or similar owner's representatives on similar projects;

(K)     giving or making the Partnership's instructions, requirements, approvals and payments provided for in the agreements with the Apartment Complex architect, general contractor, and other contractors, professionals and consultants retained for the Apartment Complex; and

(L)     at the Partnership's expense, filing on behalf of and as the attorney-in-fact for the Partnership any notices of completion required or permitted to be filed upon the completion of any improvement(s) and taking such actions as may be required to obtain any certificates of occupancy or equivalent documents required to permit the occupancy of the Apartment Complex.

(iii)     Inspect the progress of the course of the rehabilitation of the Apartment Complex, including  verification of the materials and labor being furnished to and on such rehabilitation so as to be fully competent to approve or disapprove requests for payment made by  the Apartment Complex architect and  the general contractor, or by any other parties with respect to the design or rehabilitation of the Apartment Complex, and in addition to verify that the rehabilitation is being carried out substantially in accordance with the Plans and Specifications approved by the General Partners or, in the event that the rehabilitation is not being so carried out, to promptly notify the General Partners;

(iv)     If requested to do so by the General Partners, perform on behalf of the Partnership all obligations of the Partnership with respect to the design or rehabilitation of the Apartment Complex contained in any loan agreement or security agreement entered into in connection with any construction or long-term financing for the

Apartment Complex, or in any lease or rental agreement relating to space in the Apartment Complex, or in any agreement entered into with any governmental body or agency relating to the terms and conditions of such rehabilitation, provided that copies of such agreements have been provided by the Partnership to the Developer or the Partnership has otherwise notified the Developer in writing of such obligations;

(v)     To the extent requested to do so by the General Partners, prepare and distribute to the General Partners a critical path schedule, and periodic updates thereto as necessary to reflect any material changes, but in any event not less frequently than quarterly, other design or rehabilitation cost estimates as required by the General Partners, and financial accounting reports, including monthly progress reports on the quality, progress and cost of the rehabilitation and recommendations as to the drawing of funds from any loans arranged by the Partnership to cover the cost of design and rehabilitation of the Apartment Complex, or as to the providing of additional capital contributions should such loan funds for any reason be unavailable or inadequate;

(vi)     At the Partnership's expense, obtain and maintain insurance coverage for the Apartment Complex, the Partnership, and the Developer and its employees, at all times until final completion of the rehabilitation of the Apartment Complex, in accordance with an insurance schedule approved by the General Partners, which insurance shall include general public liability insurance covering claims for personal injury, including but not limited to bodily injury, or property damage, occurring in or upon the Property or the streets, passageways, curbs and vaults adjoining the Property. Such insurance shall be in a liability amount approved by the General Partners;

(vii)     Comply with all applicable present and future laws, ordinances, orders, rules, regulations and requirements (hereinafter in this subparagraph (vii) called "laws") of all federal, state and municipal governments, courts, departments, commissions, boards and offices, any national or local Board of Fire Underwriters or Insurance Services Offices having jurisdiction in the county in which the Apartment Complex is located or any other body  exercising functions similar to those of any of the foregoing, or any insurance carriers providing any insurance coverage for the Partnership or the Apartment Complex, which may be applicable to  the Apartment Complex or any part thereof. Any such compliance undertaken by the Developer on behalf of and in the name of the Partnership, in accordance with the provisions of this Agreement, shall be at the Partnership's expense. The Developer shall likewise ensure that all agreements between the Partnership and independent contractors performing work in connection with the Apartment Complex shall include the agreement of said independent contractors to comply with all such applicable laws;

(viii)     Assemble and retain all contracts, agreements and other records and data as may be necessary to carry out the Developer's functions hereunder. Without limiting the foregoing, the Developer will prepare, accumulate and furnish to the General Partners and the appropriate governmental authorities, as necessary, data and information sufficient to identify the market value of improvements in place as of each real property tax lien date, and will make application for appropriate exclusions from the capital costs of the Apartment Complex for purposes of real property ad valorem taxes;

(ix)     Coordinate and administer the design and rehabilitation of all interior tenant improvements to the extent required under any leases or other occupancy agreements to be constructed or furnished by the Partnership with respect to the initial leasing of space in the Apartment Complex, whether involving building standard or non-building standard work;

(x)     Use its best efforts to accomplish the timely completion of the Apartment Complex in accordance with the approved Plans and Specifications and the time schedules for such completion approved by the General Partners;

(xi)     At the direction of the General Partners, implement any decisions of the General Partners made in connection with the design, rehabilitation and development of the Apartment Complex or any policies and procedures relating thereto, exclusive of leasing activities; and

(xii)     Perform and administer any and all other services and responsibilities of the Developer which are set forth in any other provisions of this Agreement, or which are requested to be performed by the General Partners and are within the general scope of the services described herein.

Section 4.     <u>Limitations and Restrictions.</u>

Notwithstanding any provisions of this Agreement, the Developer shall not take any action, expend any sum, make any decision, give any consent, approval or authorization, or incur any obligation with respect to any of the following matters unless and until the same has been approved by the General Partners:

(a)     Approval of all construction and architectural contracts and all architectural plans, specifications and drawings prior to the rehabilitation and/or alteration of any improvements contemplated thereby, except for such matters as may be expressly delegated in writing to the Developer by the General Partners;

(b)     Any proposed change in the work of the rehabilitation of the Apartment Complex, or in the Plans and Specifications therefor as previously approved by the General Partners, or in the cost thereof, or any other change which would affect the design, cost, value or quality of the Apartment Complex, except for such matters as may be expressly delegated in writing to the Developer by the General Partners;

(c)     Making any expenditure or incurring any obligation by or on behalf of the Partnership or the Apartment Complex involving a sum in excess of $25,000 or involving a sum of more than $5,000 where the same relates to a component part of any work, the combined cost of which exceeds $25,000, except for expenditures made and obligations incurred pursuant to and specifically set forth in a construction budget approved by the General Partners (the "Construction Budget") or for such matters as may be otherwise expressly delegated to the Developer by the General Partners;

(d)     Making any expenditure or incurring any obligation which, when added to any other expenditure, exceeds the Construction Budget or any line item specified in the

Construction Budget, except for such matters as may be otherwise expressly delegated in writing to the Developer by the General Partners; or

(e)     Expending more than what the Developer in good faith believes to be the fair and reasonable market value at the time and place of contracting for any goods purchased or leased or services engaged on behalf of the Partnership or otherwise in connection with the Apartment Complex.

Section 5.     Accounts and Records.

(a)     The Developer on behalf of the Partnership, shall keep such books of account and other records as may be required and approved by the General Partners, including, but not limited to, records relating to the costs of rehabilitation and rehabilitation advances. The Developer shall keep vouchers, statements, receipted bills and invoices and all other records, in the form approved by the General Partners, covering all collections, if any, disbursements and other data in connection with the Apartment Complex prior to the Completion Date. All accounts and records relating to the Apartment Complex, including all correspondence, shall be surrendered to the Partnership, upon demand without charge therefor.

(b)     All books and records prepared or maintained by the Developer shall be kept and maintained at all times at the place or places approved by the General Partners, and shall be available for and subject to audit, inspection and copying by the Management Agent, the General Partners or any representative or auditor thereof or supervisory or regulatory authority, at the times and in the manner set forth in the Partnership Agreement.

Section 6.     Development Fees.

For its services in connection with the development of the Apartment Complex and the supervision of the rehabilitation of the Apartment Complex, and as reimbursement for Development Advances, the Developer shall receive a fee (the "Development Fee") in the amount of $1,663,945. $332,789 of such fee was earned by the Developer as of the date hereof and shall be accrued as of the date hereof. The remainder of the Development Fee shall be deemed to have been earned as and when the Developer's services are rendered, and such Development Fee shall be paid out of Designated Construction Proceeds, provided, however, that other than $230,000 of the Development Fee paid from the proceeds of the Development Fee Bridge Loan, no Development Fee shall be paid prior to the payment of the Fourth Installment, not more than $273,224 of the Development Fee shall be paid out of the proceeds of the Fourth Installment, and not more than an additional $706,401 of the Development Fee shall be paid prior to the payment of the Fifth Installment. If Designated Construction Proceeds are insufficient to pay the Development Fee, such unpaid amounts shall be paid out of Cash Flow and/or Capital Proceeds as set forth in Section 10.2 of the Partnership Agreement. In any event, the General Partners shall cause the Partnership to pay such Development Fee only after the payment of all Development Costs (other than the Development Fee). If the Development Fee has not been fully paid by the twelfth (12th) anniversary of the Completion Date, the General Partners shall make a Capital Contribution to the Partnership in an amount sufficient to enable the Partnership to pay any unpaid portion of the Development Fee.

Section 7.    Applicable Law.

This Agreement, and the application or interpretation hereof, shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

Section 8.    Binding Agreement.

This Agreement shall be binding on the parties hereto, their heirs, executors, personal representatives, successors and assigns.  As long as the Developer is not in default under this Agreement, the obligation of the Partnership to pay the Development Fee shall not be affected by any change in the identity of the General Partners of the Partnership.

Section 9.    Headings.

All section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any section.

Section 10.    Terminology.

All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders, the singular shall include the plural, and vice versa as the context may require.

Section 11.    Benefit of Agreement.

The obligations and undertakings of the Developer set forth in this Agreement are made for the benefit of the Partnership and its Partners and shall not inure to the benefit of any creditor of the Partnership other than a Partner, notwithstanding any pledge or assignment by the Partnership of this Agreement or any rights hereunder.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

PARTNERSHIP:

ROCKLAND PLACE APARTMENTS LIMITED PARTNERSHIP, a Massachusetts limited partnership, by its general partners:

ROCKLAND PLACE APARTMENTS, LLC, a Massachusetts limited liability company, by Connolly and Partners, LLC, its Manager

By: _____
       William Connolly, Manager


OMNI ROCKLAND DEVELOPMENT CORPORATION, a Massachusetts corporation

By: _____
       Joseph Caffey, President

DEVELOPER:

ROCKLAND PLACE DEVELOPERS LLC, a Massachusetts limited liability company, by Connolly and Partners, LLC, its Manager

By: _____
       William Connolly, Manager

# 3926502_v6

- 9 -

**EXHIBIT D**

## FUNDING AGREEMENT

Agreement this 14 day of September, 2006, by and between Rockland Place Apartments, LLC ("Rockland"), a Massachusetts limited liability company with an address c/o Connolly and Partners, 8 Faneuil Hall Marketplace, Boston, MA; First Hartford Corporation ("First Harford"), a Maine corporation with an address of 149 Colonial Road, Manchester, CT; Omni Development Corporation ("Omni Development"), a Rhode Island non-profit corporation with an address of 810 Eddy Street, Providence, Rhode Island, and Omni Rockland Development Corporation ("Omni Rockland"), a Massachusetts corporation with an address of 810 Eddy Street, Providence, Rhode Island.

WHEREAS, Rockland is the Managing General Partner and Omni Rockland is a general partner in Rockland Place Apartments Limited Partnership ("Partnership"), a Massachusetts limited partnership; and

WHEREAS, the Partnership intends to purchase Rockland Place Apartments a/k/a Springate Apartments ("Development") in Rockland, Massachusetts; and

WHEREAS, the Partnership intends to finance the purchase and rehabilitation of the Development through loans from the Massachusetts Housing Finance Agency ("MassHousing"), the Massachusetts Housing Partnership Fund Board ("Fund Board") and through capital contributions made to the Partnership by an affiliate of Boston Capital Corporation ("Boston Capital") because of the low income housing tax credits available to the Partnership; and

WHEREAS, MassHousing has various capital requirements that need to be funded now or in the future by Rockland and Omni Rockland and/or Omni Development ("Funding Requirements"); and

WHEREAS, Boston Capital has certain guaranty requirements that need to be provided by First Hartford and Omni Development ("Boston Capital Guarantees"); and

WHEREAS, the Funding Requirements include a six (6%) percent letter of credit ("MassHousing Letter of Credit") in the amount of $342,000 until the completion of construction contemplated for the Development in accordance with the terms of a Development Fund Agreement between MassHousing and the Partnership; and

WHEREAS, the Funding Requirements also require a cash escrow or a letter of credit after the completion of said construction in the amount of $342,000 (the "Operating Escrow"), also in accordance with the terms of the Development Fund Agreement between MassHousing and the Partnership; and

WHEREAS, Rockland has agreed to provide the entire MassHousing Letter of Credit and Operating Escrow;

NOW THEREFORE, the parties agree to follow:

1.   Rockland, First Hartford or their nominee will provide the MassHousing Letter of Credit and Operating Escrow.

2.   Rockland, First Hartford or its nominee have advanced substantial pre-closing funds for the benefit of the Partnership, the payment of which has been approved by MassHousing as partnership expenses not offset from developer's fees. The parties agree that said advances will be reimbursed from loan or equity proceeds, if available, at the initial closing with

2

MassHousing. It is understood that no interest shall be due to Rockland, First Hartford or its nominee on account of any funds advanced by them to the Partnership prior to closing.   The parties agree that the $25,000 advanced by Omni Development for the benefit of the Partnership will be reimbursed to Omni Development at the closing, without interest.

3.     In the event that funds which were or are advanced to the Partnership, whether pre or post closing by Rockland, First Hartford or its nominee are not approved for payment by MassHousing, then the parties will discuss whether the funds are proper Partnership expenses. In the event that they are proper Partnership expenses, the funds will be paid by the Partnership, even if such payment will reduce the available development fee due to Rockland Place Developers LLC. If the funds are not proper Partnership expenses, the funds will be paid solely from the funds due to Rockland, First Hartford or its nominee. In the event of a dispute as to whether the funds are proper Partnership expenses, the determination will be submitted to Arbitration, and the results of the Arbitration will be binding on the parties.   In no event will overhead costs of Rockland, First Hartford, Connolly and Partners, Omni Development, Omni Rockland, or their nominees be reimbursed to them from Partnership funds or funds otherwise available for the payment of development fees. The payment of consulting fees to Mr. Connolly (unrelated to William Connolly) and Thomas Rath will be deemed proper Partnership expenses up to a

maximum payment of $150,000, but will not be approved as Partnership expenses to the extent that they exceed $150,000.

4.   Rockland, First Hartford or its nominee shall be solely responsible for the funds due by the Partnership in connection with unanticipated construction related costs without contribution from Omni Development or Omni Rockland, including any deduction from the development fee due to Rockland Place Developers LLC, Omni Development or Omni Rockland. Funds due from the Partnership due to operational shortfalls, to the extent causing a deduction from the development fee due, shall be borne equally by the members of Rockland Place Developers LLC.

5.   In the event that Omni fails to contribute additional capital pursuant to the terms of the Rockland Place Developers LLC operating agreement, then rather than have its percentage interest recalculated, the funds not advanced shall be deemed due and payable from the funds otherwise due to either Omni or Omni Rockland on account of the Development and/or the Partnership agreement, with interest at the rate of Wall Street Journal prime rate, plus 1%.

6.   Partnership and Rockland Place Developers LLC agree to not engage any non-routine consultants post closing for which a contribution is required of Omni Development or Omni Rockland or for which payment will affect the funds otherwise due and payable to Rockland Place Developers LLC, without the prior written approval of Omni Rockland or Omni Development. Rockland further agrees to provide Omni Development

and/or Omni Rockland with a copy of the annual Partnership audited financial statement and tax returns, and will provide for the signature of Omni Development on all Rockland Place Developers LLC checks, and will, on a timely basis, provide copies of any legal notices received by the Partnership from time to time. Any funds received by Rockland Place Developers LLC will be disbursed on a timely basis to the members without holdback.

7. In the event that payment is due under any of the Boston Capital Guarantees, the payments shall be funded from funds due to Rockland Place Developers LLC. To the extent that the funds due to Rockland Place Developers LLC, Omni Rockland, and/or Omni Development on account of the Development are not sufficient to satisfy said obligations, the funds shall be paid solely by Rockland, First Hartford or its nominee. The share of the funds which, but for the preceding sentence, would have been the obligation of Omni Development and/or Omni Rockland, will be reimbursed to Rockland, First Hartford or its nominee from funds that are subsequently due to Rockland Place Developers LLC, Omni Development and/or Omni Rockland, whether on account of developer's fees or other funds due under the Partnership agreement, with interest at the rate of the Wall Street Journal Prime rate plus 1%.

8. The intent of this agreement is to assure that neither Omni Development nor Omni Rockland shall be required to advance any monies on account of Development, including the return of any development fee or other

distributions from the Partnership paid to Omni Development or Omni Rockland.

Executed on the day mentioned above.

Rockland Place Apartments, LLC
Connolly and Partners, LLC Manager

By:_____
    William Connolly, Manager

First Hartford Corporation


By:_____
    Neil Ellis, President


Omni Development Corporation


By:_____
    Joseph Caffey, President

Omni Rockland Development Corporation


By:_____
    Joseph Caffey, President

6

distributions from the Partnership paid to Omni Development or Omni Rockland.

Executed on the day mentioned above.

Rockland Place Apartments, LLC
Connolly and Partners, LLC Manager

By:_____
    William Connolly, Manager

First Hartford Corporation

By:_____
    Neil Ellis, President

Omni Development Corporation

By:_____
    Joseph Caffey, President

Omni Rockland Development Corporation

By:_____
    Joseph Caffey, President

6

distributions from the Partnership paid to Omni Development or Omni

Rockland.

Executed on the day mentioned above.

Rockland Place Apartments, LLC
Connolly and Partners, LLC Manager


By:_____
      William Connolly, Manager

First Hartford Corporation


By: *Neil Ellis*
      Neil Ellis, President


Omni Development Corporation


By:_____
      Joseph Caffey, President

Omni Rockland Development Corporation


By:_____
      Joseph Caffey, President

6

**EXHIBIT E**

## GUARANTY AGREEMENT

This Guaranty Agreement (this "Guaranty") is made as of November 1, 2006, by FIRST HARTFORD CORPORATION, a Maine corporation ("First Hartford"), and OMNI DEVELOPMENT CORPORATION, a Rhode Island corporation ("Omni," and together with First Hartford, the "Guarantors"), in favor of BOSTON CAPITAL CORPORATE TAX CREDIT FUND XXV, A LIMITED PARTNERSHIP, a Massachusetts limited partnership ("Fund 25") and BOSTON CAPITAL CORPORATE TAX CREDIT FUND XXVI, A LIMITED PARTNERSHIP, a Massachusetts limited partnership ("Fund 26," and collectively with Fund 25, the "Investment Limited Partner"), and their successors and assigns.

## RECITALS

WHEREAS, reference is hereby made to the First Amended and Restated Agreement of Limited Partnership, dated as of November 1, 2006 (the "Partnership Agreement") of ROCKLAND PLACE APARTMENTS LIMITED PARTNERSHIP, a Massachusetts limited partnership (the "Partnership");

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Partnership Agreement;

WHEREAS, First Hartford is an Affiliate of ROCKLAND PLACE APARTMENTS, LLC, a Massachusetts limited liability company ("RPALLC"), and Omni is the sole shareholder of OMNI ROCKLAND DEVELOPMENT CORPORATION, a Massachusetts corporation ("ORDC," and collectively with RPALLC, the "General Partners"), which are the General Partners of the Partnership;

WHEREAS, Rockland Place Developers LLC, a Massachusetts limited liability company (the "Developer"), is the Developer of the Apartment Complex and has entered into a Development Agreement with the Partnership;

WHEREFORE, to induce the Investment Limited Partner to acquire an interest in the Partnership, to enter into the Partnership Agreement and to become the Investment Limited Partner of the Partnership, the undersigned Guarantors hereby unconditionally and jointly and severally guarantee to the Investment Limited Partner the prompt and full payment and due and punctual performance of the payment and obligations described below in this Guaranty (collectively, the "Guaranteed Obligations"), this Guaranty being upon the following terms and conditions:

1.     The Guarantors hereby unconditionally and irrevocably guarantee to the Investment Limited Partner the punctual payment when due, and at all times thereafter, of each and every obligation of the General Partners and the Developer to make any payment or advance any funds under the terms and conditions of the Partnership Agreement and the Development Agreement, including without limitation, the General Partners' obligation to make their Capital Contributions as set forth in Sections 4.2 and 6.12(a) of the Partnership Agreement, the General Partners' obligation to make any payments required by the terms of Section 5.1 of the Partnership Agreement, the General Partners' obligation to repurchase the Interest of the

Investment Limited Partner and/or the Special Limited Partner pursuant to the terms of Section 5.2 of the Partnership Agreement, the General Partners' obligation to make payments and fund certain reserves pursuant to Section 6.5 of the Partnership Agreement, the General Partners' obligation to make certain indemnity payments pursuant to the terms of Section 6.9 of the Partnership Agreement, the General Partners' obligation to advance Subordinated Loans and other funds pursuant to the terms of Sections 6.5 and 6.10 of the Partnership Agreement, the Developer's obligation to make payments necessary to satisfy the terms and conditions of Section 6.11 of the Partnership Agreement and Section 2 of the Development Agreement and the General Partners' and the Developer's obligation to make any other payments pursuant to the terms and conditions of the Partnership Agreement and the Development Agreement.

2.   The Guarantors additionally hereby unconditionally and irrevocably guarantee to the Investment Limited Partner the due and punctual performance of all other obligations of the General Partners and the Developer pursuant to the terms of the Partnership Agreement and the Development Agreement, including without limitation, the General Partners' duties and obligations set forth in Section 6.5 and Section 6.6 of the Partnership Agreement, the General Partners' and Developer's obligation to cause the completion of the rehabilitation of the Apartment Complex and the achievement of Rental Achievement pursuant to the terms of the Development Agreement and Section 6.11 of the Partnership Agreement and all of the other obligations of the General Partners and the Developer as set forth in the Partnership Agreement and the Development Agreement.

If any of the obligations of the General Partners or the Developer are not complied with, in any respect whatsoever, and without the necessity of any notice from the Investment Limited Partner to the Guarantors, the Guarantors agree to (i) assume all responsibility for the completion of the rehabilitation of the Apartment Complex and, at the Guarantors' own cost and expense, cause the rehabilitation of the Apartment Complex to be fully completed and Rental Achievement to be achieved in accordance with the Plans and Specifications, the Partnership Agreement and the Development Agreement, (ii) pay all bills in connection with the rehabilitation of the Apartment Complex and the achievement of Rental Achievement and (iii) indemnify and hold harmless the Investment Limited Partner from any and all Adverse Consequences that the Investment Limited Partner may suffer by reason of any such non-compliance period.

3.   This Guaranty is an absolute, irrevocable, unconditional and joint and several guaranty of payment and performance, except that as to the General Partner's obligation to make Subordinated Loans under Section 6.10 of the Partnership Agreement only, in which case First Hartford shall guarantee only RPALLC's obligations, and Omni shall guarantee only ORDC's obligations under such section. The Guarantors shall be liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guaranty, as a primary obligor. This Guaranty shall be effective as a waiver of, and the Guarantors hereby expressly waive, any and all rights to which the Guarantors may otherwise have been entitled under any suretyship laws in effect from time to time.

4.   Subject to any rights and remedies of the General Partners set forth in the Partnership Agreement, in the event of a default by any General Partner or the Developer in the payment or performance of the Guaranteed Obligations, or any part thereof,  when such

indebtedness or performance becomes due, the Guarantors shall, on demand and without presentment, protest, notice of protest, further notice of non-payment or of dishonor or of default or non-performance, or any other notice whatsoever, without any notice having been given to the Guarantors previous to such demand of the acceptance by the Investment Limited Partner of this Guaranty, and without any notice having been given to the Guarantors previous to such demand of the creating or incurring of such obligation to pay or perform, all such notices being hereby waived by the Guarantors, pay the amount due thereon to the appropriate party or perform or observe the agreement, covenant, term or condition of the Partnership Agreement or the Development Agreement, as the case may be, and it shall not be necessary for the Investment Limited Partner, in order to enforce such payment or performance by the Guarantors, first to institute suit or pursue or exhaust any rights or remedies against the Partnership or others liable for such payments or performance, or to enforce any rights against any security that ever shall have been given to secure such payments or performance, or to join the Partnership or any others liable for the payment or performance of the Guaranteed Obligations or any part thereof in any action to enforce this Guaranty, or to resort to any other means of obtaining payment or performance of the Guaranteed Obligations.

5.     Any time that the Investment Limited Partner is entitled to exercise its rights or remedies hereunder, it may in its discretion elect to demand payment and/or performance. If the Investment Limited Partner elects to demand performance, it shall at all times thereafter have the right to demand payment until all of the Guaranteed Obligations have been paid and performed in full. If the Investment Limited Partner elects to demand payment, it shall at all times thereafter have the right to demand performance until all of the Guaranteed Obligations have been paid and performed in full.

6.     The Guarantors hereby agree that neither the Investment Limited Partner's rights or remedies nor the Guarantors' obligations under the terms of this Guaranty shall be released, diminished, impaired, reduced or affected by any one or more of the following events, actions, facts or circumstances, and the liability of the Guarantors under this Guaranty shall be absolute and unconditional irrespective of:

(i)     any limitation of liability or recourse in any other Project Document or arising under any law;

(ii)     the taking or accepting of any other security or guaranty for, or right of recourse with respect to, any or all of the Guaranteed Obligations;

(iii)     any release, surrender, abandonment, exchange, alteration, sale or other disposition, subordination, deterioration, waste, filing to protect or preserve, impairment, or loss of, or any failure to create or perfect any lien or security interest with respect to, or any other dealings with, any collateral or security at any time existing or purported, believed or expected to exist in connection with any or all of the Guaranteed Obligations;

(iv)     whether express or by operation of law, any partial release of the liability of the Guarantors hereunder, or if one or more guaranties are now or hereafter obtained by the Investment Limited Partner covering all or any part of the Guaranteed Obligations, any complete or partial release of any one or more of such guarantors under any such

other guaranty, for the payment or performance of any or all of the Guaranteed Obligations;

(v)     the death, insolvency, bankruptcy, disability, dissolution, liquidation, termination, receivership, reorganization, merger, consolidation, change of form, structure or ownership, sale of all or substantially all of the assets, or lack of corporate, partnership or other power of the Guarantors, any General Partner, the Developer, the Partnership or any other party at any time liable for the payment or performance of any or all of the Guaranteed Obligations;

(vi)    either with or without notice to or consent of the Guarantors; any renewal, extension, modification or rearrangement of the terms of any or all of the Guaranteed Obligations and/or any of the Project Documents, including without limitation, material alterations of the terms of payment (including changes in maturity date(s) and interest rate(s)) or performance (including changes in the Plans and Specifications and other terms or aspects of the rehabilitation of the Apartment Complex) or any other terms thereof, or any waiver, termination, or release of, or consent to departure from, any of the Project Documents or any other guaranty of any or all of the Guaranteed Obligations, or any adjustment, indulgence, forbearance, or compromise that may be granted from time to time by the Investment Limited Partner to the Partnership, any General Partner, the Developer, the Guarantors, and/or any other party at any time liable for the payment or performance of any or all of the Guaranteed Obligations;

(vii)   any neglect, lack of diligence, delay, omission, failure or refusal of the Investment Limited Partner to take or prosecute (or in taking or prosecuting) any action for the collection or enforcement of any of the Guaranteed Obligations, or to foreclose or take or prosecute any action to foreclose (or in foreclosing or taking or prosecuting any action to foreclose) upon any security therefor, or to exercise (or in exercising) any other right or power with respect to any security therefor, or to take or prosecute (or in taking or prosecuting) any action in connection with any Project Document, or any failure to sell or otherwise dispose of in a commercially reasonable manner any collateral securing any or all of the Guaranteed Obligations (excepting only, with respect to any such sale or other disposition of collateral, any such requirement imposed at the time in question by then-applicable law and not waivable by the Guarantors, and the Guarantors agreeing, with respect to any such sale or other disposition that ten days' notice shall constitute reasonable notification; and provided that, except for any such non-waivable requirement applicable to any sale or other disposition of any such collateral, no provision of this Guaranty shall be construed to limit or otherwise adversely affect the Investment Limited Partner's absolute and discretionary rights (subject to the terms of the Partnership Agreement), as set forth in this Guaranty, to release and/or otherwise deal or fail to deal with any such collateral without affecting or impairing the Guarantors' liability hereunder);

(viii)  any failure of the Investment Limited Partner to notify the Guarantors of any creation, renewal, extension, rearrangement, modification, supplement or assignment of the Guaranteed Obligations or any part thereof, or of any Project Document, or of any release of or change in any security or of any other action taken or refrained from being

taken by the Investment Limited Partner against the Partnership, any General Partner or the Developer or any security or other recourse or of any new agreement between the Investment Limited Partner and the Partnership, any General Partner or the Developer, it being understood that the Investment Limited Partner shall not be required to give the Guarantors any notice of any kind under any circumstances with respect to or in connection with the Guaranteed Obligations, any and all rights to notice the Guarantors may have otherwise had being hereby waived by the Guarantors (excepting only any notice, if any, required at the time in question by then-applicable law and not waivable by the Guarantors);

(ix)   if for any reason the Investment Limited Partner is required to refund any payment by any General Partner or the Developer to any other party liable for the payment or performance of any or all of the Guaranteed Obligations or pay the amount thereof to someone else;

(x)   the existence of any claim, set-off or other right that the Guarantors may at any time have against any General Partner, the Developer, the Investment Limited Partner, or any other Person, whether or not arising in connection with this Guaranty, or any other Project Document (provided, that nothing contained herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim); or

(xi)   the unenforceability of all or any part of the Guaranteed Obligations against any General Partner or the Developer, whether because the Guaranteed Obligations exceed the amount permitted by law or violate any usury laws, or because the act of creating the Guaranteed Obligations, or any part thereof, is _ultra vires_, or because the officers or Persons creating same acted in excess of their authority, or because of a lack of validity or enforceability of or defect or deficiency in any of the Project Documents, or because any General Partner or the Developer has any valid defense, claim or offset with respect thereto (except as specifically set forth in the Partnership Agreement), or because any General Partner's or the Developer's obligation ceases to exist by operation of law, or because of any other reason or circumstance.

7.   In the event any payment by any General Partner or the Developer or any other party to the Investment Limited Partner or any other appropriate party is held to constitute a preference, a fraudulent transfer or other voidable payment under any bankruptcy, insolvency or similar law, or if for any other reason the Investment Limited Partner or any other appropriate party is required to refund such payment or pay the amount thereof to any other party, such payment by such General Partner or the Developer or any other party to the Investment Limited Partner shall not constitute a release to the Guarantors from any liability hereunder, and this Guaranty shall continue to be effective or shall be reinstated (notwithstanding any prior release or discharge by the Investment Limited Partner of this Guaranty or of the Guarantors), as the case may be, with respect to, and this Guaranty shall apply to, any and all amounts so refunded by the Investment Limited Partner or paid by the Investment Limited Partner to another party (which amounts shall constitute part of the Guaranteed Obligations), and any interest paid by the Investment Limited Partner and any attorneys' fees, costs and expenses paid or incurred by the Investment Limited Partner in connection with any such event. It is the intent of the Guarantors and the Investment Limited Partner that the obligations and liabilities of the Guarantors

hereunder are absolute and unconditional under any and all circumstances and that until the Guaranteed Obligations are fully and finally paid and performed, and are not subject to refund or disgorgement, the obligations and liabilities of the Guarantors hereunder shall not be discharged or released, in whole or in part, by any act or occurrence that might, but for the provisions of this Guaranty, be deemed a legal or equitable discharge or release of a guarantor.

8.     Notwithstanding anything to the contrary in this Guaranty, the Guarantors do not waive any claims against the Investment Limited Partner based on the failure of the Investment Limited Partner to make any payments or Capital Contributions as and when the same are due under the terms of the Partnership Agreement or any other default by the Investment Limited Partner under the terms of the Partnership Agreement. This Guaranty is for the benefit of the Investment Limited Partner and the Investment Limited Partner's successors and assigns and in the event of an assignment of the Guaranteed Obligations, or any part, thereof, the rights and benefits hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred with such Guaranteed Obligations. The Guarantors waive notice of any transfer or assignment of the Guaranteed Obligations, or any part thereof, and agree that neither the failure to give notice of such an assignment nor the assignment itself will affect the liabilities of the Guarantors hereunder.

9.     This Guaranty is binding not only on the Guarantors, but also on the Guarantors' heirs, personal representatives, successors and assigns. Upon the death of the Guarantors, this Guaranty shall continue against the Guarantors' estate as to all of the Guaranteed Obligations, including that portion incurred or arising after the death of the Guarantors and shall be provable in full against the Guarantors' estate, whether or not the Guaranteed Obligations are then due and payable.

10.    This Guaranty shall be governed by and construed in accordance with the internal law of the Commonwealth of Massachusetts. All obligations of the Guarantors hereunder are payable and performable at the place or places where the Guaranteed Obligations are payable and performable. This Guaranty may not be modified, amended or terminated except by a written agreement by and between the Investment Limited Partner and the undersigned Guarantors.

11.    If any provision of this Guaranty or the application thereof to any Person or circumstance shall, for any reason and to any extent, be judicially declared to be invalid or unenforceable, neither the remaining provisions of this Guaranty nor the application of such provision to any other Person or circumstance shall be affected thereby, and the remaining provisions of this Guaranty, or the applicability of such provision to other Persons or circumstances, as applicable, shall remain in effect and be enforceable to the maximum extent permitted by applicable law.

12.    The Guarantors shall pay on demand all reasonable attorneys' fees and other costs and expenses incurred by the Investment Limited Partner in the enforcement of or preservation of the Investment Limited Partner's rights under this Guaranty. The Guarantors agree to pay interest on any expenses or other sums due to the Investment Limited Partner under this Section 12 that are not paid when due, at a rate equal to the Prime Rate plus three percent (3%). The Guarantors' obligations and liabilities under this Section 12 shall survive any payment or

discharge in full of the Guaranteed Obligations. It is not the intention of the Investment Limited Partner or the Guarantors to obligate the Guarantors to pay interest in excess of that lawfully permitted to be paid by the Guarantors under applicable law. Should it be determined that any portion of the Guaranteed Obligations or any other amount payable by the Guarantors under this Guaranty constitutes interest in excess of the maximum amount of interest that the Guarantors, in the Guarantors' capacity as guarantor, may lawfully be required to pay under applicable law, the obligation of the Guarantors to pay such interest shall automatically be limited to the payment thereof in the maximum amount so permitted under applicable law. The provisions of this Section 12 shall override and control all other provisions of this Guaranty and of any other agreement between the Guarantors and the Investment Limited Partner.

13.     Any notice, request, demand, consent, approval or other communication given hereunder, or (unless otherwise provided therein) under any of the instruments or documents referred to or contemplated hereby, or in connection herewith shall be in writing and shall be deemed to have been given if sent by (i) registered or certified mail, return receipt requested, postage and fees prepaid, (ii) or nationally recognized overnight delivery service, (iii) telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case addressed to the party hereto to receive such notice at her or its respective address as follows:

(a)     If to the undersigned Guarantors, at 150 Colfax Street, Providence, RI 02905, Attention: John Caffey, and 8 Faneuil Hall Marketplace, Boston, MA 02109, Attention: William Connolly, with a copy to Chace Ruttenberg & Freedman, LLP, One Park Row, Suite 300, Providence, RI 02903, Attention: Robert B. Berkelhammer, and 50 Franklin Street, Suite 3A, Boston, MA 02110, Attention: Edward M. Doherty, Esq.; and

(b)     if to the Investment Limited Partner, c/o Boston Capital Partners, Inc., One Boston Place, 21st Floor, Boston, MA 02108, Attention: Amy Coghlin, with a copy to Douglas W. Clapp, Esq., Holland & Knight LLP, 10 St. James Avenue, Boston, MA 02116.

14.     The exercise by the Investment Limited Partner of any right or remedy hereunder or under any other Project Document or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy. The Investment Limited Partner shall have all rights, remedies and recourses afforded to the Investment Limited Partner by reason of this Guaranty or any Project Document or by law or equity or otherwise, and the same (i) shall be cumulative and concurrent, (ii) may be pursued separately, successively or concurrently against the Guarantors or others obligated for the Guaranteed Obligations, or any thereof, or against any one or more of them, or against any security or otherwise, at the sole discretion of the Investment Limited Partner, (iii) may be exercised as often as occasion therefor shall arise, it being agreed by the Guarantors that the exercise of, discontinuance of the exercise of or failure to exercise any of such rights, remedies or recourses shall in no event be construed as a waiver or release thereof or of any other right, remedy or recourse and (iv) are intended to be, and shall be, non-exclusive. No waiver of any default on the part of the Guarantors or of any breach of any of the provisions of this Guaranty or of any other document shall be considered a waiver of any other or subsequent default or breach, and no delay or omission in exercising or enforcing the rights and powers granted herein or in any other document shall be construed as a waiver of such rights and powers, and no exercise or enforcement of any rights or powers hereunder or under any other document shall be held to exhaust such rights and powers, and every such right and power may

be exercised from time to time. The granting of any consent, approval or waiver by the Investment Limited Partner shall be limited to the specific instance and purpose therefor and shall not constitute consent or approval in any other instance or for any other purpose. No notice to or demand on the Guarantors in any case shall of itself entitle the Guarantors to any other or further notice or demand in similar or other circumstances. No provision of this Guaranty or any right, remedy or recourse of the Investment Limited Partner with respect hereto, or any default or breach, can be waived, nor can this Guaranty or the Guarantors be released or discharged in any way or to any extent, except specifically in each case by a writing intended for that purpose (and which refers specifically to this Guaranty) executed, and delivered to the Guarantors, by the Investment Limited Partner.

15.     The Guarantors at the Guarantors' expense will promptly execute and deliver to the Investment Limited Partner upon the Investment Limited Partner's request all such other and further documents, agreements and instruments necessary to accomplish and enforce the agreements of the Guarantors under this Guaranty.

16.     Time shall be of the essence in this Guaranty with respect to all of the Guarantors' obligations hereunder.

17.     This Guaranty embodies the entire agreement between the Investment Limited Partner and the Guarantors with respect to the guaranty by the Guarantors of the Guaranteed Obligations. This Guaranty supersedes all prior agreements and understandings, if any, with respect to the guaranty by the Guarantors of the Guaranteed Obligations. No condition or conditions precedent to the effectiveness of this Guaranty exist. This Guaranty shall be effective upon execution by the Guarantors and delivery to the Investment Limited Partner.

IN WITNESS WHEREOF, the Guarantors duly executed this Guaranty as of the date first written above.

GUARANTORS:

FIRST HARTFORD CORPORATION, a Maine corporation

By: _____

OMNI DEVELOPMENT CORPORATION, a Rhode Island corporation

By: _____

- 9 -

# 3926509_v6